No. 23-8065

# In the United States Court of Appeals for the Tenth Circuit

JAYLYN WESTENBROEK, ET AL.,

*Plaintiffs-Appellants*,

v.

KAPPA KAPPA GAMMA FRATERNITY, AN OHIO NON-PROFIT CORPORATION AS NOMINAL DEFENDANT AND AS A DIRECT DEFENDANT, ET AL.,

*Defendants-Appellees*,

ARTEMIS LANGFORD,

*Defendant.*

On Appeal from the United States District Court for the District of Wyoming
No. 2:23-CV-00051-ABJ, Hon. Alan B. Johnson

## BRIEF OF APPELLANTS

GENE C. SCHAERR
CRISTINA MARTINEZ SQUIERS
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com

SYLVIA MAY MAILMAN
INDEPENDENT WOMEN'S LAW CENTER
1802 Vernon Street NW, Suite 1027
Washington, DC 20009
Telephone: (202) 807-9986
s.maymailman@gmail.com

JOHN KNEPPER
LAW OFFICE OF JOHN G. KNEPPER, LLC
P.O. Box 1512
Cheyenne, WY 82003
Telephone: (307) 632-2842
John@KnepperLLC.com

CASSIE CRAVEN
LONGHORN LAW LLC
109 East 17th Street, Suite 223
Cheyenne, WY 82001
Telephone: (307) 823-3062
cassie@longhornlawllc.com

*Counsel for Plaintiffs-Appellants*

DECEMBER 4, 2023

**\*ORAL ARGUMENT IS REQUESTED**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF RELATED CASES ............................................... viii

INTRODUCTION ................................................................................1

JURISDICTION..................................................................................3

ISSUES ..............................................................................................4

STATEMENT OF THE CASE .............................................................5

    A.    Facts ......................................................................................5

        1.    Kappa Was Founded as a Single-Sex Haven for Collegiate Women. ..................................................................5

        2.    Defendants Have Subverted Kappa's Mission and Governing Documents by Changing the Definition of "Woman" Without Following the Required Processes. ..................................8

        3.    Defendants Have Further Subverted Kappa's Governing Documents by Admitting Langford through Coercion and Voting Irregularities. .....................................................10

        4.    Langford's Admission Harmed the Sorority Holistically and Plaintiffs Individually.....................................................11

    B.    Procedural History ...............................................................13

SUMMARY OF ARGUMENT AND STANDARD OF REVIEW.......................17

ARGUMENT .....................................................................................18

    I.    The District Court Erred in Dismissing Plaintiffs' Derivative Claim Against Defendants Kappa and Rooney..................................18

        A.    Plaintiffs Met the Procedural Requirements of Their Derivative Claim, and the Rule of Non-Interference Does Not Apply to That Claim.......................................................18

        B.    Corporations Have No First Amendment Right to Disregard the Terms of Their Governing Documents. ...................................23

C.    Plaintiffs Have Sufficiently Alleged Defendants' Fiduciary Breach Due to Their Failure to Follow Kappa's Governing Documents That Define "Woman" as a Biological Female. .........27

1.    The Court applies the plain and ordinary meaning of common words. ....................................................................29

2.    Kappa's governing documents (its contracts) have always defined "woman" as a biological female. ................30

3.    Kappa has never changed the definition of "woman." ........34

4.    "Woman" is not an ambiguous term open to an evolving interpretation. .........................................................36

II.    The District Court Erred in Dismissing Plaintiffs' Direct Action Because Plaintiffs Were Separately and Distinctly Injured by Defendants' Admission of Langford into the Wyoming Chapter. ...........40

CONCLUSION .........................................................................................42

ORAL ARGUMENT STATEMENT ........................................................44

CERTIFICATE OF COMPLIANCE ........................................................45

CERTIFICATE OF DIGITAL SUBMISSION .........................................46

ATTACHMENT:

August 25, 2023 Order of Hon. Alan B. Johnson, U.S. District Judge, Granting Defs.' Mot. to Dismiss (ECF No. 19), Dismissing, Without Prejudice, Pls.' First Am. Verified Member Derivative Compl. for Breach of Fiduciary Duties (ECF No. 6), and Dismissing as Moot Def. Artemis Langford's Mot. to Dismiss (Mar. 3, 2023), ECF No. 31

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Alexander v. Buckeye Pipe Line Co.*,
374 N.E.2d 146 (Ohio 1978) ................................................................. 30, 36, 39

*Aultman Hosp. Ass'n v. Cmty. Mut. Ins. Co.*,
544 N.E.2d 920 (Ohio 1989) ...................................................................... 29, 38

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................ 17

*Bonacci v. Ohio Highway Express, Inc.*,
No. 60825, 1992 WL 181682 (Ohio Ct. App. July 30, 1992) ............................ 20

*Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020) .......................................... 33, 39

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) ..................................................... 24

*Browning v. Fraternal Ord. of Eagles*,
No. 1769, 1986 WL 9644 (Ohio Ct. App. Aug. 22, 1986) ................................. 25

*Carlson v. Rabkin*, 789 N.E.2d 1122 (Ohio Ct. App. 2003) ................. 14, 20, 28, 42

*Carr v. Acacia Country Club Co.*,
970 N.E.2d 1198 (Ohio Com. Pl. 2011) ............................................................ 28

*Cincinnati Camp Meeting Ass'n of Methodist Episcopal Church
v. Danby*, 56 N.E.2d 694 (Ohio Ct. App. 1943) ................................................. 23

*Cincinnati Ins. Co. v. CPS Holdings, Inc.*,
875 N.E.2d 31 (Ohio 2007) .............................................................................. 30

*Crosby v. Beam*,
548 N.E.2d 217 (Ohio 1989) ...................................................................... 40, 41

*DiPasquale v. Costas*,
926 N.E.2d 682 (Ohio Ct. App. 2010) ............................................................... 28

*Eastom v. City of Tulsa*,
783 F.3d 1181 (10th Cir. 2015) ......................................................................... 4

*Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 678 N.E.2d 519 (Ohio 1997).............................................. 29, 30

*Frank v. Crawley Petroleum Corp.*,
992 F.3d 987 (10th Cir. 2021) ...............................................................4

*Gee v. Pacheco*,
627 F.3d 1178 (10th Cir. 2010) ...........................................................30

*Graham v. Drydock Coal Co.*,
667 N.E.2d 949 (Ohio 1996)................................................................38

*Heaton v. Rohl*,
954 N.E.2d 165 (Ohio Ct. App. 2011)..................................................40

*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos.*,
515 U.S. 557 (1995).......................................................................... 24, 25

*In re Ferro Corp. Derivative Litig.*,
511 F.3d 611 (6th Cir. 2008)................................................................19

*Int'l Bhd. of Elec. Workers Local Union No. 8 v. Gromnicki*,
745 N.E.2d 449 (Ohio Ct. App. 2000).................................... 20, 25, 26

*Kelly v. Med. Life Ins. Co.*,
509 N.E.2d 411 (Ohio 1987)................................................................30

*Lutz v. Chesapeake Appalachia, L.L.C.*,
71 N.E.3d 1010 (Ohio 2016)......................................................... 36, 37

*Maas v. Maas*, 161 N.E.3d 863 (Ohio Ct. App. 2020) ..........................42

*Milkie v. Acad. of Med. of Toledo & Lucas Cnty.*,
246 N.E.2d 598 (Ohio Ct. App. 1969)......................................... 23, 26

*Moya v. Schollenbarger*,
465 F.3d 444 (10th Cir. 2006) ............................................................3, 4

*Nat'l Lab. Relations Bd. v. Allis-Chalmers Mfg. Co.*,
388 U.S. 175 (1967).............................................................................26

*Ohio v. Ramirez*,
151 N.E.3d 598 (Ohio 2020)................................................................30

*Petty v. Manpower, Inc.*,
    591 F.2d 615 (10th Cir. 1979) ................................................................4

*Powell v. Ashtabula Yacht Club*,
    No. 953, 1978 WL 216074 (Ohio Ct. App. 1978) ................................. 21, 22, 23

*Putka v. First Cath. Slovak Union*,
    600 N.E.2d 797 (Ohio Ct. App. 1991) ...................................................22

*Ray v. Hidden Harbour Ass'n, Inc.*,
    104 N.E.3d 261 (Ohio Ct. App. 2018) ........................................... 27, 28

*Redden v. Alpha Kappa Alpha Sorority, Inc.*,
    No. 1:09CV705, 2010 WL 107015 (N.D. Ohio Jan. 6, 2010) ..................... 21, 23

*Reyes v. Laborers' Int'l Union of N. Am.*,
    464 F.2d 595 (10th Cir. 1972) ..............................................................26

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ............................................................................26

*Shifrin v. Forest City Enters., Inc.*,
    597 N.E.2d 499 (Ohio 1992) ...............................................................36

*Smith v. United States*,
    561 F.3d 1090 (10th Cir. 2009) ...........................................................17

*Stibora v. Greater Cleveland Bowling Ass'n*,
    577 N.E.2d 1175 (Ohio Ct. App. 1989) ......................................... 22, 23

*Strah v. Lake Cnty. Humane Soc'y*,
    631 N.E.2d 165 (Ohio Ct. App. 1993) ........................................... 23, 29

*Sutton v. Utah State Sch. for Deaf & Blind*,
    173 F.3d 1226 (10th Cir. 1999) ...........................................................17

*Tri Cnty. Tel. Ass'n, Inc. v. Campbell*,
    No. 20-8053, 2021 WL 4447909 (10th Cir. June 16, 2021) ....................4

*Tucker v. Nat'l Ass'n of Postal Supervisors*,
    790 N.E.2d 370 (Cleveland Mun. Ct. 2003) ........................................23

*Ulliman v. Ohio High Sch. Athletic Ass'n*,
   919 N.E.2d 763 (Ohio Ct. App. 2009) ..................................................... 20, 28, 31

*United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*,
   716 N.E.2d 1201 (Ohio Ct. App. 1998) ............................................................37

*Wisconsin Cent. Ltd. v. United States*,
   138 S. Ct. 2067 (2018) ......................................................................................39

**Statutes**

20 U.S.C. § 1681 ...........................................................................................7, 33

28 U.S.C. § 1291 ...................................................................................................3

28 U.S.C. § 1332 ...................................................................................................3

Ohio Rev. Code Ann. § 1702.11 .........................................................................28

Ohio Rev. Code Ann. § 1702.12 ......................................................... 14, 20, 21, 28

Ohio Rev. Code Ann. § 1702.30 ................................................................... 27, 28

**Rules**

Fed. R. App. P. 4 ....................................................................................................3

Ohio Civ. R. 23.1 ....................................................................................... 15, 18, 19

**Other Authorities**

Complaint, *Kappa Alpha Theta Fraternity, Inc., v. Harvard Univ.*,
   397 F. Supp. 3d 97 (D. Mass. 2019) (No. 1:18-cv-12485),
   2018 WL 6305759 ..............................................................................................7

Kappa Kappa Gamma Convention 2004 and Bylaws/Standing Rules
   Revisions Video, Kappa Kappa Gamma (2004) ........................................... 34, 36

Kappa Kappa Gamma Fraternity,
   By-Laws of Kappa Kappa Gamma (1870) ........................................................31

Kappa Kappa Gamma Fraternity,
   By-Laws of the Kappa Kappa Gamma Fraternity (1966) ...................................32

Kappa Kappa Gamma Fraternity,
    Constitution of Kappa Kappa Gamma (1882) ......................................................31

Kappa Kappa Gamma Fraternity,
    Constitution of Kappa Kappa Gamma (1910) ......................................................32

Kappa Kappa Gamma Fraternity,
    Constitution of Kappa Kappa Gamma (1926) ......................................................32

Denise Tessier & Gay Chuba Barry,
    *History 2000: Kappa Kappa Gamma Through the Years* (2000)................. 30, 31

*Webster's International Dictionary of the English Language*
    *Comprising the issues of 1864, 1879, and 1884*
    (Springfield, Mass., G. & C. Merriam Co. 1898)................................................31

Charles A. Wright & Arthur R. Miller,
    *Federal Practice & Procedure* (3d ed. 2023 update) .........................................34

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28.2(C)(3), Appellants state that there are no prior or related appeals.

## INTRODUCTION

Well before women were granted the right to vote or permitted to attend most colleges, a small band of women in 1870 created a single-sex sorority, Kappa Kappa Gamma ("Kappa"), to provide women the benefits of Greek-letter societies then reserved for men. Those women were wildly successful, and today Kappa boasts 210,000 living alumnae. Kappa brings these many women together through its Bylaws and other governing documents, which set out Kappa's purpose, define membership, establish fees, and create organizational structure.

The question at the heart of this case is the definition of "woman," a term that Kappa has used since 1870 to prescribe membership, in Kappa's governing documents. Using any conceivable tool of contractual interpretation, the term refers to biological females. And yet, the district court avoided this inevitable conclusion by applying the wrong law and ignoring the factual assertions in the complaint.

First, the district court fabricated obstacles to avoid considering Plaintiffs' derivative claim, including Ohio courts' reluctance to interfere with an organization's internal affairs and the First Amendment's protection of expressive association. Neither of these doctrines applies here and neither prevents Plaintiffs' claims from proceeding as a matter of law. The non-interference rule applies when plaintiffs object to an organization's internal dispute-resolution process. It does not apply when, as here, plaintiffs claim a breach of fiduciary duty. Further, the First

Amendment prohibits the government from interfering with the expressive association rights of its citizens. It does not apply to a lawsuit devoid of state actors, and it does not prohibit private plaintiffs from suing to enforce the terms of a private organization's own bylaws. An Ohio corporation is bound to act in accordance with the rules of governance it voluntarily adopts. And Kappa's Bylaws plainly exclude biological men from membership.

Second, the district court erred in ruling that Plaintiffs had not sufficiently alleged direct claims stemming from the violation of the Bylaws and other governing documents. Rather than accept Plaintiffs' allegations as true in considering dismissal, as the court must, the district court treated these allegations as irrelevant. But they are not. Plaintiffs allege personal injuries stemming from the strange and sexualized behavior of the biological male (Langford) that Kappa admitted into the sorority house that were different from the injuries to the sorority as a whole. Specifically, Langford's unwanted staring, photographing, and videotaping of the Plaintiffs, as well as his asking questions about sex and displaying a visible erection while in the house, invaded Plaintiffs' privacy and caused emotional distress in a personalized and unique way. And thus Plaintiffs have pleaded a viable direct claim. This Court should therefore reverse the district court's dismissal of Plaintiffs' derivative and direct claims.

## JURISDICTION

Plaintiffs-Appellants appeal from an order dismissing all their claims without prejudice entered August 25, 2023, by the U.S. District Court for the District of Wyoming.  App. Vol. 2 at 108.  The district court had subject-matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332.  In accordance with Federal Rule of Appellate Procedure 4(a), Plaintiffs filed a timely notice of appeal on September 25, 2023.  App. Vol. 2 at 108–09.  This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

Because the district court dismissed Plaintiffs' complaint without prejudice, Kappa has argued this Court lacks an underlying final decision.  But the dismissal of a complaint without prejudice does not mean the decision is "non-final under section 1291."  *Moya v. Schollenbarger*, 465 F.3d 444, 448 (10th Cir. 2006).  For example, where "the district court's grounds for dismissal are such that the defect cannot be cured through an amendment to the complaint, that dismissal (even if it is ambiguous or nominally of the complaint) is for practical purposes of the entire action and therefore final."  *Id.* at 450–51.

Under these settled principles, and as explained in Plaintiffs' Opposition to Defendants' Motion to Dismiss Appeal for Lack of Appellate Jurisdiction, Doc. 01011093987, the district court's decision in this case is final.  Plaintiffs cannot cure the defects the district court believed present in the First Amended Complaint

through an amendment because the district court's decision was based on "a matter going to the merits of appellant's complaint itself rather than a procedural problem which amendment of a complaint might rectify." *Petty v. Manpower, Inc.*, 591 F.2d 615, 617 (10th Cir. 1979) (per curiam); *accord Moya*, 465 F.3d at 448–49.[1]

## ISSUES

1. Whether the district court erred in holding that Ohio's non-interference rule and the First Amendment bar Plaintiffs' derivative claim, which asserts a violation of fiduciary duties for admitting a biological male in contravention of Kappa's Bylaws and governing documents.

---

[1] Further, Defendants' entire challenge to this Court's jurisdiction rests on *Eastom v. City of Tulsa*, 783 F.3d 1181 (10th Cir. 2015) ("*Eastom II*"), and its progeny. But in those cases, the Court dismissed for lack of jurisdiction given the line of cases holding that parties may not manufacture appellate jurisdiction by seeking voluntary dismissal of certain claims. *Id.* at 1184; *see also Tri Cnty. Tel. Ass'n, Inc. v. Campbell*, No. 20-8053, 2021 WL 4447909, at *7 (10th Cir. June 16, 2021) (unpublished) (citing cases). Here, by contrast, the district court granted Kappa's motion to "dismiss Plaintiffs' claims in their entirety." App. Vol. 2 at 11; *see* App. Vol. 2 at 106. And, unlike the plaintiffs in *Eastom*, Plaintiffs here do not attempt to jettison claims or defendants to facilitate federal review. Instead, "[t]here was nothing pending before the district court after it issued [the motion-to-dismiss] order." *Frank v. Crawley Petroleum Corp.*, 992 F.3d 987, 995 (10th Cir. 2021). In addition, permitting this appeal would not "lead to piecemeal appeals," nor would litigation be "interrupted and delayed." *Id.* In fact, delaying Plaintiffs' right to appeal "may be irreparable." *Id.* Plaintiffs and Kappa members across the nation are unable to benefit from the female-only space for which they contracted without this Court's immediate review of the district court's dismissal of Plaintiffs' claims.

2. Whether the district court erred in holding that Plaintiffs' alleged injuries from the admission of a biological male—including loss of privacy and emotional distress caused by that student's inappropriate behavior—were not personal injuries that would support a direct action against the Defendants.

## STATEMENT OF THE CASE

A sound understanding of the issues in this case requires some familiarity with the underlying facts (as alleged in the complaint) and the procedural history.

### A.    Facts

#### 1.    Kappa Was Founded as a Single-Sex Haven for Collegiate Women.

Plaintiffs are current and recent members of the University of Wyoming's Gamma Omicron Chapter of Kappa Kappa Gamma Fraternity, an organization founded in 1870 to bring the benefits of exclusively male Greek-letter fraternities to women.  App. Vol. 1 at 20 (¶ 25).[2]  Kappa is a non-profit corporation incorporated in Ohio.  Kappa Certificate of Incorporation [App. Vol. 1 at 128–36].  Although Kappa is officially named a "fraternity" because its founding predated the common use of the term "sorority," it is now more commonly known as a sorority.

Kappa's governing documents include its Articles of Incorporation, Bylaws, and Standing Rules.  App. Vol. 1 at 10 (¶ 3).  The Articles of Incorporation form

---

[2] Appellants' Appendix is cited as "App. Vol. __ at __."

5

Kappa's charter.  *Id.* at 28 (¶ 43).  The Standing Rules describe the process Kappa must follow when selecting a new member, and the Articles of Incorporation state that these processes must be followed by every chapter.  *Id.* at 36 (¶ 59).  The Bylaws are the code of regulations for Kappa and govern membership criteria.  *Id.*

Kappa also has certain official Policies, though these are unilaterally issued and are not governing documents.  Rather, they are "statements of intent and rules formulated by Fraternity Council to consistently *carry out* its duties as defined by the … Articles of Incorporation and the Fraternity Bylaws and Standing Rules." App. Vol. 1 at 38 (¶ 64) (emphasis added) (citing App. Vol. 1 at 222).  The Fraternity Council is Kappa's board of directors.  *Id.* at 42 (¶ 72); App. Vol. 1 at 98.

The Articles of Incorporation and Bylaws can only be amended "by a Convention by a two-thirds vote provided notice of the amendment indicating its exact content has been sent to the voting members of the Convention three months prior to the Convention."  App. Vol. 1 at 104.  The Standing Rules can only be amended through a similar process.  App. Vol. 1 at 36 (¶ 59).

Since its founding, Kappa has provided a self-described "single-sex haven" in the largely co-ed environment of college campuses.  *Id.* at 20, 22 (¶¶ 25, 32).  And all of Kappa's governing documents discussed above restrict membership to women. The Articles of Incorporation state that Kappa's purpose is "[t]o unite *women*,

through membership, in a close bond of friendship." App. Vol. 1 at 29 (¶ 47) (emphasis added) (quoting App. Vol. 1 at 132).

Kappa's Bylaws also provide that a "new member shall be a woman," *id.* at 31 (¶ 51)**,** and explicitly enshrine the sorority's legal right to have sex-based membership practices under Title IX. App. Vol. 1 at 25 (¶ 37) (quoting App. Vol. 1 at 150–51 (Art. V, Sec. 2.D.)); *see also* 20 U.S.C. § 1681(a) (forbidding discrimination "on the basis of sex" in educational programs but exempting the "membership practices" of sororities). This position is well supported by social science research that has established the importance of preserving single-sex environments for women. App. Vol. 1 at 25 (¶ 38). Indeed, women "in single-sex environments are more likely to develop higher academic, and socially competent, self-images." *Id.* As recently as 2018, Kappa supported and defended the benefits of single-sex environments for women in a lawsuit against Harvard University, in which Kappa defended its single-sex status and right to discriminate on the basis of sex under Title IX. *Id.* at 25–27 (¶¶ 39–40) (citing Complaint ¶ 93, *Kappa Alpha Theta Fraternity, Inc., v. Harvard Univ.*, 397 F. Supp. 3d 97 (D. Mass. 2019) (No. 1:18-cv-12485), 2018 WL 6305759).

Further, the Standing Rules "do not include any language that supports [the] expansion of Kappa membership" beyond women. App. Vol 1 at 36 (¶ 60). And the Policies cannot deviate from or undermine the Articles of Incorporation, Bylaws,

or Standing Rules. *Id.* at 39 (¶ 67). Thus, it is unsurprising that the Policies prohibit "Kappa members from being affiliated with a men's fraternity or allowing men to have a recognized relationship with the Sorority or a chapter." *Id.* at 38–39 (¶ 65) (citing App. Vol. 1 at 224 (Policy III)). Policy III forbids this affiliation because "[t]he activities of such groups are not conducive to harmonious chapter operations and jeopardize our single-sex status." *Id.* (emphasis omitted) (quoting App. Vol. 1 at 224 (Policy III, Sec. 2)). And Policy VIII explicitly forbids men from participating in any Kappa recruitment events. *Id.* at 39 (¶ 65) ("Men shall not participate in any Kappa recruitment events[.]" (quoting App. Vol. I at 234 (Policy VIII, 3.I.))). Kappa Policies also require chapter members to live in their respective chapter houses upon admission and restrict the access of men to the house to provide "a private, safe space where young women can interact without concern that they will be on display for men." *Id.* at 44–45 (¶¶ 80, 83).

> ### 2. Defendants Have Subverted Kappa's Mission and Governing Documents by Changing the Definition of "Woman" Without Following the Required Processes.

In contrast to the governing documents described above, Kappa staff can publish "position statements," which are never presented to the Sorority's membership for approval or review. App. Vol. 1 at 50–51 (¶ 100). In 2015, and at the direction of the Fraternity Council, Kappa posted a position statement that claims

Kappa "is a single-gender organization comprised of women *and individuals who identify as women*."[3]  *Id.* (quoting App. 263).

Then, in the Fall of 2022, Defendants Kappa and Mary Pat Rooney, the President of the Council of Kappa, and the Wyoming chapter leadership orchestrated and implemented a plan that resulted in the University of Wyoming chapter initiating as a member a biological male, Artemis Langford.  *Id.* at 40–43 (¶¶ 68–76).  It could not be otherwise: Kappa's Standing Rules explicitly provide that "no person can be initiated as a Kappa member without approval from Sorority headquarters."  *Id.* at 40 (¶ 68).

Kappa's counsel has referred to its position statement to justify Langford's admission into the sorority.  *Id.*  But Kappa can only change its membership criteria by amending its Bylaws.  And, as noted above, amendments can only be made if presented months before the Convention and approved by a majority (two-thirds) vote.  *See* App. Vol. 1 at 104 (Bylaws, Art. XXIV, Sec. 1).  Defendants did not amend Kappa's Bylaws to permit biological males and thus Langford's admission violated those Bylaws.  App. Vol. 1 at 50–51, 52–53 (¶¶ 100, 102).

---

[3] The district court took note of two documents, the 2018 Guide for Supporting our LGBTQIA+ Members, and the Bylaws and Standing Rules Revisions 2022: FAQs. App. Vol. 2 at 70–71 (citing App. Vol. 1 at 111–23; App. Vol. 1 at 167–87).  Neither of these documents appears in the Bylaws and each references the same 2015 statement, which this brief addresses.

### 3. Defendants Have Further Subverted Kappa's Governing Documents by Admitting Langford through Coercion and Voting Irregularities.

Aside from facilitating and approving Langford's admission in contravention of Kappa's governing documents, Defendants went even further and violated several Standing Rules throughout the admission process.

The Standing Rules, as described above, prescribe rules and procedures for the election of new members by a local chapter. App. Vol. 1 at 37–38 (¶ 62). But these rules were not followed for Langford's admission. While the Standing Rules require that elections employ a secret ballot and use Kappa's approved electronic voting system, Wyoming chapter leadership forced the Wyoming sisters to vote through a non-anonymous Google poll. *Id.* at 62–64 (¶¶ 129–130, 134). And even though the Rules require that all members vote on admission of a new member unless excused by the chapter's alumnae adviser in writing, "the chapter officers adopted the opposite policy" for Langford's vote, "forbidding Plaintiffs Choate and Ramar, and all other members who were not present at the chapter meeting on September 20, 2022 from voting," even though none of them had been excused. *Id.* at 37 (¶ 61).

Further in violation of Kappa's rules, Wyoming chapter officials, after consultation with Kappa's leadership, told members that voting against Langford's admission was evidence of "bigotry" that "is a basis for suspension or expulsion from the Sorority." *Id.* at 63 (¶ 131). After an initial anonymous vote conducted via

Google Poll failed to result in admission, Chapter officers forced a second, non-anonymous vote in which multiple sisters changed their votes because of "fear of reprisal." *Id.* at 65 (¶ 135). Without these unlawful procedures preventing some members from voting and pressuring other members to change their votes, Langford would not have been admitted. *Id.* at 65 (¶ 136).

When Plaintiffs—current members and recent graduates of the Wyoming chapter—contacted Kappa leadership and alerted them to these irregularities and their objection to Kappa admitting a biological-male member, the leadership dismissed their concerns. *Id.* at 48–49 (¶¶ 94, 95). In a response letter, counsel for Kappa rejected requests to enforce the Bylaws and rescind Langford's admission. *Id.* Other attempts to have the Wyoming chapter enforce the single-sex provisions of Kappa's Bylaws were similarly met with hostility and retaliation. *Id.* at 48, 49–51, 65–67 (¶¶ 93–94, 97–100, 137–42).

### 4. Langford's Admission Harmed the Sorority Holistically and Plaintiffs Individually.

Admission to the Wyoming chapter gave Langford access to all Kappa meetings and, crucially, the areas of the chapter house that were reserved for women only. *Id.* at 45 (¶ 81). This was contrary to the housing contract that Plaintiffs had to sign as members of the chapter, which required Plaintiffs to pay approximately $8,000 to live in the chapter house, *id.* at 45–46 (¶ 84), and specified that housing would be provided "subject to … the [Kappa] Bylaws, Standing Rules and Policies."

*Id.* at 31, 44–46, 77 (¶¶ 51, 78, 80, 83–84, 175); App. Vol. 1 at 246.  Those rules exclude men from the house and limit membership to women.  App. Vol. 1 at 31, 44–46, 77 (¶¶ 51, 78, 80, 83–84, 175); App. Vol. 1 at 246; *see* App. Vol. 1 at 44 (¶ 80) (quoting App. Vol. 1 at 275 (House Standing Rule 2.4.A.2)) ("The Kappa rules for the sorority house forbid all men from being on the second floor.").

Admission of a biological male also eliminated the "single-sex haven" that Kappa had promised to provide to Plaintiffs, one of whom is a sexual assault survivor who sought "a safe place to interact with other college students without the presence of men." *Id.* at 43–44 (¶ 77).  That the chapter's house was not designed for co-educational living made matters worse.  "[M]any of the [bedroom] doors do not lock consistently," two of the bathrooms are communal and without a lock, and the non-communal bathroom lacks "a private area to disrobe before showering." *Id.* at 44 (¶ 79).

Although Langford did not live in the house, Langford frequently entered the restricted area of the house and engaged in inappropriate and odd behavior there.[4] To give just a few examples, Langford has "several times chosen to sit for hours on the couch in the second-floor common area," not talking or studying but simply "star[ing] at women walking past." *Id.* at 45 (¶ 82).  And "Langford has, while

---

[4] Further, the sorority has failed to assure Plaintiffs and other members that Langford would not live in the house at some point.  App. Vol. 1 at 65 (¶ 137).

watching members enter the sorority house, had an erection visible through his leggings." *Id.* at 58–59 (¶ 119).  At other times, Langford sat with a pillow covering his lap.  *Id.*  At a slumber party, Langford "repeatedly questioned the women about what vaginas look like, [and] breast cup size," and stared as one Plaintiff changed her clothes.  *Id.* at 68 (¶ 144).  Langford also talked about his virginity and discussed at what age it would be appropriate for someone to have sex.  *Id.*  And he stated that he would not leave one of the sorority's sleepovers until after everyone fell asleep. *Id.* at 68 (¶ 145).  Langford also took pictures of female members "without their knowledge or consent."  *Id.* at 69 (¶¶ 148–49).  And members "observed Langford writing detailed notes about [the students] and their statements and behavior."  *Id.*

In response to Plaintiffs' concerns about privacy and safety, "Kappa officials recommended that … they should quit Kappa Kappa Gamma entirely."  *Id.* at 46 (¶ 85).  As Kappa officials well know, however, once Plaintiffs were accepted into Kappa, they were permanently barred from ever joining another sorority, *id.* at 14–15 (¶ 12), and thus could never again obtain the single-sex sorority experience for which they had contracted.

## B.    Procedural History

Following the events described above, Plaintiffs sued on their own behalf and derivatively on behalf of Kappa itself under Ohio law, App. Vol. 1 at 74 (¶ 161), which "provides members of nonprofit corporations with a derivative cause of action

13

on behalf of the corporation," *Carlson v. Rabkin*, 789 N.E.2d 1122, 1127 (Ohio Ct. App. 2003) (citing Ohio Rev. Code Ann. § 1702.12(I)(1)(c)). In their First Amended Complaint, Plaintiffs alleged that Kappa's dissolution of the woman-only environment, orchestrated by Defendant Rooney, violated the sorority's Bylaws and other governing documents. App. Vol. 1 at 73–75 (¶¶ 159–67). Plaintiffs next asserted a breach of contract claim against Kappa Kappa Gamma Building Corp. ("Building Corp.") due to the presence of Langford in the restricted living areas of the house. *Id.* at 76 (¶¶ 168–72). Plaintiffs also brought claims against Rooney and Kappa for tortious interference with their housing contracts with the Building Corp. and asserted a direct claim against Rooney and Kappa seeking to recover for the personal, individual injuries Plaintiffs suffered because of Langford's unlawful admission and presence in the house. *Id.* at 76–77 (¶¶ 173–79).

Defendants moved to dismiss Plaintiffs' "claims in their entirety," identifying the "central issue in this case" as whether "Plaintiffs have a legal right to be in a sorority that excludes" biological males. App. Vol. 2 at 10, 11 (emphasis omitted). Defendants argued that Plaintiffs have no such right because Kappa's Bylaws do not create a "restrictive definition of the term 'woman.'" *Id.* at 21.

The district court granted Defendants' motion on August 25, 2023. App. Vol. 2 at 67–107. The court first addressed jurisdiction. It concluded that it lacked diversity jurisdiction to hear the breach of contract claim against KKG Building Co.

14

"because Plaintiffs do not seek damages against KKG Building Co. and fail to plead an amount in controversy as to that Defendant." App. Vol. 2 at 78.

The court held, however, that it was appropriate to exercise personal jurisdiction over Defendant Rooney because, "when Rooney approved Langford's admission, injury, if any, would occur on campus in Laramie, Wyoming," and therefore Rooney "purposefully directed her activities at Wyoming." App. Vol. 2 at 88 (internal quotation marks omitted).

Turning to the merits, the district court first concluded that Plaintiffs met the procedural requirements for a derivative claim under Ohio Civil Rule 23.1 because Plaintiffs and their families, before filing this lawsuit, petitioned Defendants to overrule Langford's admission and "communicated the crux of their future claims." App. Vol. 2 at 91. The court noted that Defendants rejected Plaintiffs' petition, and because they are the ones who approved Langford's admission, Defendants would oppose this lawsuit. *Id.* at 92. Thus, any attempt to make a pre-suit demand would have been futile. *Id.*

The court then held that Plaintiffs had failed to state a derivative claim against Kappa because Defendants had the right to interpret "woman" however they pleased. Specifically, the court understood the "gravamen" of Plaintiffs' lawsuit to be whether Kappa's Bylaws and other governing documents, in limiting membership to women, excluded biological males. App. Vol. 2 at 92. But the court refused to

15

hold that Plaintiffs had sufficiently alleged that Kappa's Bylaws "define[] 'woman'" to exclude biological men, instead concluding that (1) under Ohio law, it should not interfere with the actions taken by a voluntary association, and (2) Kappa has a First Amendment right to disregard its bylaw requirements. *See* App. Vol. 2 at 93 (citing Ohio precedent); *Id.* at 99 ("The Court will not … invade the organization's freedom of expressive association.").

The court also held that Plaintiffs could not bring a direct action against Defendants because they "have not shown a special duty, nor a separate and distinct injury, to sustain their direct claim." App. Vol. 2 at 103. The court reasoned that any injury from Langford's admission "inured to all KKG members alike, whether in Laramie or beyond," and stated that the egregious misbehavior of the biological male was "irrelevant" to the case. App. Vol. 2 at 105–06. The district court thus dismissed without prejudice all of Plaintiffs' claims, leaving no ongoing claims, counterclaims, motions, or other business before the court. App. Vol. 2 at 106.

Plaintiffs filed a timely notice of appeal on September 25, 2023 (App. Vol. 2 at 108–10). Defendants filed a motion to dismiss this appeal for lack of appellate jurisdiction, which Plaintiffs opposed on October 23, 2023. By Order of October 24, 2023, this Court deferred consideration of that motion to the merits panel.

## SUMMARY OF ARGUMENT AND STANDARD OF REVIEW

Reversal is required under this Court's settled standards. Specifically, this Court reviews de novo a district court's decision to grant a motion to dismiss under Rule 12(b)(6). *See Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009). The court must "accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." *Id.* And a complaint "does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). That is because "'[t]he court's function on a Rule 12(b)(6) motion is'" only to determine whether the complaint "'is legally sufficient to state a claim for which relief may be granted.'" *Smith*, 561 F.3d at 1098 (quoting *Sutton v. Utah State Sch. for Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999)).

Under these standards, the district court was wrong to dismiss Plaintiffs' derivative and direct claims. First, the district court mistakenly applied a policy against judicial interference, which applies only to internal dispute-resolution processes, and the First Amendment, which applies only to state actors, to Plaintiffs' derivative claim. Without these irrelevant legal barriers, Plaintiffs' allegations of how Defendants violated their duties of care, loyalty, and compliance by acting outside of the Bylaws are sufficient to state a derivative claim.

Second, the district court disregarded key allegations in Plaintiffs' complaint to conclude that they had not adequately alleged a direct injury. The district court

had no basis for rejecting Plaintiffs' allegations of personal harm, including loss of privacy and emotional distress.

## ARGUMENT

## I.  The District Court Erred in Dismissing Plaintiffs' Derivative Claim Against Defendants Kappa and Rooney.

Plaintiffs pled sufficient allegations for a derivative, breach-of-fiduciary duty claim because the First Amended Complaint explains in detail how Kappa disregarded its Bylaws and other governing documents to admit Langford, a biological male, into the sorority.  The district court did so by ignoring longstanding principles of corporate law that require courts to enforce the articles and bylaws of a voluntary corporation.  The district court compounded that error by misapplying the Supreme Court's First Amendment precedent to hold that Kappa is free to interpret the word "woman" however it pleases.

### A.  Plaintiffs Met the Procedural Requirements of Their Derivative Claim, and the Rule of Non-Interference Does Not Apply to That Claim.

Although the district court correctly applied the law governing derivative claims to hold that Plaintiffs met the futility requirement under Ohio Civil Rule 23.1, it applied the incorrect law to hold that it should not interfere with the actions of a voluntary association in defining the term "woman."  A derivative claim like the one Plaintiffs brought is not subject to the rule of non-interference.

18

First, the district court correctly concluded that Plaintiffs met the futility requirement of Ohio Civil Rule 23.1. That rule requires a shareholder to make a demand upon the board of directors prior to bringing a derivative suit unless such a demand would be futile.

Plaintiffs' complaint provides more than enough evidence that a formal demand would have been futile in this case. As the district court observed, Plaintiffs and their parents made multiple attempts to contact and convince Kappa's Council not to admit Langford. App. Vol. 2 at 90–92. Plaintiffs also sent a letter through counsel seeking the enforcement of Kappa's Bylaws to prevent the initiation of Langford in November 2022. App. Vol. 1 at 4 (¶ 94). Kappa rejected this request through a letter from its own counsel and delineated its commitment to a policy of admitting individuals who identify as women regardless of their sex. *Id.* at 49–51 (¶¶ 95, 100).

Additionally, as the district court found, "Rooney, Executive Director Poole, and other Fraternity Council members are the same officers who purportedly approved Langford; under Plaintiffs' theory, Rooney and other directors violated KKG's Bylaws – of course the Fraternity Council would oppose Plaintiffs' federal lawsuit." App. Vol. 2 at 92. Thus, Kappa's directors were '"antagonistic, adversely interested, or involved in the transactions attacked,'" such that demand would be futile. *In re Ferro Corp. Derivative Litig.*, 511 F.3d 611, 618 (6th Cir. 2008)

(quoting *Bonacci v. Ohio Highway Express, Inc.*, No. 60825, 1992 WL 181682, at *4 (Ohio Ct. App. July 30, 1992) (unreported)).

However, when it came to the substance of Plaintiffs' derivative claim, the district court applied the wrong law. Ohio law is clear that organizations that choose to avail themselves of the corporate form must accept the responsibilities that accompany that form, including the duty to abide by the terms of their articles of incorporation, bylaws, and other governing documents. *Ulliman v. Ohio High Sch. Athletic Ass'n*, 919 N.E.2d 763, 771 (Ohio Ct. App. 2009) (citing *Int'l Bhd. of Elec. Workers Local Union No. 8 v. Gromnicki*, 745 N.E.2d 449, 452–53 (Ohio Ct. App. 2000) ("Constitutions and bylaws entered into by an association and consenting parties constitute a contract between the association and its members."). As a non-profit corporation incorporated in Ohio, Kappa has an obligation under Ohio law to comply with its Articles of Incorporation, Bylaws, and Standing Rules, all of which are contracts that limit membership to women. *See id.*; App. Vol. 1 at 137–66 (Bylaws, Arts. II, III.1.A).

In addition, Ohio law grants shareholders in a non-profit organization the right to bring a derivative action to challenge actions taken by a board of directors that violate an organization's bylaws and governing directives. Ohio Rev. Code Ann. § 1702.12(I)(1)(c); *see also Carlson*, 789 N.E.2d at 1127. That is because corporate board members who disregard or otherwise seek to circumvent a corporation's

20

governing documents violate their duty of loyalty, duty of care, and duty of obedience (also called duty of compliance).  *See* Ohio Rev. Code Ann. § 1702.12(I)(1)(c).

Rather than apply these well-settled rules to assess whether Plaintiffs had sufficiently stated a derivative claim, the district court applied the doctrine that "'Ohio courts are unwilling to interfere with the management and internal affairs of a voluntary association'" unless "'there has been some palpable violation of the constitution or laws of the corporation whereby he has been deprived of valuable rights.'"  App. Vol. 2 at 93 (quoting *Redden v. Alpha Kappa Alpha Sorority, Inc.*, No. 1:09CV705, 2010 WL 107015, at *5 (N.D. Ohio Jan. 6, 2010) (unreported); *Powell v. Ashtabula Yacht Club*, No. 953, 1978 WL 216074, at *4 (Ohio Ct. App. 1978) (unreported) (emphasis omitted)).

But this rule does not apply to Plaintiffs' derivative claim.  Indeed, none of the cases the district court cites apply this non-interference rule to a derivative claim or a claim concerning a breach of fiduciary duties.  Rather, the court's cited cases all concerned a plaintiff's complaint about direct injuries resulting from a violation of due process or some other complaint personal to the plaintiff about an internal dispute-resolution process. *See Redden*, 2010 WL 107015, at *3–4 (plaintiff alleged sorority "did not comply with the requirements of due process which apply to proceedings for disciplining a member of a private association" and court applied

21

the non-interference rule only to this claim and not plaintiff's separate claim for breach of fiduciary duties); *Powell*, 1978 WL 216074, at *1 (plaintiff alleged association's termination of his membership for misbehavior violated due process); *Stibora v. Greater Cleveland Bowling Ass'n*, 577 N.E.2d 1175, 1178–79 (Ohio Ct. App. 1989) (suit arguing plaintiffs' suspension from membership because of their unauthorized withdrawal violated due process); *Putka v. First Cath. Slovak Union*, 600 N.E.2d 797, 801–02 (Ohio Ct. App. 1991) (plaintiff alleged organization violated his due process rights in expelling him from membership because he brought a complaint to a state agency before taking it to the organization).

Plaintiffs' derivative claim is not about due-process rights or a personal grievance concerning Kappa's internal-dispute resolution process. Rather, Plaintiffs allege, with particularity, the requirements for a derivative suit and why Plaintiffs meet those requirements. App. Vol. 1 at 74–75 (¶¶ 162–67). Specifically, Plaintiffs state that the Bylaws and rules of Kappa have always "limited membership to women only," and Defendants refused to enforce this requirement, which has resulted in the sorority losing "its identity as an organization for women" and experiencing "a significant decline in alumnae giving, membership, and participation." *Id.* at 75 (¶¶ 164–66). And thus, Defendants "have violated their duties of loyalty, care, and obedience/compliance." *Id.* at 74 (¶ 163).

Rather than analyze these allegations, the district court decided that it could not interfere with the private organization's interpretation and that the First Amendment permitted Kappa to define "woman" however it wanted. But, as explained above, the non-interference rule does not apply to this derivative claim.[5] And, as explained next, the First Amendment does not shield Defendants from this claim.

### B. Corporations Have No First Amendment Right to Disregard the Terms of Their Governing Documents.

Faced with Kappa's plain violation of its Bylaws and abandonment of required democratic procedures in admitting a biological male, the district court

---

[5] Further, even if the non-interference rule applied to a derivative claim—a proposition no case supports—Plaintiffs' claim would clearly fall under the rule's exception for a "'palpable violation of the … laws of the corporation whereby [the plaintiff] has been deprived of valuable rights.'" *Redden v. Alpha Kappa Alpha Sorority, Inc.*, No. 1:09CV705, 2010 WL 107015, at *5 (N.D. Ohio Jan. 6, 2010) (unreported) (quoting *Powell v. Ashtabula Yacht Club*, No. 953, 1978 WL 216074, at *4 (Ohio Ct. App. 1978) (unreported)); *see* App. Vol. 1 at 30, 32–38 (¶¶ 49, 53–63); *Stibora v. Greater Cleveland Bowling Ass'n*, 577 N.E.2d 1175, 1178–79 (Ohio Ct. App. 1989) (explaining that Ohio law requires courts to reject decisions of voluntary associations that "are arbitrary and undertaken as a willful exercise of power."). Courts must not "hesitate to interfere where," as here, "proceedings have not been conducted in accordance with the organization's own rules of procedure," *Milkie v. Acad. of Med. of Toledo & Lucas Cnty.*, 246 N.E.2d 598, 602 (Ohio Ct. App. 1969), or when "'the managing officers are acting in excess of their corporate power.'" *Strah v. Lake Cnty. Humane Soc'y*, 631 N.E.2d 165, 171 (Ohio Ct. App. 1993) (quoting *Cincinnati Camp Meeting Ass'n of Methodist Episcopal Church v. Danby*, 56 N.E.2d 694, 696 (Ohio Ct. App. 1943)). And "the courts may and should protect the democratic processes of those organizations and vindicate the rights of their members." *Tucker v. Nat'l Ass'n of Postal Supervisors*, 790 N.E.2d 370, 374 (Cleveland Mun. Ct. 2003).

refused to consider Plaintiffs' claims on the grounds that Kappa's decision to admit biological-male members was "speech which th[e] Court may not impinge," and "Kappa's freedom of expressive association … insulate[s] the organization" from the requirement that it abide by its Bylaws as written. App. Vol. 2 at 96–97. But the First Amendment's freedom of expressive association applies when a state actor is meddling with such association. There is no state actor here, and no authority supports the court's novel conclusion that the First Amendment protects a *private* organization from a *private* lawsuit when it contravenes its own *voluntarily chosen and private* obligations as provided in its corporate bylaws.

The district court based its flawed First Amendment analysis on the Supreme Court's decisions in *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), and *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995). App. Vol. 2 at 94–97. However, those cases are inapposite: Both involved situations in which *the State* attempted to force an organization to accept a member (or participant) the organization did not want to include. *Dale*, 530 U.S. at 656 (holding that the state's public accommodations law, which would have forced the Boy Scouts to accept a gay scoutmaster, infringed upon the group's freedom of association); *Hurley*, 515 U.S. at 575–76 (holding that the state's public

24

accommodations law that would have forced a private parade to allow pro-LGBT participants was unconstitutional).[6]

Here, in contrast, *Defendants*, the nationwide leaders of the sorority, are attempting to force Kappa to accept individuals that Kappa's own Bylaws exclude. The State has required nothing of the organization in this regard. Instead, Kappa has imposed limitations on itself.

Because there is no state action at issue, the First Amendment is not implicated. If it were otherwise, as the district court held, then courts would be barred from resolving any private contractual dispute that could be alleged to implicate a party's associational freedoms. That is not the law.

On the contrary, courts routinely resolve disputes over an organization's membership decisions and whether an organization's expulsion of a member was consistent with that organization's bylaws and rules. *See*, *e.g.*, *Gromnicki*, 745 N.E.2d at 452–53 (explaining that "[t]o determine when the union-member relationship terminated, we turn to the union's constitution"); *Browning v. Fraternal Ord. of Eagles*, No. 1769, 1986 WL 9644, at *1 (Ohio Ct. App. Aug. 22, 1986)

---

[6] *Hurley* is also inapposite because it was a case primarily about compelled speech, not freedom of association. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,* 515 U.S. 557, 559 (1995) ("The issue in this case is whether Massachusetts may require private citizens who organize a parade to include among the marchers a group imparting a message the organizers do not wish to convey.").

(unreported) (Ohio courts review an expulsion of a member of a fraternal society for "compliance with the constitution and bylaws of the association"); *Milkie v. Acad. of Med. of Toledo & Lucas Cnty.*, 246 N.E.2d 598, 602 (Ohio Ct. App. 1969) (invalidating a member's expulsion from professional association).

In such circumstances, the court's role is simply to enforce the organization's contracts. *Gromnicki*, 745 N.E.2d at 452–53 ("according to the United States Supreme Court, '[t]he court's role is but to enforce the contract'") (quoting *Nat'l Lab. Relations Bd. v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 182 (1967)); *Reyes v. Laborers' Int'l Union of N. Am.,* 464 F.2d 595, 597 (10th Cir. 1972) (affirming a member's suspension because the court was not "apprised of any provision of the Union constitution which was violated by [the plaintiff's] suspension.").[7]  Simply put, judicial enforcement of corporate requirements does not infringe an organization's First Amendment rights of association.

---

[7] Even if Ohio's requirement that Kappa abide by its governing documents could somehow be deemed state interference, that law poses no concerns under the First Amendment.  The Supreme Court has recognized that "[t]he right to associate for expressive purposes is not … absolute.  Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms."  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).  State laws allowing shareholders and members to bring derivative suits against corporations when they deviate from their bylaws—a longstanding and unremarkable feature of corporate law—clearly meet that test.

### C.    Plaintiffs Have Sufficiently Alleged Defendants' Fiduciary Breach Due to Their Failure to Follow Kappa's Governing Documents That Define "Woman" as a Biological Female.

With the non-interference rule and First Amendment properly set aside, Plaintiffs' allegations state a viable derivative claim.  As discussed above, the district court erred in concluding otherwise based on the theory that Kappa has "organizational autonomy … to interpret [its] own bylaws."  App. Vol. 2 at 98.  If the district court had properly assessed the contractual documents, it should have found that the Bylaws and other governing documents use "woman" as it is commonly understood—a biological female.  And Kappa's off-the-cuff position statement in 2015 did not change that definition or give any of the Defendants the right to interpret the term as they wished.[8]

A plaintiff bringing a claim for breach of fiduciary duty "must allege the existence of a fiduciary duty, the breach of that duty, and damages proximately caused therefrom."  *Ray v. Hidden Harbour Ass'n, Inc.*, 104 N.E.3d 261, 269 (Ohio Ct. App. 2018) (citation omitted).  Ohio law "imposes fiduciary duties on directors of nonprofit corporations."  *Id.*  (citing Ohio Rev. Code Ann. § 1702.30).  In fact, Section 1702.30(B) explicitly states: "A director shall  perform the duties of a director … in good faith, in a manner the director reasonably believes to be in or not

---

[8] If it were true that corporations could interpret their governing documents however they pleased, governing documents would become meaningless.

27

opposed to the best interests of the corporation, and with the care that an ordinary prudent person in a like position would use under similar circumstances." *Id.* (quoting Ohio Rev. Code Ann. § 1702.30(B)).

As noted above, part of a director's fiduciary duties involves following the terms of a nonprofit's governing documents, which are contracts. *Ulliman*, 919 N.E.2d at 771; *DiPasquale v. Costas*, 926 N.E.2d 682, 708 (Ohio Ct. App. 2010); *Carr v. Acacia Country Club Co.*, 970 N.E.2d 1198, 1206 (Ohio Com. Pl. 2011), *aff'd*, 970 N.E.2d 1075 (Ohio Ct. App. 2012). The governing documents may "reserve control" over the non-profit's governing body, *Carr,* 970 N.E.2d at 1206, including with respect to the "qualification[]" and "admission[]" of members, Ohio Rev. Code Ann. § 1702.11. And, when a board of directors violates an organization's bylaws and other governing documents, state law provides shareholders in a non-profit organization the right to bring a derivative action to challenge those actions. Ohio Rev. Code Ann. § 1702.12(I)(1)(c); *see also Carlson*, 789 N.E.2d at 1127.

The First Amended Complaint explicitly alleges numerous breaches of Defendants' fiduciary duties based on violations of the Bylaws, Standing Rules, and Articles of Incorporation. First, Kappa's governing documents all require that membership be limited to women. *See supra* pp. 5–8. Yet Kappa leadership admitted Langford by claiming that Kappa altered the membership criterion to

include individuals who identify as women without amending the Bylaws and other governing documents. App. Vol. 1 at 27–30 (¶¶ 42, 46, 48–49); *see generally Strah v. Lake Cnty. Humane Soc'y*, 631 N.E.2d 165, 172 (Ohio Ct. App. 1993) (affirming trial court's finding of arbitrariness when organization interpreted its bylaws inconsistently).

Second, Langford's admission violated additional provisions of Kappa's Standing Rules. App. Vol. 1 at 30–32, 38–39 (¶¶ 49, 52, 65). Specifically, the First Amended Complaint states that the Standing Rules were breached when (1) certain Plaintiffs and other members who were not present at the chapter meeting were prohibited from voting, and (2) voting took place in a non-anonymous and irregular way. *Id.* at 36–38 (¶¶ 59–63). Defendants approved Langford's membership despite these rule violations and coordinated with the Wyoming chapter leadership to pressure members to recruit then vote for Langford. *Id.* at 61–66 (¶¶ 125, 129, 131–36, 139). For the reasons stated below, these allegations cross the plausibility line.

### 1. The Court applies the plain and ordinary meaning of common words.

Under Ohio law, "the cardinal purpose for judicial examination of any written instrument is to ascertain and give effect to the intent of the parties." *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997) (citing *Aultman Hosp. Ass'n v. Cmty. Mut. Ins. Co.*, 544 N.E.2d 920, 923 (Ohio 1989)). The parties' intent is "presumed to reside in the language

they chose to employ in the agreement."  *Id*. (quoting *Kelly v. Med. Life Ins. Co.*, 509 N.E.2d 411, 413 (Ohio 1987)).  The court applies the plain and "ordinary meaning" of common words, "unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument."  *Id*. (quoting *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978)); *see also Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 875 N.E.2d 31, 34 (Ohio 2007).  The relevant plain meaning is the meaning "at the time" the contract was made.  *Alexander*, 374 N.E.2d at 151; *cf. Ohio v. Ramirez*, 151 N.E.3d 598, 604 (Ohio 2020) ("In interpreting a statute, we look to its ordinary meaning at the time of its enactment.").

### 2.   Kappa's governing documents (its contracts) have always defined "woman" as a biological female.

Kappa was founded in 1870 because six biological females questioned why "women should be satisfied with literary societies while men on campus enjoyed full-fledged fraternity chapters."  Denise Tessier & Gay Chuba Barry, *History 2000: Kappa Kappa Gamma Through the Years* 14 (2000).[9]  The founders' "aim was to

---

[9] In deciding a motion to dismiss, courts may take judicial notice of "documents referred to in the complaint" and "documents that the complaint incorporates by reference."  *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (quotation marks and citation omitted from first quotation; citation omitted from second quotation). The complaint incorporates and references the above document and thus the court may take notice of it.  *See* App. Vol. 1 at 21–22 (¶ 27).

draw into the society the choicest spirits among the girls, not only for literary work, but also for social development." *Id*. Initiation gave new members self-assurance that "Kappa girls [held] an equality with any women in the world, even royalty." *Id*. at 23; *see* App. Vol. 1 at 20–21 (¶¶ 25–27).

Kappa's Bylaws are a contract that "constitute the code of regulations of the Fraternity." App. Vol. 1 at 103 (Bylaws, Art. XIX); *accord Ulliman*, 919 N.E.2d at 771. The earliest Bylaws stated that "[a]ny lady" may be a candidate for membership. App. Vol. 1 at 21–22 (¶ 27); *see also* Kappa Kappa Gamma Fraternity, By-Laws of Kappa Kappa Gamma, Art. III, Sec. 1 (1870), available at https://bit.ly/49L8LpN. By 1882, Kappa described membership as limited to "women." Kappa Kappa Gamma Fraternity, Constitution of Kappa Kappa Gamma, Art. VI, Sec. 2 (1882), available at https://bit.ly/3SSBMtK.

"Women" in the 1882 Constitution referred to biological females.[10] Indeed, Kappa does not argue otherwise. And since its founding, the organization has consistently used the term in its governing documents to prescribe qualifications for

---

[10] *See Woman, Webster's International Dictionary of the English Language Comprising the issues of 1864, 1879, and 1884,* at 1661 (Springfield, Mass., G. & C. Merriam Co. 1898) [https://archive.org/details/webstersinternat00port/page/1660/mode/2up] (defining "woman" as a "female"); *Female, id.* at 551 [https://archive.org/details/webstersinternat00port/page/550/mode/2up] (defining "female" as a biological female—"[a]n individual of the sex…which has an ovary and produces ova.").

membership.  *See, e.g.*, Kappa Kappa Gamma Fraternity, Constitution of Kappa Kappa Gamma, Art. IV, Sec. 1 (1910), available at https://bit.ly/49PGxdC ("women ... shall be eligible to membership"); Kappa Kappa Gamma Fraternity, Constitution of Kappa Kappa Gamma, Art. IV, Sec. 1 (1926), available at https://bit.ly/47KiJG1 (same); Kappa Kappa Gamma Fraternity, By-Laws of the Kappa Kappa Gamma Fraternity, Art. IV, Sec. 1 (1966), available at https://bit.ly/3sO1rcs ("[a] woman … may be elected to membership").

The current Bylaws state: "A new member shall be a woman who has accepted an invitation to join the Fraternity but has not been initiated."  App. Vol. 1 at 86 (Bylaws, Art. III, Sec. 1.A).  "To qualify as … a collegiate new member … a woman shall" meet certain criteria including college enrollment, a B+ high school grade point average, and not belonging to "any similar college or university women's social sorority."  *Id*. at 87 (Bylaws, Art. III, Sec. 2.A–B).

While the Bylaws provide for waiver of certain obligations like the B+ grade point average (*Id.* at 87 (Bylaws, Art. III, Sec. 2.B.2)) or financial commitments (*Id.* (Bylaws, Art. III, Sec. 3.A.1)) in "extraordinary conditions" following a "petition" to Kappa's membership director from the "chapter," Kappa does not provide for an exception in any of its governing documents to the requirement that a new member must be a "woman" invited to membership or a "woman" who has not previously pledged to another sorority.  App. Vol. 1 at 87 (Bylaws, Art. III, Sec. 2).

32

The use of "women" and "woman" in the Bylaws incorporates references to other laws and policies that define and apply those words in biological terms. App. Vol. 1 at 21–22 (¶¶ 28–32). For example, under Article V, Section 2, "Legal Compliance," Kappa explains that its woman-only nature stems from sororities' "exemption under the Title IX of the Educational Amendments of 1972." App. Vol. 1 at 151. Title IX addresses *sex*-discrimination in biological, binary terms. *See, e.g.*, 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in … any education program or activity"); *id*. § 1681(a)(8) (permitting "father-son or mother-daughter activities at an educational institution, but if such activities are provided for students of *one* sex, opportunities for reasonably comparable activities shall be provided for students of the *other* sex" (emphasis added)); *cf. Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020) (applying "sex" in Title VII of the Civil Rights Act, passed close in time to Title IX, as male or female as determined by reproductive biology). *See also* App. Vol. 1 at 24 (¶ 36).

And Kappa's Policies, which are intended to "carry out" the Bylaws, explain that Kappa women may not participate in "men's Fraternity events when or where the primary purpose is recruitment," and that "[m]en shall not participate in any Kappa recruitment events." App. Vol. 1 at 225, 234; App. Vol. 1 at 38–39 (¶ 65). These rules can only be understood through a biological lens.

### 3. Kappa has never changed the definition of "woman."

Significantly, Kappa does not argue that the founders of Kappa or the drafters of Kappa's 1882 Constitution intended the word "woman" to refer to anything other than a biological female. At no time has the organization amended its governing documents to define "woman" or "women" atypically or to open membership to people other than women.

In fact, the 2004 Convention voted to replace the Bylaws and Articles of Incorporation "in their entirety," to "*underscore* that we are a single gender organization." Kappa Kappa Gamma Convention 2004 and Bylaws/Standing Rules Revisions Video, Kappa Kappa Gamma, at 7:13, 9:36 (2004) ("Kappa Convention Video") (emphasis added), https://bit.ly/3SSQiSj.[11] Kappa's Fraternity Council President's use of "underscore" illustrates that the 2004 voting delegates were asked to continue, not eliminate, Kappa's longstanding membership criteria. The 2004 revision clarified that Kappa would "unite *women*, through membership, in a close bond of friendship." Restated Articles of Incorporation (2004) (emphasis added) (App. Vol. 1 at 132); App. Vol. 1 at 30 (¶ 49). Kappa filed restated articles of

---

[11] In deciding a motion to dismiss, courts may consider "matters of public record." 5B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (3d ed. 2023 update).

incorporation with the State of Ohio to reflect this clarified purpose, which have not since been refiled.  App. Vol. 1 at 129–32; App. Vol. 1 at 27 (¶ 47).[12]

Yet Kappa seems to believe that a "position statement adopted in 2015" means its membership criteria includes individuals who "identify as women."  App. Vol. 2 at 21.  The 2015 online statement, prepared at the direction of Defendants and others on Kappa's board, says Kappa "is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character."  App. Vol. 1 at 263; App. Vol. 1 at 50–51 (¶ 100).  But this statement did not change Kappa's membership requirements.  Only the Bylaws—not online statements free from any process, collaboration, explanation, or review

---

[12] In the summer of 2022, Kappa adopted a technical revision of the Bylaws, though "most of the content [was] unchanged."  App. Vol. 1 at 138 (Report of the Bylaws Committee (Mar. 16, 2022)); App. Vol. 1 at 32–33 (¶ 53).  The revision was "structur[al]," to reflect that the Bylaws Committee "found that the subjects that should be in the Fraternity Bylaws were in the Fraternity Standing Rules, some things in the Fraternity Bylaws should be in the Fraternity Standing Rules, and some things should be moved to the Fraternity Policies."  App. Vol. 1 at 138.  The "major amendments" included: term limits for regional leadership, a fee increase, and the reconsideration of "gendered pronouns" including whether "chairman" was appropriate.  (The Committee recommended keeping "chairman," given that it signified leadership and not maleness.).  App. Vol. 1 at 139.  The membership criteria remained the same: "A new member shall be a woman."  *See* App. Vol. 1 at 31–33 (¶¶ 52–54).  Thus, at no point in Kappa's history, including the 2004 or 2022 Conventions, were voting delegates made aware of a new or non-biological understanding of "woman" that differed from the term's constant presence as a biological limit to membership.

mechanism—govern membership.  *See* Kappa Convention Video, at 3:24 ("we always protect the rights of our members and allow the general convention assembly to make decisions on … membership qualifications"); *id.* at 2:23 ("The Bylaws include the rules considered *so important* that they *cannot* be changed without previous notice to the members and a vote of the members.") (emphasis in original by inflection).

### 4. "Woman" is not an ambiguous term open to an evolving interpretation.

Despite the clear history of the definition of "woman" as a biological female in Kappa's documents, Kappa argued below that the word is "unquestionably open to multiple interpretations."  App. Vol. 2 at 21.  But courts will not find common words ambiguous unless "'manifest absurdity'" results or another meaning is "'clearly evidenced from the face or overall contents'" of the Bylaws.  *Shifrin v. Forest City Enters., Inc.*, 597 N.E.2d 499, 501 (Ohio 1992) (quoting *Alexander,* 374 N.E.2d 146 at 148).  Kappa cannot argue that applying its long-held biological meaning to "women" would be absurd.  Nor can Kappa argue that a non-biological interpretation is clearly evidenced from the Bylaws.

Even if this Court were to hold that the word "woman" is ambiguous today, which it is not, Plaintiffs still prevail.  The court may use extrinsic evidence to ascertain the parties' intended use of a word.  *Lutz v. Chesapeake Appalachia, L.L.C.*, 71 N.E.3d 1010, 1012 (Ohio 2016).  "Extrinsic evidence can include '(1) the

36

circumstances surrounding the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by entering into the contract, and (3) any acts by the parties that demonstrate the construction they gave to their agreement.'" *Id.* (quoting *United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 716 N.E.2d 1201, 1208 (Ohio Ct. App. 1998)).

As discussed above, Kappa crafted its Bylaws and other governing documents to provide an organization for women who were, at the time, excluded from fraternal organizations on the basis of sex, App. Vol. 1 at (¶ 12). Today's Bylaws reflect this history and 152 subsequent years of sisterhood, during which voting delegates have never been asked to re-define woman or to expand membership to biological men.

Nothing about Kappa's more recent position statement demonstrates that the parties intended to revise the Bylaws and other documents governing membership criteria. Kappa might think the 2015 statement (repeated in 2018 and 2020) either explains what earlier or later Bylaws mean, but that argument fails for several reasons.

First, an unattributed intention made without both parties' input (or awareness) cannot reliably determine a contract term's meaning, any more than a legislator or witness's statement in the legislative record determines the meaning of a statute. For this reason, Ohio courts have held that "intentions not expressed in the

writing are deemed to have no existence and may not be shown by parol evidence."
*Aultman Hosp. Ass'n*, 544 N.E.2d at 923.

Second, Kappa holds the pen in revising the Bylaws and thus Kappa is not owed deference in asserting an interpretation outside the four corners of the document. Ohio courts have held that "a contract is to be construed against the party who drew it." *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996).

Third, reading the 2015 statement itself, Kappa agrees with Plaintiffs that "women" is biologically distinct from "individuals who identify as women." That is, Kappa understands that describing itself as an organization comprised of "women" is insufficient to cover "individuals who identify as women" because we see the word "*and*." App. Vol. 1 at 51 (¶ 100) (quoting App. Vol. 1 at 263). For example, your neighbor might say he owns cats and dogs, using "and" to delineate two different things. He would not say he owns pets and dogs, because when the second category is synonymous with or a subcategory of the first, we see other connectors like "including," "such as," or "who are."

Ultimately, Kappa knows that its organizational history contradicts any claim that Kappa founders understood the word woman to refer to anything other than biological females. So, the organization argues instead that the meaning of the word "woman" has "evolve[d] over time." App. Vol. 2 at 22. (What, exactly, the word has evolved to mean, Kappa has not said. Nor have Defendants articulated when or

how the word evolved or whether any voting delegate knew or agreed to this evolution.).  But Kappa fundamentally misunderstands how contracts work.  Courts enforce the meaning of terms "at the time" a contract is made.  *Alexander*, 374 N.E.2d 146 at 151.

Incredibly, Kappa believes the Supreme Court in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), blessed the idea that words evolve and courts should apply that evolved meaning.  But *Bostock* and reams of Supreme Court precedent say the opposite.  The Court interprets words in a statute "consistent with their ordinary meaning *at the time* Congress enacted the statute."  *Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (internal quotation marks, citation and alterations omitted) (emphasis added).  The Court in *Bostock* did not reimagine "sex" under the Civil Rights Act of Title VII of 1964 as synonymous with "transgender status" in 2020, enabling Kappa to reimagine "woman" from the 1870s as synonymous with "transgender woman" today.  App. Vol. 2 at 22.  Instead, the *Bostock* Court applied "sex" as a binary, biological term not interchangeable with a non-binary, identity-based term like "transgender status."  *Bostock*, 140 S. Ct. at 1739, 1741.  Consistent with this understanding, the Court used "woman" throughout its opinion to mean biological female.  It explained that employers discriminate against women—*i.e.,* discriminate on the basis of sex—when they employ men married to women but not women married to women.  *Bostock*'s

39

interpretive guidelines, accompanied by its use of the term "woman" to mean biological female, support Plaintiffs' interpretation, not Kappa's interpretation, of the Bylaws.

*      *      *

In sum, there are no legal impediments to Plaintiffs' derivative, breach of fiduciary duty claim. The non-interference rule and First Amendment do not bar Plaintiffs' claims, and basic contract principles support it. Plaintiffs' allegations that Defendants flouted the definition of "woman" in the Bylaws and governing documents form a viable derivative claim.

## II. The District Court Erred in Dismissing Plaintiffs' Direct Action Because Plaintiffs Were Separately and Distinctly Injured by Defendants' Admission of Langford into the Wyoming Chapter.

The district court also erred in dismissing Plaintiffs' direct claim against Kappa and Rooney on the ground that "Plaintiffs have not shown a special duty, nor a separate and distinct injury," to support that claim. App. Vol. 2 at 103. Under Ohio law, a shareholder may file a direct action "if the complaining shareholder is injured in a way that is separate and distinct from an injury to the corporation." *Crosby v. Beam*, 548 N.E.2d 217, 219 (Ohio 1989); *accord Heaton v. Rohl*, 954 N.E.2d 165, 175 (Ohio Ct. App. 2011).

The First Amended Complaint satisfies this requirement, as it details several claims of injury that are personal to Plaintiffs and that have not, as the district court

40

suggested, "inured to all [Kappa] members alike, whether in Laramie or beyond." App. Vol. 2 at 105. Kappa members beyond Laramie have not encountered Langford's unwanted and uncomfortable behavior, including Langford's having a visible erection while staring at the girls as they move about the sorority house. App. Vol. 1 at 67–71 (¶¶ 143–52). Nor have Kappa members nationwide been subject to Langford's "repeated[] question[ing]" about private anatomical details like "what vaginas look like." *Id.* at 68 (¶ 144). They have not been placed in the physically vulnerable position of unknowingly changing clothes in front of a biological male in what was supposed to be a single-sex living space. *Id.* at 68–69 (¶ 146). Plaintiffs were uniquely subjected to a loss of privacy, frustration of contractual expectations, and emotional distress, such that they were "injured in a way that is separate and distinct from an injury to the corporation." *Crosby*, 548 N.E.2d at 219.

The district court suggested these injuries should be disregarded because "only [Plaintiffs'] frustrated contractual expectations merit consideration," and those expectations were the same for "all KKG members." App. Vol. 2 at 105. That, too, was error.[13] Ohio law is clear that "a wrong involving one of the shareholder's

---

[13] Indeed, the district court's dismissal of Plaintiffs' direct claim is in tension with its holding that it had personal jurisdiction over Defendant Rooney, in part, because "when Rooney approved Langford's admission, injury, if any, would occur on campus in Laramie, Wyoming." App. Vol. 2 at 88. There was injury in Laramie, and that injury is separate and distinct from the injury that occurred to the sorority nationwide.

contractual rights as a shareholder" can result in "[a]n injury that is distinct from that suffered by other shareholders." *Carlson*, 789 N.E.2d at 1127. "The difference in the nature of the injury"—whether personal and direct or shared and derivative—"is reflected in the manner of recovery." *Maas v. Maas*, 161 N.E.3d 863, 880 (Ohio Ct. App. 2020). "In a shareholder's derivative suit, any recovery accrues to the corporation." *Id.* at 880–81. "In a direct action," on the other hand, "the complaining shareholder is directly compensated," which "prevent[s] the wrongdoers from being the principal beneficiaries of the damages." *Id.* at 881.

The contractual violations in this case resulted in personal injuries unique to Plaintiffs, who, unlike Kappa members of other chapters, found themselves required to share intimate spaces with a biologically male student. The district court was wrong to deem those harms "irrelevant" and dismiss Plaintiffs' direct claim. *See* App. Vol. 2 at 106 (n.67).

## CONCLUSION

The district court dismissed Plaintiffs' derivative claim by applying the wrong law, and it dismissed Plaintiffs' direct claim by ignoring the complaint's alleged facts. This Court should reverse the lower court's legal and factual errors and hold that Plaintiffs have pleaded sufficient direct and derivative claims.

Dated: December 4, 2023                    Respectfully submitted,

                                           /s/ Sylvia May Mailman
                                           SYLVIA MAY MAILMAN
                                           INDEPENDENT WOMEN'S LAW CENTER
                                           1802 Vernon Street NW, Suite 1027
                                           Washington, DC 20009
                                           Telephone: (202) 807-9986
                                           s.maymailman@gmail.com

                                           GENE C. SCHAERR
                                           CRISTINA MARTINEZ SQUIERS
                                           SCHAERR | JAFFE LLP
                                           1717 K Street NW, Suite 900
                                           Washington, DC 20006
                                           Telephone: (202) 787-1060
                                           gschaerr@schaerr-jaffe.com

                                           CASSIE CRAVEN
                                           LONGHORN LAW LLC
                                           109 East 17th Street, Suite 223
                                           Cheyenne, WY 82001
                                           Telephone: (307) 823-3062
                                           cassie@longhornlawllc.com

                                           JOHN G. KNEPPER
                                           LAW OFFICE OF JOHN G. KNEPPER, LLC
                                           P.O. Box 1512
                                           Cheyenne, WY 82003
                                           Telephone: (307) 632-2842
                                           John@KnepperLLC.com

                                           Counsel for Plaintiffs-Appellants

## ORAL ARGUMENT STATEMENT

Plaintiffs-Appellants respectfully request oral argument because this case raises important issues about the applicable law to Plaintiffs' derivative claims as well as the correct standards for assessing factual allegations regarding Plaintiffs' direct claims.

December 4, 2023

*/s/ Sylvia May Mailman*
Sylvia May Mailman

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g), I certify that this document:

(i) complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(A) because, excluding those portions exempted by Fed. R. App. P. 32(f), it contains 10,312 words, as determined by the word counting feature of Microsoft Word; and

(ii) complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) and 10th Circuit Rule 32(A) because it has been prepared in a proportionally spaced typeface using Microsoft 365, in Times New Roman 14-point font.


Dated: December 4, 2023

/s/ Sylvia May Mailman
Sylvia May Mailman

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify that with respect to the foregoing:

(1)    all required privacy redactions have been made per 10th Cir. R. 25.5;

(2)    if required to file additional hard copies, that the ECF submission is an exact copy of that document;

(3)    the digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, McAfee LifeSafe, version 1.11.279, most recently updated on October 18, 2023, and according to the program is free of viruses.

Dated: December 4, 2023

*/s/ Sylvia May Mailman*
Sylvia May Mailman

# ATTACHMENT

Order, August 25, 2023
U.S. District Court for the District of Wyoming
No. 2:23-CV-00051-ABJ, Hon. Alan B. Johnson

FILED

3:17 pm, 8/25/23

**Margaret Botkins**
**Clerk of Court**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

JAYLYN WESTENBROEK, HANNAH
HOLTMEIER, ALLISON COGHAN,
GRACE CHOATE, MADELINE
RAMAR, and MEGAN KOSAR, on
behalf of themselves and derivatively on
behalf of KAPPA KAPPA GAMMA
FRATERNITY,

Plaintiffs,

v.

Case No.  23-CV-51-ABJ

KAPPA KAPPA GAMMA
FRATERNITY, an Ohio non-profit
corporation, as a Nominal Defendant and
as a Direct Defendant, MARY PAT
ROONEY, President of the Fraternity
Council of KAPPA KAPPA GAMMA
FRATERNITY, in her official capacity,
KAPPA KAPPA GAMMA BUILDING
CO., a Wyoming non-profit corporation,
and ARTEMIS LANGFORD,

Defendants.

---

**ORDER GRANTING DEFENDANTS' *MOTION TO DISMISS* (ECF NO. 19),**
**DISMISSING, WITHOUT PREJUDICE, PLANTIFFS' *FIRST AMENDED***
***VERIFIED MEMBER DERIVATIVE COMPLAINT FOR BREACH OF***
***FIDUCIARY DUTIES* (ECF NO. 6), AND DISMISSING AS MOOT**
**DEFENDANT ARTEMIS LANGFORD'S *MOTION TO DISMISS* (ECF NO. 22)**

---

THIS MATTER comes before the Court following Defendants', Kappa Kappa

Gamma Fraternity, an Ohio non-profit corporation ("KKG", "Kappa Kappa Gamma", or

"Kappa"), Mary Pat Rooney, President of the Fraternity Council of Kappa Kappa Gamma

1

Fraternity ("Rooney"), and Kappa Kappa Gamma Building Co., a Wyoming non-profit corporation ("KKG Building Co.") (collectively, "Defendants"), *Motion to Dismiss*, filed on June 20, 2023. ECF No. 19. Pursuant to Fed. R. Civ. P. 12(b)(1), (2), and (6), Defendants move to dismiss Plaintiffs', Jaylyn Westenbroek, Hannah Holtmeier, Allison Coghan, Grace Choate, Madeline Ramar, and Megan Kosar (collectively, "Plaintiffs"), *First Amended Verified Member Derivative Complaint for Breach of Fiduciary Duties* ("*Complaint*") (ECF No. 6), due to lacking subject matter jurisdiction over KKG Building Co., lacking personal jurisdiction over Rooney, and Plaintiffs' failure to state a claim upon which relief can be granted. ECF Nos. 19, at 2; 20.

Having reviewed the filings, the applicable law, and being otherwise fully advised, the Court **GRANTS** Defendants' *Motion to Dismiss* (ECF No. 19) and **DISMISSES, WITHOUT PREJUDICE,** Plaintiffs' *Complaint* (ECF No. 6).

Separately, the Court **DISMISSES AS MOOT** Defendant's, Artemis Langford ("Langford"), *Motion to Dismiss with Prejudice* ("Langford's *Motion to Dismiss*") (ECF No. 22), filed on June 20, 2023.

## BACKGROUND

Embittered by their chapter's admission of Artemis Langford, a transgender woman, six KKG sisters at the University of Wyoming sue their national sorority and its president. Plaintiffs, framing the case as one of first impression, ask the Court to, *inter alia*, void their sorority sister's admission, find that KKG's President violated her fiduciary obligations by betraying KKG's bylaws, and prevent other transgender women from joining KKG

2

nationwide. A "woman", say Plaintiffs, is not a transgender woman. Unadorned, this case condenses to this: who decides whether Langford is a Kappa Kappa Gamma sister? Though given the opportunity to vote this past fall, not the six Plaintiffs. Not KKG's Fraternity Council. Not even this federal Court. The University of Wyoming chapter voted to admit – and, more broadly, a sorority of hundreds of thousands approved – Langford. With its inquiry beginning and ending there, the Court will not define "woman" today. The delegate of a private, voluntary organization interpreted "woman", otherwise undefined in the non-profit's bylaws, expansively; this Judge may not invade Kappa Kappa Gamma's freedom of expressive association and inject the circumscribed definition Plaintiffs urge. Holding that Plaintiffs fail to plausibly allege their derivative, breach of contract, tortious interference, and direct claims, the Court dismisses, without prejudice, Plaintiffs' causes of action. This Court outlines the case's posture,[1] its standard of review, and its disposition in the pages that follow.

Founded in 1870, Kappa Kappa Gamma is a non-profit organization based in Dublin, Ohio. ECF Nos. 6, ¶¶ 21, 25, 28; 6-1, at 49, 55–56.[2] Today, KKG spans 140 college

---

[1] Recounting the pertinent facts, *infra*, the Court wades through a well-researched, yet meandering, complaint; for example, despite a seventy-two-page complaint excluding attachments, Plaintiffs devote four-and-a-half pages to their actual claims. Only the facts relevant to the four claims Plaintiffs bring against Defendants are outlined today. Those facts are accepted as true for the purpose of resolving the motion at bar. ECF No. 6; *see also* ECF Nos. 20, 24, 26. The Court also looks to documents attached as exhibits to Plaintiffs' *Complaint. See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *Hall v. Bellmon*, 935 F.2d 1106, 1112 (10th Cir. 1991) ("A written document that is attached to the complaint as an exhibit is considered part of the complaint and may be considered in a Rule 12(b)(6) dismissal.") (internal citations omitted).
[2] KKG filed its *Articles of Incorporation* with the Ohio Secretary of State in 1930. ECF No. 6-1, at 56.

3

campuses and boasts 210,000 living alumnae. ECF No. 6, ¶ 26. Of note are policies from

KKG's national headquarters and the University of Wyoming's KKG chapter; bear with

me as I summarize both. Broadly, KKG's "purposes", *inter alia*, are:

> A. *To unite women*, through membership, in a close bond of friendship,
> seeking to instill in them a spirit of mutual love and helpfulness, to the
> end that each member and the Fraternity-at-large[3] may attain social,
> moral, and intellectual excellence;
> B. To establish chapters at various colleges and universities, provide for the
> proper organization, installation, and operation, *with each chapter having
> the right and responsibility to select members of its choice in accordance
> with Fraternity standards and procedures*[.]

ECF No. 6-1, at 52 (emphasis added). KKG has *Bylaws* ("bylaws"), *Standing Rules*,[4] and

*Fraternity Policies*. ECF Nos. 6, ¶ 53; 6-1, at 2–30, 109–38, 140–61. While the KKG

bylaws state that "[a] new member shall be a woman", no bylaw defines "woman". ECF

No. 6-1, at 6.[5]

In 2018, KKG published a *Guide for Supporting our LGBTQIA+ Members* ("2018

*Guide*").[6] ECF Nos. 6, ¶ 5; 6-1, at 32–43. The 2018 *Guide* states:

> Kappa Kappa Gamma is a single-gender organization *comprised of women
> and individuals who identify as women* whose governing documents do not
> discriminate in membership selection except by requiring good scholarship
> and ethical character.

---

[3] KKG considers itself a "fraternity" in its governing documents. *E.g.*, ECF No. 6-1, at 5.
However, emulating Plaintiffs and our national discourse, the Court refers to KKG as a
"sorority".

[4] The *Standing Rules* state that "[a]ctive members shall be responsible for selecting new
members of their chapter." ECF No. 6-1, at 111.

[5] When a new member, following acceptance of a local chapter's invitation, accepts admission to
KKG and annually thereafter, she pledges to "uphold the [KKG] *Bylaws*, *Standing Rules and
Policies* as well as [her] chapter Bylaws and Standing Rules." ECF No. 6-1, at 163.

[6] The parties dispute when KKG began to allow transgender women to qualify for membership.
While Defendants allege that Kappa has allowed transgender women admission since 2015,
Plaintiffs respond that "there is no evidence of this fact." *See* ECF Nos. 20, at 3; 24, at 3. The
parties agree that KKG published its *Guide* in 2018. *See* ECF Nos. 6, ¶ 5; 20, at 4.

> . . .
> Each Kappa chapter has the final choice of its own members. . . . [T]he
> chapter is well within its right to offer [a] potential member [who is
> transgender] a bid.

ECF No. 6-1, at 32, 35 (emphasis added). While KKG's bylaws do not reflect the "and

individuals who identify as women" addition, accompanying documents, including KKG's

*Position Statements*[7] in 2021 and *FAQs*[8] in 2022, both published ahead of KKG's 2022

biennial convention, do. *Id.* at 105 (same language *supra*), 183 (same); *cf. id.* at 2–30, 58–

86.[9] An Illinois resident and volunteer, Rooney heads KKG's eight-member Fraternity

Council, consisting of directors and by extension staff tasked with supervising chapters

nationwide. ECF Nos. 6, ¶¶ 22, 71; 26, at 3.[10] Plaintiffs equate KKG's Fraternity Council

to a corporation's board of directors. *E.g.*, ECF No. 6, ¶ 4.

---

[7] The *Position Statements* also note that "[e]ach chapter of Kappa Kappa Gamma has the final choice of its own members." ECF No. 6-1, at 183.

[8] The *FAQs* state:

> We also look to NPC [National Panhellenic Conference ("NPC")] policy as an NPC member organization. The NPC Recruitment Eligibility (2020) policy states: 'For the purpose of participation in Panhellenic recruitment, woman is defined as an individual who consistently lives and self-identifies as a woman. Each women's-only NPC member organization determines its own membership selection policies and procedures.'
>
> . . .
> **Why are we including gender-neutral pronouns in the revised documents?**
>
> This change is coming from a Convention resolution that formed Kappa's Diversity, Equity and Inclusion Committee. Kappa Kappa Gamma was founded 150 years ago on the principles of integrity, respect and regard for others. *Kappa has reflected on the path forward, and we are beginning with actions that speak to our belief that all members are valued. This is one of those action steps. We want to be as inclusive of all members as we can be.*

ECF No. 6-1, at 105 (emphasis in original and added).

[9] *See also* ECF No. 6-1, at 59 ("Inclusivity. Since diversity, equity and inclusion have been a focus and the subject of a previous resolution at [the] Convention, a concerted effort has been made to make sure the language of the documents is inclusive.").

[10] *See also* Kappa Kappa Gamma Fraternity Council, available at:
https://www.kappakappagamma.org/why-kappa/our-leadership-team/fraternity-council/
(accessed Aug. 25, 2023).

5

Founded in 1927, the KKG, or Gamma Omicron, chapter at the University of Wyoming ("the UW chapter") has forty-four members and an on-campus house today. ECF Nos. 6, ¶ 78; 6-1, at 200. Plaintiffs[11] are six – some current and some graduated – chapter members and undergraduates at the University. ECF Nos. 6, ¶¶ 1, 15–20; 20, at 1. Because KKG headquarters has a "live-in rule", all UW chapter members must reside within the on-campus house in Laramie, Wyoming, signing a contract with KKG Building Co.[12] to do so. ECF No. 6-1, at 148, 165–76. Like KKG's governing documents, neither the UW chapter's *Bylaws*,[13] nor its *Standing Rules*, define "woman". *Id.* at 185–98, 200–09.

During fall 2022 recruitment, the UW chapter voted to admit Langford, a transgender[14] woman. ECF No. 6, ¶ 116. Per KKG protocol, Langford was subsequently approved by KKG headquarters prior to her initiation to the chapter. *Id.*, ¶¶ 68, 139, 141;

---

[11] In accordance with Tenth Circuit guidance, the Court twice denied Plaintiffs' request to proceed anonymously in this matter. ECF Nos. 3, 5. On April 20, 2023, complying with the Court's instruction, Plaintiffs filed an amended complaint featuring their true names. ECF No. 6.
[12] Though not seeking damages from KKG Building Co., Plaintiffs allege that KKG Building Co. is a Fed. R. Civ. P. 19(a)(1)(B) required party to this action because five Plaintiffs signed housing contracts with KKG Building Co. for the 2022–23 academic year. ECF No. 6, ¶¶ 23, 84.
[13] The UW chapter *Bylaws* state that membership "shall be in accordance with the provisions of the Fraternity [*i.e.*, KKG] *Bylaws*." ECF No. 6-1, at 200.
[14] "Transgender" is a broad, umbrella term that is often used for individuals whose brain sex, gender identity, or gender expression either does not or is perceived not to match the physical sex they were assigned at birth. *See* Stevie V. Tran & Elizabeth M. Glazer, *Transgenderless*, 35 HARV. J.L. & GENDER 399, 399 n.1 (2012).

6

ECF No. 6-1, at 120. Following Langford's admission, Plaintiffs accuse Langford[15] of

salacious impropriety at the chapter house and elsewhere.[16]

Plaintiffs' four claims include: (1) a derivative[17] cause of action, pursuant to Ohio

Rev. Code Ann. § 1702.12(I)(1)(c),[18] against Rooney (ECF No. 6, ¶¶ 159–67) ("Count I");

(2) breach of contract against KKG and KKG Building Co. (*id.*, ¶¶ 168–72) ("Count II");

(3) tortious interference with a contract against KKG (*id.*, ¶¶ 173–75) ("Count III"); and

(4) a direct[19] cause of action against KKG and Rooney (*id.*, ¶¶ 176–79) ("Count IV").

Plaintiffs request three declaratory judgments from this Court, ordering: (1) that Langford

is ineligible for KKG membership and voiding, *ab initio*, her admission; (2) Defendants'

violation of their obligations to KKG by admitting Langford; and (3) Defendants' violation

of Plaintiffs' housing contracts. *Id.* at 70. Plaintiffs also seek preliminary and permanent

---

[15] Like KKG Building Co., Plaintiffs do not seek damages or relief from Langford, but label her a Fed. R. Civ. P. 19(a)(1)(B) required party. ECF No. 6, ¶ 1 n.2.

[16] Given Plaintiffs' dual dearth of claims against Langford and their inability to connect their allegations concerning Langford's behavior to their four causes of action against the remaining Defendants, the Court sees no reason to recount Plaintiffs' peripheral allegations against Langford.

[17] A derivative cause of action against an Ohioan non-profit corporation "seeks to vindicate the duty owed by the board of the corporation to the corporation as a whole and not a duty that is owed to a particular member or shareholder." *Wood v. Cashelmara Condo. Unit Owners Ass'n, Inc.*, No. 110696, 2022 WL 1422807, at *4–5 (8th Dist. May 5, 2022).

[18] Ohio law provides members of non-profit corporations with a derivative cause of action on behalf of the corporation; § 1702.12, *inter alia*, states:

    (I)(1) No lack of, or limitation upon, the authority of a corporation shall be asserted in any action except as follows:

       . . .

       (c) By a member as such or by or on behalf of the members against the corporation, a director, an officer, or a member as such.

Ohio Rev. Code Ann. § 1702.12(I)(1)(c); *see also* ECF No. 6, ¶ 46.

[19] "A shareholder brings a derivative action on behalf of the corporation for injuries sustained by or wrongs done to the corporation, and a shareholder brings a direct action where the shareholder is injured in a way that is separate and distinct from the injury to the corporation." *HER, Inc. v. Parenteau*, 147 Ohio App. 3d 285, 291 (10th Dist. 2002).

injunctive relief preventing Defendants from "seeking or encouraging" transgender women to join KKG, damages, and attorneys' fees and costs. *Id.*[20]

## STANDARD OF REVIEW

Defendants challenge Plaintiffs' *Complaint* on three bases – and three Federal Rules of Civil Procedure. I begin with a dose of procedural background; federal courts are courts of limited jurisdiction. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Accordingly, federal courts are presumed to lack jurisdiction "unless and until a plaintiff pleads sufficient facts to establish it." *See Celli v. Shoell*, 40 F.3d 324, 327 (10th Cir. 1994) (internal citation omitted). If jurisdiction is challenged, the party asserting jurisdiction must demonstrate its existence by a preponderance of the evidence. *See id.* First, when considering a Fed. R. Civ. P. 12(b)(1) challenge to subject matter jurisdiction and the movant challenges the allegations set forth in the complaint, the Court must accept those allegations as true. *See Holt v. United States*, 46 F.3d 1000, 1002–03 (10th Cir. 1995), *abrogated on other grounds by Cent. Green Co. v. United States*, 531 U.S. 425, 437 (2001). Second, Plaintiffs bear the burden of establishing personal jurisdiction. *See Far W. Cap., Inc. v. Towne*, 46 F.3d 1071, 1075 (10th Cir. 1995). If, however, the Court resolves the pending motion on the basis of their *Complaint*, Plaintiffs need only make a prima-facie showing of personal jurisdiction. *See OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998). Plaintiffs can make such a showing by alleging, "via

---

[20] Defendants, excluding Langford, filed their *Motion to Dismiss*, coupled with a *Memorandum in Support*, on June 20, 2023. ECF Nos. 19, 20. Plaintiffs responded in their *Response in Opposition* on July 5, 2023, to which Defendants replied on July 12, 2023. ECF Nos. 24, 26.

8

affidavit or other written materials, facts that if true would support jurisdiction over the defendant." *See AST Sports Sci., Inc. v. CLF Distrib., Ltd.*, 514 F.3d 1054, 1057 (10th Cir. 2008). Like a Fed. R. Civ. P. 12(b)(1) challenge, the Court accepts as true all well-pleaded facts in the *Complaint* and resolves all factual disputes in Plaintiffs' favor. *See Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008).

Third, when considering a Fed. R. Civ. P. 12(b)(6) motion to dismiss, district courts follow a two-pronged approach. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). First, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id. Iqbal* clarified that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions", and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. The Court stated that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Plausibility lies somewhere between possibility and probability; a complaint must establish more than a mere

9

possibility that Defendants acted unlawfully, but the complaint does not need to establish

that Defendants probably acted unlawfully. *See id.*

## ANALYSIS

The Court dismisses KKG Building Co. and Plaintiffs' four claims without

prejudice. First, Plaintiffs fail to plead this Court's subject matter jurisdiction over KKG

Building Co. Second, Plaintiffs demonstrate this Court's personal jurisdiction over

Rooney. Third, while Plaintiffs demonstrate futility under Ohio law, their derivative

claim against Rooney fails to escape KKG's First-Amendment-protected freedom of

expressive association to include transgender members. Fourth, Plaintiffs fail to allege

any breach of contract. Fifth, Plaintiffs fail to allege any tortious interference of contract.

Sixth, Plaintiffs fail to allege a direct claim against Rooney under Ohio law. Below, the

Court proceeds from the courthouse door to the courtroom, addressing challenges to

jurisdiction and on the merits, *seriatim*.

A. *The Court's Subject Matter Jurisdiction over Plaintiffs' Breach of Contract Claim against,* inter alia, *KKG Building Co. (*i.e., *Count II).*

Plaintiffs fail to allege this Court's subject matter jurisdiction over KKG Building

Co. Defendants move to dismiss Count II, alleging breach of contract against, *inter alia*,

KKG Building Co., for lack of subject matter jurisdiction. *See* ECF Nos. 20, at 7–8; 26, at

4–5. Plaintiffs appear to concede, parroting language from their *Complaint* that they do

not seek damages from KKG Building Co. but consider it a required party.[21]

---

[21] *Compare* ECF No. 6, ¶ 23 ("Plaintiffs do not seek damages directly from Kappa Housing Corp., but Plaintiffs do allege that [KKG] has interfered with their contractual relationship with

Preliminarily, the Court admits its confusion disentangling Plaintiffs' Count II,

which Plaintiffs seem to recognize.[22] Count II in Plaintiffs' *Complaint* appears to sue

KKG Building Co.; yet, in their response, Plaintiffs clarify that they sue KKG for *two*

breach of contract claims. This section addresses KKG Building Co.'s status vis-à-vis

Count II.

To proceed under this Court's diversity jurisdiction, 28 U.S.C. § 1332, as

Plaintiffs do, "all [] plaintiff[s] need[] to do is allege an amount in excess of $75,000 and

[they] will get [their] way, unless [] defendant[s] [are] able to prove 'to a legal certainty'

that the plaintiff's claim cannot recover the alleged amount." *McPhail v. Deere & Co.*,

529 F.3d 947, 953 (10th Cir. 2008) (quoting *St. Paul Mercury Indem. Co. v. Red Cab

Co.*, 303 U.S. 283, 289 (1938)) (internal citation omitted); ECF No. 6, ¶ 13. In *Young*,

U.S. District Judge James O. Browning opined:

> The statutory amount-in-controversy requirement, which presently stands at
> $75,000.00, must be satisfied *as between a single plaintiff and a single
> defendant* for a federal district court to have original jurisdiction over the
> dispute; a plaintiff cannot aggregate independent claims against multiple
> defendants to satisfy the amount-in-controversy requirement, nor can
> multiple plaintiffs aggregate their claims against a single defendant to
> exceed the threshold. If multiple defendants are jointly liable, or jointly and
> severally liable, on some of the claims, however, the amounts of those
> claims may be aggregated to satisfy the amount-in-controversy requirement
> as to all defendants jointly liable for the claims. Similarly, multiple

---

this Defendant. As such, Plaintiffs believe the Kappa Housing Corporation is a required party to
this litigation.") (citing Fed. R. Civ. P. 19(a)(1)(B)), *with* ECF No. 24, at 17–18 (near-*verbatim*
language).

[22] ECF No. 24, at 14 ("Plaintiffs admit that there may be some ambiguities in the Complaint, but
only because there are actually two different contracts. There is the contract between Kappa and
its members under Ohio corporate law. And there is the contract with the Kappa Kappa Gamma
Housing Corporation . . . *Through Defendant Kappa's actions, they have created a breach of
contract* as to both the sorority experience and paid housing experience that these young women
were promised.") (emphasis added);

11

> plaintiffs may aggregate the amounts of their claims against a single
> defendant if the claims are not separate and distinct.

*Young v. Hartford Cas. Ins. Co.*, 503 F. Supp. 3d 1125, 1172–73 (D.N.M. 2020) (internal

quotations and citations omitted) (emphasis added). Here, Plaintiffs' *Complaint* and

response cement that they, explicitly, do not levy claims against or seek damages from

KKG Building Co. Plaintiffs also do not seek injunctive or declaratory relief from KKG

Building Co. *See* ECF No. 6, at 70 ("Plaintiffs pray for . . . [a] declaratory judgment that

the Defendants have violated the housing contract[.]") (presumably referring to KKG

and/or Rooney); *Lovell v. State Farm Mut. Auto. Ins. Co.*, 466 F.3d 893, 897 (10th Cir.

2006) ("The Tenth Circuit has followed what has commonly been referred to as the

'either viewpoint rule' which considers either the value to the plaintiff or the cost to

defendant of injunctive and declaratory relief as the measure of the amount in

controversy for purposes of meeting the jurisdictional minimum.") (internal quotation

omitted). Plaintiffs also do not allege that KKG Building Co. is jointly liable with its co-

defendants. Nor is this a case where unquantifiable variables prevent the Court from

declaring to a legal certainty that no jury would award Plaintiff more than $75,000;

Plaintiffs, in their words, do not seek damages from KKG Building Co. and, when

prompted by Defendants to their amount-in-controversy flaw, fail to respond.

Accordingly, because Plaintiffs do not seek damages against KKG Building Co. and fail

to plead an amount in controversy as to that Defendant, the Court dismisses KKG

Building Co. from Count II for lacking subject matter jurisdiction.

12

But wait, say Plaintiffs, KKG Building Co. is a Fed. R. Civ. P. 19(a)(1)(B)

required party. "When applying Rule 19, a district court must first determine whether the

absent party is necessary to the lawsuit[.]" *See Davis v. United States*, 192 F.3d 951, 957

(10th Cir. 1999) (citing Fed. R. Civ. P. 19(a)). Necessity weighs three factors, including:

"(1) whether complete relief would be available to the parties already in the suit, (2)

whether the absent party has an interest related to the suit which as a practical matter

would be impaired, and (3) whether a party already in the suit would be subjected to a

substantial risk of multiple or inconsistent obligations." *Rishell v. Jane Phillips Episcopal

Mem. Med. Ctr.*, 94 F.3d 1407, 1411 (10th Cir. 1996) (footnote omitted).[23] "If a

necessary person cannot be joined, the court proceeds to the second step, determining

'whether in equity and good conscience the action should proceed among the parties

before it, or should be dismissed, because the absent person . . . is indispensable' to the

litigation at hand." *Davis ex rel. Davis v. United States*, 343 F.3d 1282, 1289 (10th Cir.

2003) (quoting Fed. R. Civ. P. 19(b)) (internal brackets omitted).

---

[23] Identical in effect to *Rishell*'s three-factor test, Fed. R. Civ. P. 19(a) states:
    (1) *Required Party.* A person who is subject to service of process and whose joinder will
    not deprive the court of subject-matter jurisdiction must be joined as a party if:
        (A) in that person's absence, the court cannot accord complete relief among
        existing parties; or
        (B) that person claims an interest relating to the subject of the action and is so
        situated that disposing of the action in the person's absence may:
            (i) as a practical matter impair or impede the person's ability to protect the
            interest; or
            (ii) leave an existing party subject to a substantial risk of incurring double,
            multiple, or otherwise inconsistent obligations because of the interest.
    Fed. R. Civ. P. 19(a)(1).

13

Plaintiffs bear the burden of demonstrating KKG Building Co.'s necessity, yet,

beyond bare allusion to Fed. R. Civ. P. 19(a)(1)(B), make no effort to do so. *See Davis*,

192 F.3d at 951; ECF Nos. 6, ¶ 23; 24, at 17. Nor is it apparent to the Court whether joinder,

in Plaintiffs' view, is warranted under Fed. R. Civ. P. 19(a)(1)(B)(i) or (ii). *See* Fed. R.

Civ. P. 19(a)(1)(B); *see also* ECF No. 25, at 2, 4–8 (arguing for Langford's joinder under

Fed. R. Civ. P. 19(a)). Considering, *sua sponte*, KKG Building Co.'s necessity under

*Rishell*'s factors, none weigh in favor of KKG Building Co.'s joinder.

First, Plaintiffs fail to establish that complete relief cannot be granted among KKG

and Rooney.[24] Though difficult to decipher,[25] Plaintiffs clarify that, under Count II, KKG's

"actions" breached "two" contracts, including Plaintiffs' membership contracts with KKG

in Ohio and their housing contracts with KKG Building Co. in Wyoming. ECF No. 24, at

14. As to Count III, Plaintiffs seemingly allege that KKG tortiously interfered with

Plaintiffs' housing contracts – and, like Count II, not any improper action by KKG Building

Co. ECF No. 6, ¶¶ 23 ("Plaintiffs do allege that Kappa Kappa Gamma Fraternity has

interfered with their contractual relationship with [KKG Building Co.]."), 175. Because

---

[24] *See Begay v. Pub. Serv. Co. of N.M.*, 710 F. Supp. 2d 1161, 1183 (D.N.M. 2010) ("'Complete relief refers to relief as between the persons already parties to the action and not as between a present party and the absent party whose joinder is sought.'") (quoting *Champagne v. City of Kan. City, Kan.*, 157 F.R.D. 66, 67 (D. Kan. 1994)).

[25] *See also* ECF Nos. 24, at 14 ("Plaintiffs admit that there may be some ambiguities in the Complaint, but only because there are actually two different contracts."), 20, at 17 n.8 ("To the extent Plaintiffs purport to allege a breach of contract claim against Kappa or Rooney, the Court should dismiss it because Plaintiffs do not allege that either is a party to the [KKG Building Co.] [c]ontracts.").

both contractual claims attack KKG's actions, not KKG Building Co.,[26] complete relief can be granted among KKG and/or Rooney.

Second, KKG Building Co. does not have an interest in this suit at risk of impairment. The Court's review of the housing contracts, in fact, belies Plaintiffs' contention that KKG Building Co. contracted with Plaintiffs to "provide housing in accordance with the Bylaws, Standing Rules, and Policies of Kappa Kappa Gamma." ECF Nos. 6, ¶ 170; 24, at 14. The only applicable section of the housing contracts states:

> **5. Other Services.** *The chapter [i.e., the UW chapter] shall provide the student such services* as are customarily furnished by the chapter to residents of the chapter house, subject to this contract, the Kappa Kappa Gamma Fraternity *Bylaws, Standing Rules and Policies*; and rules and regulations of the chapter, including, without limitation, the House Rules attached hereto as Exhibit, subject to any changes may be made by the chapter, House Board or the Fraternity at any time.

ECF No. 6-1, at 166–67 (identifiers omitted) (emphasis added). Notified of the lacking contractual language supporting their claim, Plaintiffs, once again, fail to respond. *See* ECF Nos. 20, at 19; 24. Thus, a key allegation to keep KKG Building Co. in this lawsuit – that KKG Building Co. is contractually obligated to provide housing per headquarters policy – withers under the Court's glancing scrutiny; if anything, the UW chapter must abide by such policies, not KKG Building Co. ECF No. 6, ¶ 170. Furthermore, it is KKG's policies that underpin the sorority's alleged breach and tortious interference; under Plaintiffs' view,

---

[26] ECF No. 6, ¶ 171 ("Langford's access to and presence in the sorority house violates the housing contract that Plaintiffs signed."), ¶ 175 ("Through their [*i.e.*, KKG and/or Rooney's] initiation of Langford, Defendants have prevented Plaintiffs from having the benefit of the Housing Contract that they signed."), at 70 (requesting "[a] declaratory judgment that the Defendants [*i.e.*, KKG and/or Rooney] have violated the housing contract").

this case turns on KKG's governing documents, not an independent non-profit confined to housing issues, of which any interests held are adequately represented by KKG and/or Rooney. *See id.*, ¶¶ 170, 175; *EquiMed, Inc. v. Genstler*, 170 F.R.D. 175, 179 (D. Kan. 1996) (finding that joinder of an absent party was not necessary if its interests were adequately represented by present parties) (citing *Rishell*, 94 F.3d at 1411–12); *Portable Solar, LLC v. Lion Energy, LLC*, No. 22-CV-00026-DAK, 2022 WL 3153869, at *2 (D. Utah Aug. 8, 2022) (noting that in tortious interference cases, courts should determine necessity "by evaluating whether the absent party's rights or obligations under an existing contract have necessarily become implicated"). However ineloquent, Plaintiffs' housing contracts with KKG Building Co., while possibly relevant to damages down the road, are *not* the subject of this litigation. *See Wolf Mountain Resorts, LC v. Talisker Corp.*, No. 07–CV–00548DAK, 2008 WL 65409, at *3 (D. Utah Jan. 4, 2008) ("It is well-established that a party to a contract *which is the subject of the litigation* is considered a necessary party.") (internal citation omitted) (emphasis added).

Third, there is no evidence to support an assertion that KKG or Rooney would be subject to a substantial risk of multiple or inconsistent obligations if KKG Building Co. was removed from this lawsuit. "Inconsistent obligations occur when a party is unable to comply with one court's order without breaching another court's order concerning the same incident." *Sonnett v. Lankford*, No. 15–CV–0024–SWS, 2016 WL 9105175, at *2 (D. Wyo. Mar. 16, 2016) (internal quotation omitted). In short, nothing before the Court indicates that KKG or Rooney's abilities to protect their interests would be hindered by dismissing KKG Building Co.

16

Therefore, the Court finds that KKG Building Co. is not a Fed. R. Civ. P. 19(a)(1)(B) necessary party.[27] The action proceeds, as does the Court, without KKG Building Co.

B. *The Court's Personal Jurisdiction over Rooney.*

Shouldering their burden, Plaintiffs demonstrate this Court's personal jurisdiction over Rooney. The parties dispute Rooney's contacts with Wyoming. On one hand, Plaintiffs say that this Court has specific jurisdiction over a derivative suit against Rooney, a corporate official, in Wyoming, where alleged injury, past and future, occurred. *See* ECF No. 24, at 2 (citing *Newsome v. Gallacher*, 722 F.3d 1257 (10th Cir. 2013)). Defendants counter that Plaintiffs levy no allegation that Rooney directed any conduct at Wyoming. *See* ECF No. 26, at 3–4.

Plaintiffs assert one sect of personal jurisdiction – to wit, specific – which allows this Court to haul a nonresident defendant to Wyoming federal court. *See OMI Holdings, Inc.*, 149 F.3d at 1090–91.[28] Specific jurisdiction "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*

---

[27] Because KKG Building Co. is not a necessary party, the Court need not proceed with an indispensability analysis under the Tenth Circuit's second step. *See Salt Lake Tribune Pub. Co., LLC v. AT & T Corp.*, 320 F.3d 1081, 1098 (10th Cir. 2003).

[28] This Court holds "'considerable leeway in deciding a pretrial motion to dismiss for lack of personal jurisdiction.'" *Tungsten Parts Wyo., Inc. v. Glob. Tungsten and Powders Corp.*, No. 21-CV-99-ABJ, 2022 WL 19263451, at *3 (D. Wyo. Jul. 13, 2022) (quoting *Cheyenne Publ'g, LLC v. Starostka*, 94 P.3d 463, 469 (Wyo. 2004) (internal citation omitted)). The Court also makes that determination "'on the basis of pleadings and other materials called to its attention.'" *Id.* (quoting *Staroskta*, 94 P.3d at 469).

*Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (internal quotation, citation, and brackets omitted). "To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state[29] and that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment." *Towne*, 46 F.3d at 1074.

Notably, "[s]pecific jurisdiction is proper if (1) the out-of-state defendant 'purposefully directed' its activities at residents of the forum State, and (2) the plaintiff's alleged injuries 'arise out of or relate to those activities.'" *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 840 (10th Cir. 2020) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). Challenged today, purposeful direction[30] "calls for an inquiry into whether [Plaintiffs] have shown that [Rooney's] acts were (1) intentional, (2) 'expressly aimed' at Wyoming, and (3) done with 'knowledge that the brunt of the injury would be felt' in Wyoming." *Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 959 (10th Cir. 2022) (quoting *Dudnikov*, 514 F.3d at 1072).[31]

---

[29] Wyoming's long-arm statute, Wyo. Stat. § 5-1-107(a), confers jurisdiction "on any basis not inconsistent with the Wyoming or United States constitution."

[30] Purposeful direction, or purposeful availment, requires that the defendant "deliberately . . . engaged in significant activities within the forum State or deliberately directed [her] activities at the forum State, so that [she] has manifestly availed [her]self of the privilege of conducting business there." *XMission, L.C.*, 955 F.3d at 840 (internal quotation, citation, and brackets omitted).

[31] Additionally, if the Court determines that the minimum contacts standard is satisfied, exercising personal jurisdiction over Rooney "must always be consonant with traditional notions of fair play and substantial justice." *Dudnikov*, 514 F.3d at 1080 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

18

Plaintiffs plead Rooney's[32] purposeful direction. Plaintiffs allege that Rooney, despite "aware[ness]" of Langford's ineligibility, "violated [her] fiduciary duties to [KKG] when [she] procured and approved the initiation of" Langford. ECF No. 6, ¶¶ 49, 105. Thus, the first element, intentional action, is satisfied; the record contains no suggestion that Rooney acted unintentionally when, accepted as true, she approved Langford's initiation following the UW chapter's invitation. While the parties disagree when Rooney, or others on the Fraternity Council, knew about Langford's invitation to join the UW chapter, Rooney's approval of Langford's induction, as alleged, occurred thereafter. *See* ECF Nos. 20, at 12 n.6; 24, at 8.

The second element, express aiming at Wyoming, is more difficult for Plaintiffs, but is nonetheless cleared. Yes, Plaintiffs' *Complaint* lacks reference to Rooney's dealings with the UW chapter as President or her personal sign-off on Langford's admission thirteen hundred miles away. The email from Executive Director[33] Kari Kittrell Poole – informing Plaintiffs that their "concerns were reviewed by several national officers of the organization" and "we believe proceeding with [Langford's]

---

[32] Plaintiffs' suing of only KKG's President, Rooney, and not other Fraternity Council members, is also debated. *See* ECF Nos. 20, at 10 n.5; 24, at 7 n.2 ("The law does not require more, but if there is a concern, Plaintiffs can sue more directors. [] Plaintiffs are open to whatever direction is provided."). § 1702.12(I)(1)(c) does not appear to require naming all directors or officers as defendants. *See* Ohio Rev. Code Ann. § 1702.12(I)(1)(c) (". . . against . . . *a* director, *an* officer[.]") (emphasis added); *see also In re Ferro Corp. Derivative Litig.*, 511 F.3d 611, 618–19 (6th Cir. 2008) ("[A] [pre-suit] demand may also be excused [from Ohio Civ. R. 23.1] 'when all directors are named as wrongdoers and defendants in a suit[.]'") (quoting *Carlson v. Rabkin*, 152 Ohio App. 3d 672, 681 (1st Dist. 2003)). Due to its inability, however, to locate any state authority on this question, the Court reserves judgment.
[33] ECF No. 6-1, at 21 ("An Executive Director, employed by the Fraternity, shall serve as the chief administrative officer and corporate secretary of the Fraternity and perform such duties as defined by Fraternity Council.").

19

initiation is the appropriate next step" – goes both ways; while that email could refer to

any of the other six members of the Fraternity Council, excluding Rooney, it is obviously

feasible that the Fraternity Council's corporate secretary was referring to the president[34]

of that body when she used "we". ECF No. 6, ¶¶ 93, 141. Forgoing separation of their

purposeful direction analysis by element, Defendants lean upon, without naming, the

fiduciary shield doctrine. *See* ECF No. 20, at 8–9 (quoting *Christian v. Loyakk, Inc.*, No.

19-CV-220-F, 2023 WL 170868, at *14 (D. Wyo. Jan. 12, 2023)) (also quoting *Virgin*

*Enter. Ltd. v. Virgin LLC*, No. 19-CV-220-F, 2019 WL 13222758, at *3 (D. Wyo. Dec.

30, 2019), that dealt with foreign service of process and is inapposite). Under that

doctrine,[35] even if a particular employee has "substantial contacts" with the forum state,

"those contacts will not count against the employee in the personal jurisdiction analysis

so long as the employee acted solely on the corporation's behalf." *Newsome*, 722 F.3d at

1275. Given that Rooney undoubtedly has not had "substantial contacts" with Wyoming,

Defendants appear to be arguing that contacts by Rooney's "workforce" (*e.g.*, KKG-

employed alumnae advisers at the UW chapter or Executive Director Poole)[36] in

Wyoming do not convey this Court's personal jurisdiction over Rooney. ECF No. 6, ¶ 74;

---

[34] "The members of Fraternity Council shall be the *officers* of the Fraternity: the President, the Four Vice Presidents, and the Treasurer." ECF No. 6-1, at 18 (emphasis added).
[35] Though the Wyoming Supreme Court has not expressly adopted the fiduciary shield doctrine, the Tenth Circuit invoked the doctrine under an application of Wyoming law. *See Newsome*, 722 F.3d at 1277.
[36] While this Judge is near-numb to hyperbole, Plaintiffs' statement that "every single [chapter] decision is made by the 'workforce' that Rooney commands" is plainly inaccurate. *See* ECF No. 24, at 7. Per the UW chapter's *Bylaws*, KKG advisers may not vote during recruitment of new members. *See* ECF No. 6-1, at 208 ("Advisers shall serve in an advisory capacity without a vote."). The KKG bylaws outline the same. *See id.* at 27 ("Advisers to each of the chapter officers . . . shall serve in an advisory capacity without vote.").

20

*see, e.g.*, *Walden v. Fiore*, 571 U.S. 277, 286 (2014) ("Due process requires that a defendant be haled into court in a forum State based on h[er] own affiliation with the State, not based on the . . . 'attenuated' contacts [s]he makes by interacting with other persons affiliated with the State.") (quoting *Burger King Corp.*, 471 U.S. at 475).

Fair enough. Nevertheless, accepting Plaintiffs' allegation that Rooney approved Langford as true, as I must, the "'focal point'" of Rooney's actions occurred in Wyoming. *See Dudnikov*, 514 F.3d at 1076–77 (quoting *Calder v. Jones*, 465 U.S. 783, 789 (1984)). Langford's admission, however minor among thousands across 140 chapters each fall and spring, occurred at a KKG chapter house in Wyoming; Rooney's alleged sign-off was an "intentional action[] that [was] expressly aimed at" Wyoming. *See id.* (finding express aiming where the defendants intended "to halt a Colorado-based sale by a Colorado resident" and the presiding-state's location was obvious from an eBay auction page) (emphasis altered). Moreover, a corporate officer[37] may be sued in a derivative action where the injury occurred. *See, e.g.*, *Newsome*,[38] 722 F.3d at 1268–69 (finding personal jurisdiction where corporate directors expressly aimed their wrongdoing at

---

[37] Defendants do not offer, nor can this Court unearth, controlling authority indicating that Rooney's volunteer status on the Fraternity Council dictates a contrary outcome than would a compensated officer. *See* ECF Nos. 20, at 8–9; 26, at 3–4; *see also Bronner v. Duggan*, 249 F. Supp. 3d 27, 40 (D.D.C. 2017) (finding that, despite the volunteer service of a governing body's officers, the directors could still anticipate being hauled into a Washington, D.C. court to account for their activities).

[38] Defendants' interpretation of *Newsome*, that a fiduciary can be subject to personal jurisdiction *if* that fiduciary has contacts with the forum state, lacks support. *See* ECF No. 26, at 3 (citing 722 F.3d at 1264, which merely outlined personal jurisdiction's general contours). Defendants also fail to engage with *Newsome*'s analysis of the purposeful direction elements. *See* 722 F.3d at 1268–74; ECF No. 20, at 9. Their reply offers no additional authority that compels the Court otherwise. *See* ECF No. 26, at 3–4.

Oklahoma when they saddled a subsidiary company, knowing it "operated exclusively" in Oklahoma, with overwhelming debt).

The final element of purposeful direction "concentrates on the consequences of the defendant's action–where was the alleged harm actually felt by the plaintiff." *Dudnikov*, 514 F.3d at 1075. I look, once again, to *Newsome*, where the Tenth Circuit found that a Delaware corporation and its creditors, to whom the defendants owed fiduciary duties, were injured primarily in Oklahoma because "the individual defendants knew that the brunt of any injury to [the corporation] would be felt in Oklahoma." *See* 722 F.3d at 1269 (citing *Dudnikov*, 514 F.3d at 1077). KKG operates via its Gamma Omicron chapter in Wyoming; when Rooney approved Langford's admission, injury, if any, would occur on campus in Laramie, Wyoming. ECF No. 6, ¶¶ 166–67. Therefore, Rooney "purposefully directed" her activities at Wyoming.[39] *See Dudnikov*, 514 F.3d at 1078 (internal quotation marks omitted).

Plaintiffs demonstrate this Court's personal jurisdiction over Rooney. The Court proceeds to the merits.

C. *Count I: Plaintiffs' Derivative Claim*.

Defendants critique Count I in two ways, including Plaintiffs': (1) failure to demonstrate futility under Ohio law; and (2) seeking of relief contravening a voluntary

---

[39] Because Defendants do not challenge personal jurisdiction on any basis but purposeful direction (*i.e.*, specific jurisdiction's initial element), the Court declines from engaging in unbriefed analyses concerning Plaintiffs' alleged injuries "aris[ing] out of or relat[ing] to those activities [above]" or "'offend[ed] traditional notions of fair play and substantial justice.'" *See XMission, L.C.*, 955 F.3d at 840 (internal quotation omitted); *Dudnikov*, 514 F.3d at 1080 (quoting *Int'l Shoe Co.*, 326 U.S. at 316); ECF Nos. 20, at 8–9; 26, at 3–4.

organization's freedom of association. While Plaintiffs demonstrate futility under Ohio law, their derivative claim against Rooney[40] fails to escape KKG's First-Amendment-protected freedom of expressive association to include transgender members.

**1. Ohio Civ. R. 23.1 Futility.**

I begin with Defendants' argument of lacking Ohio Civ. R. 23.1 specificity. Due to KKG's incorporation in Ohio, Ohio law governs Plaintiffs' derivative claim.[41] "When members bring a derivative action against a nonprofit corporation, they are enforcing a corporate right just as shareholders in for-profit corporations." *Russell v. United Missionary Baptist Church*, 92 Ohio App. 3d 736, 739 (12th Dist. 1994); Ohio Rev. Code Ann. § 1702.12(I)(1)(c). Governing derivative actions, Ohio Civ. R. 23.1 states:

> **Derivative Actions by Shareholders.** . . . The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors and, if necessary, from the shareholders and the reasons for his failure to obtain the action or for not making the effort.

---

[40] *See* ECF No. 6, ¶¶ 163 ("[T]he directors of the Sorority have violated their duties of loyalty, care, and obedience/compliance."), 166 ("As a result of Defendant's behavior . . ."), 167 ("[T]he behavior of Defendant Rooney and other Fraternity Council members will result in the chapter's closure[.]").

[41] Both parties appear to stipulate that, due to its incorporation in Ohio as a private, non-profit corporation, KKG is governed by Ohio law. *See* ECF Nos. 20, at 9; 24, at 11–12; 6-1, at 23 ("The Fraternity shall be governed in accordance with the laws of the state of Ohio[.]"); *see, e.g.*, *In re ZAGG Inc. S'holder Derivative Action*, 826 F.3d 1222, 1228 (10th Cir. 2016) (noting that "federal common law should adopt the futility law of the state of incorporation of the company on behalf of which the plaintiffs are bringing suit"); *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 179 n.10 (3d Cir. 2005) (applying the law of the state of incorporation to breach of fiduciary duty claims); *Baker-Bey v. Delta Sigma Theta Sorority, Inc.*, No. 12–1364, 2013 WL 1742449, at *4 (E.D. Pa. Apr. 23, 2013) (same).

Ohio Civ. R. 23.1; *see also* Fed. R. Civ. P. 23.1(b)(3)(A).[42] "'[N]o shareholder has an

independent right to bring suit *unless* the board [of directors] refuses to do so *and* that

refusal i[s] wrongful, fraudulent, or arbitrary, or is the result of bad faith or bias on the

part of the directors.'" *In re Cardinal Health, Inc. Derivative Litig.*, 518 F. Supp. 3d

1046, 1064 (S.D. Ohio 2021) (quoting *Drage v. Procter & Gamble*, 119 Ohio App. 3d

19, 24 (1st Dist. 1997)) (emphasis in original). Failure to make this pre-suit demand is

excused, however, when a plaintiff can demonstrate that the demand would have been

futile. *Id.* (citing *Drage*, 119 Ohio App. 3d at 25).

> Ohio courts have found a demand presumptively futile '*where the directors
> are antagonistic, adversely interested, or involved in the transactions
> attacked.*' Likewise, for example, a demand may also be excused 'when all
> directors are named as wrongdoers and defendants in a suit, when there is
> self-dealing by the directors such that the directors gain directly from the
> challenged transactions, or when there is domination of nondefendant
> directors by the defendant directors.'

*In re Ferro Corp. Derivative Litig.*, 511 F.3d at 618–19 (quoting *Bonacci*, 1992 WL

181682, at *4 and *Carlson*, 152 Ohio App. 3d at 681) (emphasis added). Defendants

argue that Plaintiffs' failure to elevate their concerns to the Fraternity Council and

identify violated KKG bylaws belies futility. *See* ECF No. 20, at 11–12. Plaintiffs

counter, sans state authority, that they and other relatives[43] pestered KKG for months

---

[42] "[Ohio] Civ. R. 23.1 and Fed. R. Civ. P. 23.1 are essentially the same." *Bonacci v. Ohio
Highway Exp., Inc.*, No. 60825, 1992 WL 181682, at *4 (8th Dist. Jul. 30, 1992) (spacing
altered).

[43] *See also* ECF No. 27-1, at 1 (*i.e.*, the mother of Plaintiff Holtmeier's email to a KKG officer).
Though the email's date is unlisted, the Court presumes, based on the reference to Langford's
accepting a bid "today", that the email was sent in October or early November 2022.

prior to Langford's induction and were ultimately rejected by Executive Director Poole's

email in mid-November 2022. *See* ECF Nos. 24, at 10; 6, ¶ 165; 6-1, at 45–47.

Plaintiffs plead specific facts to demonstrate that the Fraternity Council, akin to

Kappa's board of directors,[44] is "antagonistic, adversely interested, or involved in the

transactions attacked." *See In re Ferro Corp. Derivative Litig.*, 511 F.3d at 618; *see also*

*Leff v. CIP Corp.*, 540 F. Supp. 857, 868–69 (S.D. Ohio 1982) (when evident from a

complaint that the directors of a corporation would oppose a derivative suit, formal

demand on the directors is considered futile and unnecessary). Though demand futility in

Ohio is no "easy task,"[45] further efforts by Plaintiffs to convince the Fraternity Council to

alter their stance on admitting "individuals who identify as women" would be futile. For

months ahead of Langford's induction, Plaintiffs, their families, and counsel petitioned

Executive Director Poole, Rooney, KKG district and content directors, and KKG alumni

representatives to overrule the UW chapter's decision. ECF Nos. 6-1, at 178–79; 24, at 9–

11; 27-1, at 1. Addressing KKG leadership, including Rooney, Plaintiffs' counsel

communicated the crux of their future claims, including "a breach of contract and a

---

[44] *See* Ohio Rev. Code Ann. §§ 1702.01(K) ("'Directors' means the persons vested with the authority to conduct the affairs of the corporation irrespective of the name, such as trustees, by which they are designated."), 1702.30(B) ("A director shall perform the duties of a director, including the duties as a member of any committee of the directors upon which the director may serve, in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances. A director serving on a committee of directors is acting as a director."); ECF No. 6-1, at 18 ("Fraternity Council serving hereunder shall have the power, authority and responsibilities of and shall perform the functions provided for directors under the Ohio Nonprofit Corporation Law.").
[45] *In re Ferro Corp. Derivative Litig*, No. 04CV1626, 2006 WL 2038659, at *5 (N.D. Ohio Mar. 21, 2006).

25

violation of Kappa Kappa Gamma's by-laws and standing rules", recounted their failed efforts thus far (*e.g.*, being "told that their values don't align with those of Kappa so they should reconsider being in Kappa"), and requested that the Fraternity Council "legally alter the sorority's membership requirements and conduct a valid vote in accord with existing rules or halt the illegal course of conduct being pursued[.]" ECF No. 6-1, at 179–80 (internal quotation marks and errant comma omitted). Rooney, Executive Director Poole, and other Fraternity Council members are the same officers who purportedly approved Langford; under Plaintiffs' theory, Rooney and other directors violated KKG's bylaws[46] – of course the Fraternity Council would oppose Plaintiffs' federal lawsuit. Finding futility under Ohio Civ. R. 23.1, the Court forges on.

### 2. Kappa Kappa Gamma's Freedom of Expressive Association.

After much leadup, the Court turns to the gravamen of Plaintiffs' lawsuit. Their derivative claim condenses to this: from 1870 to 2018, KKG defined "woman" to exclude transgender women; any new definition may not be enacted, *ultra vires*, without a KKG bylaw amendment.[47] Expectedly, Defendants counter: private organizations may interpret their own governing documents and define "woman" as including transgender women.[48]

Defendants are correct. Defining "woman" is Kappa Kappa Gamma's bedrock right as a private, voluntary organization – and one this Court may not invade. Below, I apply Ohio and U.S. Supreme Court jurisprudence to the facts at bar.

---

[46] ECF No. 6, ¶¶ 163–65.
[47] *See* ECF Nos. 24, at 11–14; 6, ¶ 104.
[48] *See* ECF No. 20, at 12–15.

26

First, Ohio law is highly deferential to associational interpretation. "As a general

rule, Ohio courts are unwilling to interfere with the management and internal affairs of a

voluntary association." *Redden v. Alpha Kappa Alpha Sorority, Inc.*, No. 09CV705, 2010

WL 107015, at *5 (N.D. Ohio Jan. 6, 2010). More specifically:

> [T]hose who become members of non-profit corporations are presumed to
> have joined them with knowledge of their nature and the law applicable to
> them, and to have consented to be bound by the principles and rules of
> government, *or the policy which they have adopted, or may adopt* . . . [T]he
> member has, by voluntarily becoming a member of the order, chosen his
> forum for the redress of his grievances, and *unless there has been some
> palpable violation of the constitution or laws of the corporation whereby he
> has been deprived of valuable rights, the civil courts will not interfere.*

*Powell v. Ashtabula Yacht Club*, No. 953, 1978 WL 216074, at *3 (11th Dist. Dec. 4,

1978) (internal citations omitted) (emphasis added) (rejecting a member's plea to

overturn the termination of his club membership where the club met due process

requirements, including facilitating the member's presence and opportunity to be heard at

a hearing); *see Stibora v. Greater Cleveland Bowling Ass'n*, 63 Ohio App. 3d 107, 113

(8th Dist. 1989) ("'A voluntary association may, without direction or interference by the

courts, for its government, adopt a constitution, by-laws, rules and regulations which will

control as to all questions of discipline, *or internal policy and management*, and its *right

to interpret and administer the same is as sacred as the right to make them.*'") (quoting

*State ex rel. Givens v. Superior Court of Marion Cnty.*, 233 Ind. 235, 238 (1954))

(emphasis added); *Putka v. First Catholic Slovak Union*, 75 Ohio App. 3d 741, 748 (8th

Dist. 1991), *cert. denied*, 503 U.S. 986 (1992) ("Generally speaking, in matters of policy,

discipline or internal economy of a voluntary association, wherein the members have

27

mutually agreed upon a charter or rules, the decision of the association itself is
supreme.") (internal citation omitted).

I turn to guidance from the United States Supreme Court. In *Boy Scouts of Am. v.
Dale*, 530 U.S. 640 (2000) (Rehnquist, C.J.), the Court held that the application of New
Jersey's nondiscrimination law, requiring the Boy Scouts to appoint James Dale, an
openly gay man as a scoutmaster, ran "afoul of the Scouts' freedom of expressive
association."[49] *Id.* at 656. The Court found that a state compelling the Scouts to include
Dale would "interfere with the Boy Scouts' choice not to propound a point of view
contrary to its beliefs." *Id.* at 653–54. "[T]he First Amendment simply *does not require
that every member of a group agree on every issue* in order for the group's policy to be
'expressive association.' The Boy Scouts takes an official position . . . and that is
sufficient for First Amendment purposes."[50] *Id.* at 655 (emphasis added). Chief Justice
Rehnquist concluded:

> 'While the law is free to promote all sorts of conduct in place of harmful
> behavior, *it is not free to interfere with speech for no better reason than
> promoting an approved message or discouraging a disfavored one*,
> however enlightened either purpose may strike the government.'

---

[49] Freedom of expressive association is the "right to associate with others in pursuit of a wide
variety of political, social, economic, educational, religious, and cultural ends." *Dale*, 530 U.S. at
647.

[50] *See also Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1149 (10th Cir. 2013) (en banc)
(Hartz, J., concurring) ("[An organization's] speech or conduct may reflect the view of only a
bare majority of the members, *or even just the view of the members' delegate*–such as the editor
of a newspaper or the pastor of a congregation. It suffices that the speech or conduct represents
an 'official position.'") (quoting *Dale*, 530 U.S. at 655) (emphasis added).

*Id.* at 661 (quoting *Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Boston*, 515

U.S. 557, 579 (1995)) (emphasis added). *Dale*'s takeaway for the Court: the government

may not defy the internal decision-making of a private organization, including the criteria

governing that entity's membership.[51]

Voluntary organizations beget benefits and drawbacks. KKG provides community

on campus and a professional network for life.[52] Forty-four women in Laramie seemingly

prioritized those benefits when they rushed. Membership, on the other hand, relinquishes

a dose of personal autonomy. That organization may say or publish something anathema

to one or a faction of members. Take the 2018 *Guide*, speech that Plaintiffs undoubtedly

---

[51] Advanced by Defendants, *Bostock*, by contrast, is inapposite today. *See Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731 (2020) (Gorsuch, J.). There, the Court held that "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex" because "to discriminate on th[is] ground[] requires an employer to intentionally treat individual employees differently because of their sex." *Id.* at 1741–42. Justice Gorsuch concluded that Title VII "prohibit[s] [employers] from firing employees on the basis of . . . transgender status." *Id.* at 1753. Both sides misapply *Bostock.* Defendants say that if the Supreme Court interpreted "discrimination because of sex" as protecting transgender individuals, so too may Kappa interpret its bylaws "to be similarly inclusive." *See* ECF No. 20, at 14. Plaintiffs respond that the law's ordinary meaning at enactment (*i.e.*, KKG's definition of "woman" in 1870) "usually governs." *See* ECF No. 24, at 12–13. Neither argument assists the Court today. Had the UW chapter or KKG denied Langford admission because she was transgender, *Bostock*, though addressing employer discrimination, would certainly amplify. On the other hand, *Bostock* concerned the Court's statutory interpretation of Title VII and not a private organization's internal bylaws. *See, e.g.*, 140 S. Ct. at 1738 ("[O]nly the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending the statutes outside the legislative process reserved for the people's representatives.").

[52] In fact, each year of their KKG membership, Plaintiffs signed the following: "I recognize that membership in Kappa Kappa Gamma offers me many benefits and the opportunity for friendship, mutual support, personal growth and intellectual development. I understand that the privilege of membership comes with great responsibility." ECF No. 6-1, at 163; *see also 303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2315 (2023) (Gorsuch, J.) ("In *Dale*, the Boy Scouts offered what some might consider a unique experience.") (citing 530 U.S. at 649–50).

disagree with. Just as the Boy Scouts were "an expressive association" entitled to First

Amendment protection, so too is Kappa Kappa Gamma.[53] *See Dale*, 530 U.S. at 647–56,

650 ("It seems indisputable that an association that seeks to transmit such a system of

values engages in expressive activity."). The law, or this Court, may not interfere with –

whether promoting or discouraging – that speech. *Dale* controls today, interestingly with

the shoe on the other foot.[54] Whether excluding gay scoutmasters in *Dale* or including

transgender women in Kappa, this Judge may not invade Kappa's sacrosanct,

associational right to engage in protected speech. KKG's "official position" of admitting

transgender women, even if decreed by a mere "delegate", is speech which this Court

may not impinge. *See Dale*, 530 U.S. at 655; *Sebelius*, 723 F.3d at 1149 (Hartz, J.,

---

[53] *See Iota XI Chapter of the Sigma CHI Fraternity v. Paterson*, 538 F. Supp. 2d 915, 923 (E.D. Va. 2008), *aff'd on other grounds*, 566 F.3d 138 (4th Cir. 2009) (extrapolating *Dale* to find that "a college fraternity is no different from the Boy Scouts"); *see also Schultz v. Wilson*, 304 F. Appx. 116, 120 (3d Cir. 2008) (unpublished) ("A social group is not protected unless it engages in expressive activity such as taking a stance on an issue of public, political, social, or cultural importance.") (internal citation omitted). The 2018 *Guide* was obviously such a stance by KKG. Because this matter presents no governmental action, which, in part, distinguishes *Dale*, the Court sees no reason to conduct *Dale*'s three-step analysis regarding a group's expressive association claim. *See* 530 U.S. at 650–56.

[54] Plaintiffs do not engage with *Dale*. Had they, Plaintiffs would likely contend that the Fraternity Council's unilateral decision to admit transgender women violated the members' First Amendment rights because it "force[d] the organization to send a message . . . that [it] accepts" transgender women for KKG membership, belying their views. *See Dale*, 530 U.S. at 650; *see also Green v. Miss United States of Am., LLC*, 52 F.4th 773, 802 (9th Cir. 2022) (rejecting a transgender applicant's plea to "use the power of the state to force Miss United States of America to express a message contrary to what it desires to express"). *Dale*'s posture, however, lends little to Plaintiffs; there, the Court considered the constitutionality of a state's nondiscrimination law compelling expression, rather than a member's challenge to an expressive decision of their voluntary organization. *See also Roberts v. U.S. Jaycees*, 468 U.S. 609, 622–23 (1984) (Brennan, J.) ("There can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire. Such a regulation may impair the ability of the original members to express only those views that brought them together.").

concurring). Notably, there are also two associational layers before the Court. Not only

did KKG headquarters publish their willingness to accept transgender women in 2018,

the UW chapter voted to associate with Langford in 2022. *See Dale*, 530 U.S. at 658

("Impediments to the exercise of one's right to choose one's associates can violate the

right of association protected by the First Amendment.") (internal quotation and brackets

omitted). Cognizant of Langford's gender identity, the UW chapter determined that she

met *their* criteria for membership, including, *inter alia*, "integrity, respect, and regard for

others"; KKG confirmed the same thereafter. ECF No. 6-1, at 6–7. Their decisions lie

beyond the purview of this Court.

Plaintiffs respond that Kappa's freedom of expressive association does not insulate

the organization from amendment of its own bylaws. I disagree, especially where

Plaintiffs cannot point the Court to the bylaw that defines "woman" the way they wish.

Of course, an organization binds itself via its bylaws.[55] Those bylaws state that a new

Kappa "shall be a woman".[56] ECF No. 6-1, at 6. The parties diverge from there. Whereas

Plaintiffs circumscribe "woman", their delegate augmented the same. *See* ECF No. 24, at

11. In the Court's view, that is a lawful interpretation – explicitly authorized per the

sorority's *Standing Rules* – of an otherwise-silent bylaw. *See* ECF No. 6-1, at 119 ("The

---

[55] ECF No. 6-1, at 23 ("The Fraternity *Bylaws* shall constitute the code of regulations of the Fraternity.").

[56] The Court sees no reason to disturb the governance process by which the Fraternity Council published its *Position Statements* in 2021 and *FAQs* in 2022 ahead of KKG's biennial convention in 2022. Any issue that Plaintiffs raise with respect to KKG's putatively improper counting of the two-thirds vote necessary for bylaw amendment belong before the sorority, not this Court. *See also* ECF No. 6-1, at 24 (mandating a two-thirds convention vote to amend a KKG bylaw, sans any requirement regarding the Fraternity Council's method (*e.g.*, voice or written) of counting votes).

administrative duties of Fraternity Council shall include . . . [i]nterpreting the Fraternity

*Bylaws* and *Standing Rules*[.]"). Plaintiffs' plea that the Court interpret "woman" as it

was in 1870 clashes with this and other Courts' deference to organizational autonomy, or

the notion that organizations deserve considerable latitude to interpret their own bylaws.

For instance, the *Powell* court in Ohio spotlighted an exception to courts' general

unwillingness to interfere with a voluntary association when "there has been some

palpable violation of the constitution or laws of the corporation whereby [the member]

has been deprived of valuable rights." 1978 WL 216074, at *4. Plaintiffs make no such

showing. Instead, they ask this Court to overrule one interpretation and inject another.

The Court refuses to do so.

Though an akin bylaw-interpretation, derivative challenge is non-existent, the

Court's approach today, from a policy perspective, is practical. This Court cannot step in

every time a member, or even multiple members, cries foul when a bylaw is disparately

interpreted; if it did, KKG and its Fraternity Council would spend their days responding

to derivative suits from their thousands of current members and 210,000 alumnae. *See*

*also Barrash v. Am. Ass'n of Neurological Surgeons, Inc.*, No. 13–cv–1054, 2013 WL

4401429, at *6 (S.D. Tex. Aug. 13, 2013) (noting that such interference would subject a

non-profit, private organization to "frustration at every turn" and cause it "to founder in

the waters of impotence and debility"). Our federal and state courts would similarly be

overrun with disgruntled members challenging large organizations. Consider, also, that

KKG supervises 140 chapters nationwide; reception of contested speech in today's

climate will obviously vary. Finally, Plaintiffs' alternative recourse lies within their

32

chapter and organization, not this Court. An appeal to other chapters is one such route; disassociation, while drastic, is another.

In summary, the delegate of a private, voluntary organization, in pursuit of "inclusiv[ity]", broadened its interpretation of "woman". ECF No. 6-1, at 105. The Court will not interfere with its result, nor invade the organization's freedom of expressive association. Accordingly, this Court dismisses Count I.[57]

D. *Count II: Plaintiffs' Breach of Contract Claim.*

Plaintiffs fail to demonstrate any breach of contract. Plaintiffs allege KKG's breach of two contracts, including Plaintiffs': (1) membership contracts with KKG under Ohio law; and (2) housing contracts with KKG Building Co. under Wyoming law.[58] *See* ECF Nos. 24, at 14; 6-1, at 163, 165–76. Defendants respond that Plaintiffs do not allege any plausible breach of their housing contracts. *See* ECF Nos. 20, at 18; 26, at 7.

Defendants are correct on both contracts. I begin with Plaintiffs' membership contracts with KKG. Under Ohio law, "[t]o establish a claim for breach of contract, a plaintiff must prove: (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages or loss resulting from the breach." *In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 276 (6th Cir. 2019) (internal quotation omitted); *Tel. Mgmt. Corp. v. Goodyear Tire & Rubber Co.*, 32 F. Supp. 2d 960, 969 (N.D. Ohio 1998) ("A breach of contract is a failure without legal excuse to

---

[57] ECF No. 6, ¶¶ 159–67.
[58] Finding that KKG Building Co. was not a Fed. R. Civ. P. 19(a)(1)(B) required party within Section A. *supra*, the Court dismissed KKG Building Co. from this lawsuit.

33

perform any promise that forms a whole or a part of a contract.") (internal citation

omitted). Entirely unalleged in their *Complaint*, Plaintiffs supplement that KKG's

admission of Langford in the UW chapter house "created a breach of contract as to . . .

the sorority experience[.]" *See* ECF No. 24, at 14. While Plaintiffs and KKG formed a

membership contract and Plaintiffs appear to have performed, any demonstration of

element (3) is absent; Plaintiffs fail to point the Court to any contractual breach by KKG.

*See* ECF No. 6-1, at 163. The Court admits its confusion as to what contractual language

KKG, in Plaintiffs' view, breached. *See id.*; *Allied Erecting and Dismantling Co., Inc. v.*

*Genesis Equip. & Mfg., Inc.*, 649 F. Supp. 2d 702, 728 (N.D. Ohio 2009) ("[W]here a

contract is clear and unambiguous, the court need not ... go beyond the plain language of

the agreement to determine the rights and obligations of the parties.") (internal quotation

omitted). If anything, the membership contract primarily outlines Plaintiffs' obligations.

*See id.* Plaintiffs make no effort to contend otherwise.[59] Giving effect to the membership

contract before the Court, KKG undertook no contractual obligation to reject transgender

women. Accordingly, Plaintiffs fail to allege a breach of their membership contracts.

Reverting to Wyoming law, I turn to Plaintiffs' housing contracts.[60] Here, a breach

of contract claim consists of: (1) "'a lawfully enforceable contract;'" (2) "'an unjustified

---

[59] If Plaintiffs argue that KKG breached their membership contracts by redefining "woman" sans a bylaw amendment, they, similarly, fail to direct the Court to the contractual provision within their membership contracts that KKG allegedly violates. Even when liberally construing Plaintiffs' *Complaint* to incorporate an unpled breach of contract claim, the Court cannot do counsels' job for them.

[60] *See* ECF No. 6-1, at 173 ("This contract is made with reference to and shall be construed in accordance with the laws of Wyoming in which state it shall be performed by the parties.").

34

failure to timely perform all or any part of what is promised [*i.e.*, the breach];'" and (3)

'"entitlement of the injured party to damages."' *Peterson v. Meritain Health, Inc.*, 508

P.3d 696, 705 (Wyo. 2022) (quoting *Halling v. Yovanovich*, 391 P.3d 611, 616–17 (Wyo.

2017)) (internal brackets omitted). Plaintiffs allege that KKG breached their housing

contracts by allowing transgender women to live in the chapter house in violation of

KKG's governing documents. *See* ECF Nos. 6, ¶¶ 170–72; 24, at 14. Once again, though,

Plaintiffs fail to cite the Court to any explicit breach within the housing contracts; the

Court's analysis, thus, fails at element (2). ECF No. 6-1, at 165–76. As developed in

Section A. *supra*, the Court's review of the housing contract contradicts Plaintiffs. Within

those contracts, any obligations to comply with KKG's "*Bylaws, Standing Rules and

Policies* ('Fraternity standards')" were either undertaken by the UW chapter or Plaintiffs

themselves. *See, e.g.*, *id.* at 166–67, 168 ("The student . . . shall, at all times, comply with

all . . . the Fraternity Standards. The student acknowledges that it is their responsibility to

seek out, read and understand . . . the Fraternity standards and they agree to follow the

same.").[61] Plaintiffs fail to show how KKG's receptive stance towards transgender

women "forms the whole or part of" their housing contracts. *See Reynolds v. Tice*, 595

P.2d 1318, 1323 (Wyo. 1979). Nowhere in the housing contracts do the parties contract

an obligation to "provide housing in accordance with" KKG's governing documents;

---

[61] Separately, KKG's bylaws state that *members* of KKG Building Co., described as "members
of the Fraternity", "shall agree to be bound by . . . the Fraternity *Bylaws, Standing Rules* and
*Policies*." *See* ECF No. 6-1, at 23–24.

35

Plaintiffs may not impose such an obligation on Defendants absent from those contracts. ECF No. 6, ¶ 170.

Accordingly, the Court dismisses Count II.[62]

E. *Count III: Plaintiffs' Tortious Interference Claim.*

Plaintiffs also fail to allege any tortious interference of contract. Plaintiffs claim that KKG[63] tortiously interfered with their housing contracts by inducting a transgender woman in violation of KKG's governing documents. ECF No. 6, ¶¶ 173–75. Defendants regurgitate that, without a breach of a housing contract, there can be no tortious interference with that contract. *See* ECF No. 20, at 20.

I concur with Defendants. To show tortious interference with a contract, Plaintiffs must allege: "(1) the existence of the contract; (2) the defendant's knowledge; (3) intentional and improper interference *inducing or causing a breach*; and (4) resulting damages." *First Wyo. Bank v. Mudge,* 748 P.2d 713, 715 (Wyo. 1998) (emphasis added) (citing Restatement (Second) of Torts, § 766 (Am. Law. Inst. 1979)). Inseverable from the Court's analyses above, Plaintiffs make no effort to demonstrate that KKG induced or caused a breach or termination of their housing contracts. *See USI Ins. Servs. LLC v. Craig,* No. 18-CV-79-F, 2019 WL 5295533, at *9–10 (D. Wyo. Apr. 9, 2019) (rejecting a

---

[62] ECF No. 6, ¶¶ 168–72.

[63] The Court admits its confusion by Plaintiffs' usage, twice, of "Defendants" within Count III. ECF No. 6, ¶ 175. However, because Plaintiffs use "Defendant Kappa Kappa Gamma" earlier in that paragraph and fail to clarify, even when prompted, the error in their response, the Court construes Count III as against solely KKG. *Id.*; *see* ECF Nos. 20, at 20 n.10; 24, at 17 ("Plaintiffs do allege that Kappa Kappa Gamma Fraternity has tortiously interfered with their contractual relationship with [KKG Building Co.]").

36

tortious interference claim where a plaintiff failed to show a breach of contract "[s]ince the third element of this tort requires an underlying breach of a contract"); ECF No. 24, at 14–20. Plaintiffs fail to even attempt their burden. *See* ECF No. 24; *Gore v. Sherard*, 50 P.3d 705, 710 (Wyo. 2002) (internal citation omitted). Given Plaintiffs' failure to allege a breach or termination by KKG, the Court need go no further.

Accordingly, the Court dismisses Count III.[64]

F. *Count IV: Plaintiffs' Direct Claim.*

Plaintiffs fail to allege a direct claim against Rooney. Count IV appears to allege that Plaintiffs suffered direct injuries due to KKG and Rooney's admission of Langford. ECF No. 6, ¶¶ 176–79. Defendants argue that Plaintiffs' contention that they suffered "individual legal harm distinct" from their derivative claim on behalf of all Kappa members is wanting. *See* ECF No. 20, at 20–22. Plaintiffs copy and paste allegations within their *Complaint* in response. *Compare* ECF No. 24, at 16–17, *with* ECF No. 6, ¶ 12.

Plaintiffs have not shown a special duty, nor a separate and distinct injury, to sustain their direct claim. Unlike a derivative action filed on behalf of a corporation, a shareholder may bring a direct action "against a director or officer[65] of the corporation '(1) where there is a special duty, such as contractual duty, between the wrongdoer and the shareholder, *and* (2) the shareholder suffered an injury separate and distinct from that

---

[64] ECF No. 6, ¶¶ 173–75.

[65] Though Plaintiffs appear to sue KKG and Rooney under Count IV, direct actions under Ohio law are only sanctioned against a corporation's director or officer. *Cf.* ECF No. 6, ¶ 179. Therefore, the Court solely considers Plaintiffs' direct claim against Rooney.

37

suffered by other shareholders.'" *Morgan v. Ramby*, Nos. CA2010–10–095, CA2010–10–

101, 2012 WL 626209, at *4 (12th Dist. Feb. 27, 2012) (quoting *Herman's, Inc. v. Sach–*

*Dolmar Div.*, 87 Ohio App. 3d 74, 77 (9th Dist. 1993)) (emphasis in original); *see also*

*Heaton v. Rohl*, 193 Ohio App. 3d 770, 782 (11th Dist. 2011) (noting that a shareholder

may bring a direct action where they demonstrate a special duty *or* a separate and distinct

injury) (internal citation omitted).

First, Plaintiffs do not allege a special duty. Injury flowing "from a breach of

corporate fiduciary duty" – as Plaintiffs briefly allude to – "amounts to nothing more than

loss of the [non-profit corporation's] value, which is an injury shared in common with all

other stockholders," or here, KKG members nationwide, and should be brought as a

derivative action. *See* ECF No. 24, at 16; *Barr v. Lauer*, No. 87514, 2007 WL 117502, at

*2 (8th Dist. Jan. 18, 2007); *Carlson*, 152 Ohio App. 3d at 679 ("As a general

proposition, claims for breach of fiduciary duties on the part of corporate directors or

officers are to be brought in derivative suits."); *see also Weston v. Weston Paper & Mfg.*

*Co.*, 74 Ohio St. 3d 377, 379 (Ohio 1996) (rejecting plaintiffs' argument that breach-of-

fiduciary-duties claims against corporate directors should be allowed as a direct action in

the absence of injury separate and distinct from the corporation). Moreover, for reasons

articulated in Section C. above, Plaintiffs have not shown that Rooney breached any

fiduciary duty to Plaintiffs by interpreting "woman" expansively.

Second, they also do not demonstrate a separate and distinct injury. Plaintiffs

allege that their "loss of privacy, frustration of contractual expectations, and emotional

distress" from Langford's induction are unique injuries. ECF No. 6, ¶ 179. However,

Plaintiffs sue Rooney, not their sorority sister; thus, only their frustrated contractual expectations merit consideration. Under Plaintiffs' theory, Rooney's actions contravene their pre-rush intent to join an organization that excludes transgender women. Yet, injury, if any, from Rooney's purported orchestration of Langford's admission inured to all KKG members alike, whether in Laramie or beyond, not merely Plaintiffs. In other words, Plaintiffs' putative injury – association with a transgender woman – technically affected all KKG members. Therefore, Plaintiffs' claims at bar, forgoing their determined unviability, belong as a derivative suit rather than a direct action. *See Grand Council of Ohio v. Owens*, 86 Ohio App. 3d 215, 220 (10th Dist. 1993) (determining that plaintiffs brought a derivative claim by "look[ing] to the nature of the alleged wrong rather than the designation used by plaintiffs"). Therefore, Plaintiffs fail to plead a special duty, nor a separate and distinct injury, to sustain their direct claim.

Accordingly, the Court dismisses Count IV.[66]

G. *Dismissal without Prejudice and Langford's* Motion to Dismiss *(ECF No. 22).*

Finally, Defendants argue that the Court should dismiss Plaintiffs' claims with prejudice. *See, e.g.*, ECF Nos. 20, at 22; 26, at 10. "'[A] dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) *and* granting leave to amend would be futile.'" *Seale v. Peacock*, 32 F.4th 1011, 1027 (10th Cir. 2022) (quoting *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006) (internal citation omitted)) (emphasis in original) (brackets omitted). Defendants make no effort to

---

[66] ECF No. 6, ¶¶ 176–79.

39

argue futility and do not otherwise explain why dismissal with prejudice is appropriate; accordingly, the Court will dismiss Plaintiffs' claims without prejudice.[67]

Furthermore, due to the Court's dismissal today of Plaintiffs' four claims, the Court also dismisses Langford's *Motion to Dismiss* (ECF No. 22) as moot.[68]

## CONCLUSION

For the foregoing reasons, Plaintiffs' four claims fail. Pursuant to Fed. R. Civ. P. 12(b)(1), Defendant KKG Building Co. is dismissed. Pursuant to Fed. R. Civ. P. 12(b)(6), Plaintiffs' four claims against Defendants KKG and Rooney are dismissed without prejudice.

Therefore, IT IS **HEREBY ORDERED** that Defendants', Kappa Kappa Gamma, Rooney, and KKG Building Co., *Motion to Dismiss* (ECF No. 19) is **GRANTED**.

---

[67] If Plaintiffs wish to amend their complaint, the Court advises Plaintiffs that they devote more than 6% of their complaint to their legal claims against Defendants. It also counsels Plaintiffs to provide more factual detail, where feasible, as well as highlight the Defendant(s) it sues under each count and relevant state statutes and authority. Finally, if provided another opportunity to clarify unclear language within an amended complaint, Plaintiffs should not copy and paste their complaint in lieu of elaboration or legal research that assists the Court in disentangling their claims. *See, e.g.*, ECF No. 24, at 14, 16–19.

[68] Langford moves to dismiss herself because, *inter alia*, she is not a Fed. R. Civ. P. 19(a)(1)(B) required party. *See* ECF Nos. 23, at 4; 27, at 2, 4. Plaintiffs respond: "if Langford stipulates that [s]he is not a required party, Plaintiffs would support h[er] dismissal." ECF No. 25, at 13 n.4. Langford did not reply. ECF No. 27. Without addressing the substance of Langford's motion, the Court notes the irrelevancy of Langford's alleged behavior. The crux of Plaintiffs' lawsuit is their derivative claim against Rooney and contractual claims against KKG. Unbefitting in federal court, Langford's unsubstantiated behavior at the UW chapter house has no bearing on Plaintiffs' legal claims. The Court, however, acknowledges that Plaintiffs' requested relief seeks to void Langford's KKG membership.

Furthermore, IT IS **HEREBY ORDERED** that Plaintiffs' *First Amended Verified Member Derivative Complaint for Breach of Fiduciary Duties* (ECF No. 6) against Defendants is **DISMISSED WITHOUT PREJUDICE**.

Finally, IT IS **HEREBY ORDERED** that Defendant Langford's *Motion to Dismiss with Prejudice* (ECF No. 22) is **DISMISSED AS MOOT**.

IT IS **SO ORDERED**.

Dated this 25th day of August, 2023.

Alan B. Johnson
United States District Judge

41