NO. 23-8065

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

JAYLYN WESTENBROEK, et al.,

Plaintiffs-Appellants

v.

KAPPA KAPPA GAMMA FRATERNITY, et al.,

Defendants-Appellees

On Appeal from the United States District Court
for the District of Wyoming, No. 2:23-CV-00051-ABJ
The Honorable Alan B. Johnson

BRIEF OF DEFENDANTS-APPELLEES KAPPA KAPPA GAMMA
FRATERNITY, MARY PAT ROONEY, AND KAPPA KAPPA GAMMA
BUILDING CO.

Natalie M. McLaughlin (Ohio Bar 0082203)
Brian W. Dressel (Ohio Bar 0097163)
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio  43216-1008
Telephone:   (614) 464-5452
Facsimile:    (614) 464-5452
E-mail:   nmmclaughlin@vorys.com
          bwdressel@vorys.com

Scott P. Klosterman (Wyoming Bar No. 6-3081)
Williams, Porter, Day & Neville, P.C.
159 North Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602-3902
Telephone:   (307) 265-0700
Facsimile:    (307) 266-2306
E-Mail:      sklosterman@wpdn.net

*Counsel for Defendants-Appellees Kappa Kappa Gamma Fraternity,*
*Mary Pat Rooney, and Kappa Kappa Gamma Building Co.*

**ORAL ARGUMENT NOT REQUESTED**

## RULE 26.1 DISCLOSURE STATEMENT

Kappa Kappa Gamma Fraternity is a non-profit corporation that does not have a parent corporation.  No publicly held corporation owns more than 10% of Kappa Kappa Gamma Fraternity's stock.

Kappa Kappa Gamma Building Co. is a non-profit corporation that does not have a parent corporation.  No publicly held corporation owns more than 10% of Kappa Kappa Gamma Building Co.'s stock.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

RULE 26.1 DISCLOSURE STATEMENT...............................................................ii

TABLE OF AUTHORITIES ............................................................................... vi

STATEMENT OF RELATED APPEALS ........................................................... xiii

JURISDICTIONAL STATEMENT .......................................................................... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ........................... 3

STATEMENT OF THE CASE................................................................................ 3

    A.    Factual Background.................................................................................3

    B.    Procedural History.................................................................................7

SUMMARY OF THE ARGUMENT ..................................................................... 11

ARGUMENT ......................................................................................................... 14

    A.    Appellants Fail to State a Derivative Claim........................................14

        i.    Kappa Is Entitled to Reasonably Interpret Its Own
               Bylaws......................................................................................14

            a.    Ohio Law Grants Deference to a Voluntary
                   Organization Interpreting Its Own Bylaws and
                   Governing Documents ...................................................14

            b.    There Is No Basis to Limit the Deference Owed to
                   Kappa to Interpretations Concerning Member
                   Discipline and Due Process .............................................16

            c.    Declining to Defer to Kappa's Interpretation of Its
                   Bylaws Would Undermine the Purposes of the
                   Judicial Non-Intervention Doctrine and Ensnare
                   Courts in Unnecessary Litigation ...................................22

ii.    Fraternity Council's Interpretation of Kappa's Bylaws Was Reasonable .......................................................................23

        a.    Kappa's Bylaws Do Not Define the Term "Woman" ...............................................................24

        b.    The Term "Woman" Is Open to More than One Reasonable Interpretation ................................................24

        c.    Even if the Court Were to Deny Kappa the Right to Interpret Its Own Governing Documents, Kappa's Interpretation Is Correct Under Appellants' More Demanding Analysis ........................32

iii.    Once Kappa Has Reasonably Interpreted Its Own Bylaws, a Court Dictating Whom It Can and Cannot Admit Would Violate the First Amendment ............................36

        a.    Court Orders Constitute State Action ............................37

        b.    Courts Cannot Make the Membership Decisions for Private Organizations ................................................38

iv.    To the Extent Appellants Now Assert a Derivative Claim Based on the Gamma Omicron Chapter's Election Procedures, They Have Forfeited the Claim in the District Court, Failed to Demonstrate Futility, and Failed to Allege Facts to Show Bad Faith ...........................................40

        a.    Appellants Forfeited This Claim by not Raising It with The District Court and by not Arguing Plain Error in Their Brief ........................................................40

        b.    Appellants Failed to Demonstrate Futility for This Claim ..............................................................................42

        c.    Appellants Failed to Allege Facts to Show Bad Faith ..............................................................................45

B.    Appellants' Direct Claim Is Both Forfeited and Fails on the Merits .................................................................................46

     i.    Appellants Forfeited Their Direct Claim When They Did Not Defend It in the District Court in Response to the Motion to Dismiss ....................................................................46

     ii.    Even if Appellants Had Preserved Their Direct Claim, It Would Fail .................................................................47

     iii.    Appellants Have Not Alleged Any Frustration of Contractual Obligations .............................................48

C.    The Court Can Also Dispose of Appellants' Claims Against Rooney on Personal-Jurisdiction Grounds ..........................................49

CONCLUSION .......................................................................................... 52

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS

# <u>TABLE OF AUTHORITIES</u>

**<u>Page</u>**

**Cases**

*Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (10th Cir. 2022) (en banc) (Wilson, J., dissenting; Pryor, J., dissenting)............................27

*Alexander v. Buckeye Pipeline Co.*, 374 N.E.2d 146 (Ohio 1978)...................................................................................................33

*Ashaheed v. Currington*, 7 F.4th 1236 (10th Cir. 2021).........................................46

*B. P. J. v. W. Va. State Bd. of Educ.*, No. 2:21-cv-00316, 2023 U.S. Dist. LEXIS 1820 (S.D. W. Va. Jan. 5, 2023) .............................26

*Barr v. Lauer*, No. 2007-Ohio-156, 2007 Ohio App. LEXIS 154 (Jan. 18, 2007) ...........................................................................47

*Barrash v. Am. Ass'n of Neurological Surgeons, Inc.*, No. 4:13-cv-1054, 2013 U.S. Dist. LEXIS 114605 (S.D. Tex. Aug. 13, 2013)...................................................................................................21

*Bhd. of Locomotive Eng'rs v. Folkes*, 109 S.E.2d 392 (Va. 1959)...................................................................................................21

*Bodiford v. Krause*, No. 1:23 CV 1191, 2023 U.S. Dist. LEXIS 169907 (N.D. Ohio Sept. 25, 2023) ....................................................25

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) ............................................ 38, 39

*Brosz v. Fishman*, 99 F. Supp. 3d 776 (S.D. Ohio 2015) ...........................................18

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)...........................................50

*Cal. Dental Ass'n v. Am. Dental Ass'n*, 590 P.2d 401 (Cal. 1979)...................................................................................................24

*Campbell v. Am. Psychological Ass'n*, 68 F. Supp. 2d 768 (W.D. Tex. 1999)....................................................................................22

*Carlson v. Rabkin,* 789 N.E.2d 1122 (Ohio Ct. App. 2003)............................ 43, 47

*Cincinnati Camp Meeting Ass'n v. Danby*, 56 N.E.2d 694 (Ohio Ct. App. 1943) ...........................................................................20

*City of Dayton ex rel. Scandrick v. McGee*, 423 N.E.2d 1095 (Ohio 1981)..................................................................................15

*Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036 (6th Cir. 2001) ..........................................................................................29

*Crosby v. Beam*, 548 N.E.2d 217 (Ohio 1989) .....................................10

*Crossen v. Duffy*, 103 N.E.2d 769 (Ohio Ct. App. 1951)........................15

*D.N. v. DeSantis*, No. 21-cv-31344, 2023 U.S. Dist. LEXIS 198678 (S.D. Fla. Nov. 6, 2023) ...........................................28

*Danese v. Ginesi*, 654 A.2d 479 (N.J. App. 1995) ................................21

*De Mille v. Amer. Fed'n of Radio Artists*, 187 P.2d 769 (Cal. 1947)....................................................................................20

*Democratic Party of United States v. Wis.*, 450 U.S. 107 (1981) ..........38

*Drage v. Proctor & Gamble*, 694 N.E.2d 479 (Ohio Ct. App. 1997)....................................................................................18

*Dudnikov v. Chalk & Vermilion Fine Arts*, 514 F.3d 1063 (10th Cir. 2008) ...........................................................................50

*Duke v. Smith*, 784 F. Supp. 865 (S.D. Fla. 1992)................................37

*Eighteen Seventy, LP v. Jayson*, 32 F.4th 956 (10th Cir. 2022) ............50

*Finlay v. Duffy*, 94 N.E.2d 466 (Ohio Ct. App. 1950)...........................15

*Gore v. Lee*, No. 3:19-cv-0328, 2023 U.S. Dist. LEXIS 107984 (M.D. Tenn. Jun. 22, 2023) ......................................... 27, 28

*Grand Council v. Owens*, 620 N.E.2d 234 (Ohio Ct. App. 1993)............43

*Green v. Miss USA, LLC*, 52 F.4th 773 (9th Cir. 2022) ..........................39

*Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272 (10th Cir. 1994)............10

*Heaton v. Rohl*, 954 N.E.2d 165 (Ohio Ct. App. 2011)....................................... 11, 47

*Hecox v. Little*, 79 F.4th 1009 (9th Cir. 2023)...................................... 25, 28, 29, 33

*Henkel v. Aschinger*, No. 11CVH-11-14,324, et al., 2012 Ohio Misc. LEXIS 5598 (Ohio Comm. Pleas 2012)........................................................17

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013).................................................................................................39

*Hobby Lobby Stores, Inc. v. Sommerville*, 186 N.E.3d 67 (Ill. Ct. App. 2021) ........................................................................... 25, 28

*Hurley v. Irish-American Gay, Lesbian, & Bisexual Group of Boston*, 515 U.S. 557 (1995) ........................................................... 38, 39

*In re Ferro Corp. Derivative Litig.*, No. 1:04CV1626, 2006 U.S. Dist. LEXIS 11608 (N.D. Ohio Mar. 21, 2006)...........................................43

*In re Gas Natural, Inc.*, No. 1:13-CV-02805, 2014 U.S. Dist. LEXIS 184046 (N.D. Ohio Sept. 24, 2014) .........................................45

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945) .................................................50

*Joseph v. Joseph*, No. 19-3350, 2022 U.S. App. LEXIS 23216 (6th Cir. Aug. 18, 2022) ....................................................................48

*Kadel v. Folwell*, 620 F. Supp. 3d 339 (M.D.N.C. 2022)........................................25

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90 (1991) ........................................42

*Koos v. Central Ohio Cellular*, 641 N.E.2d 265 (Ohio Ct. App. 1994)..............................................................................................................19

*Liquidating Tr. of the Amcast Unsecured Creditor Liquidating Tr. v. Baker*, 365 B.R. 91 (S.D. Ohio Bkrupty. 2007) .................................. 18, 19

*Maas v. Maas*, 161 N.E.3d 863 (Ohio Ct. App. 2020) ..................................... 30, 48

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ..............................................29

*Morgan v. Ramby*, No. 2012-Ohio-763, 2012 Ohio App. LEXIS 662 (Feb. 27, 2012) ................................................................................47

*Moya v. Schollenbarger,* 465 F.3d 444 (10th Cir. 2006).............................................2

*Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895
    (10th Cir. 2017) ................................................................................49

*Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of
    Educ.*, No. 2:23-cv-01595, 2023 U.S. Dist. LEXIS 131707
    (S.D. Ohio Jul. 28, 2023)........................................................ 26, 27

*Parker Excavating, Inc. v. Lafarge W., Inc.*, 863 F.3d 1213
    (10th Cir. 2017) ................................................................................40

*Peters v. Clark (In re Bryan)*, 857 F.3d 1078 (10th Cir. 2017) ..............................10

*Pikk v. Pedersen*, 826 F.3d 1222 (10th Cir. 2016)......................................................42

*Powell v. Ashtabula Yacht Club*, No. 953, 1978 Ohio App.
    LEXIS 8855, 1978 WL 216074 (Ohio Ct. App. 1978).........................................14

*Putka v. First Catholic Slovak Union*, 600 N.E.2d 797 (Ohio Ct.
    App. 1991) ........................................................................ 14, 20

*Qz'Etax v. Ortiz*, 170 F. App'x 551 (10th Cir. 2006)...............................................26

*Radol v. Thomas*, 772 F.2d 244 (6th Cir. 1985) ......................................................19

*Redden v. Alpha Kappa Alpha Sorority, Inc.*, No. 1:09CV705,
    2010 U.S. Dist. LEXIS 822 (N.D. Ohio Jan. 6, 2010) ..................... 14, 16, 17, 20

*Richison v. Ernest Grp., Inc.*, 634 F.3d 1123 (10th Cir. 2011) ................. 40, 41, 42

*Ross v. Bernhard*, 396 U.S. 531 (1970) ..................................................................17

*Shelley v. Kraemer*, 334 U.S. 1 (1948) .....................................................................37

*Soule v. Conn. Ass'n of Sch.*, 57 F.4th 43 (2d Cir. 2022) ........................................28

*Stibora v. Greater Cleveland Bowling Ass'n*, 577 N.E.2d 1175
    (Ohio Ct. App. 1989)........................................................ 14, 15, 20

*Strah v. Lake Cnty. Humane Soc'y*, 631 N.E.2d 165 (Ohio Ct.
    App. 1993) ........................................................................................19

*Ten Mile Indus. Park v. W. Plains Serv. Corp.*, 810 F.2d 1518
  (10th Cir. 1987) ....................................................................................50

*Tucker v. Nat'l Ass'n of Postal Supervisors, Cleveland Branch
  46*, 790 N.E.2d 370 (Ohio Mun. Ct. 2003)................................... 15, 20

*Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019 (10th Cir. 2021) ............................25

*Ulliman v. Ohio High Sch. Ath. Ass'n*, 919 N.E.2d 763 (Ohio
  Ct. App. 2009) .....................................................................................15

*Un. Fire & Cas. Co. v. Boulder Plaza Residential, LLC*, 633
  F.3d 951 (10th Cir. 2011) ....................................................................49

*United States v. Price*, 84 F.4th 738 (7th Cir. 2023) ...............................25

*W. Va. Coal. Against Domestic Violence, Inc. v. Morrisey*, No.
  2:19-cv-00434, 2023 U.S. Dist. LEXIS 154406 (S.D. W. Va.
  Aug. 31, 2023)......................................................................................36

*Walden v. Fiore*, 571 U.S. 277 (2014) ....................................................51

*Wellendorf v. Chauffeurs, Teamsters, etc., Local Union No.
  377*, No. 87 C.A. 37, 1988 Ohio App. LEXIS 2166 (Ohio
  App. 1988) ............................................................................................15

*Westenbroek v. Kappa Kappa Gamma Fraternity*, No. 23-CV-
  51-ABJ, 2023 U.S. Dist. LEXIS 152458 (D. Wyo. Aug. 25,
  2023)...................................... 1, 2, 4, 8, 10, 11, 14, 26, 41, 44, 49, 51

*Williams v. Kincaid*, 45 F.4th 759 (4th Cir. 2022) .................................26

*Zalvin v. Ayers*, 157 N.E.3d 256 (Ohio Ct. App. 2020)..........................18

**Statutes**

28 U.S.C. § 1332(a) .................................................................................1

Wyo. Stat. § 5-1-107 ..............................................................................49

## Other Authorities

15A Charles Alan Wright, et al., Federal Practice & Procedure
    § 3914.6 ...................................................................................................2

Endocrine Society Guidelines ........................................................ 29, 30

F.P. Kruijver et al., Male-to-female transsexuals have female
    neuron numbers in a limbic nucleus, 85 J. CLINICAL
    ENDOCRINOLOGY & METABOLISM 2034 (2000) ...................................27

*Historically Women's Colleges with Trans-Inclusive
    Admissions Policies*, CAMPUS PRIDE,
    https://www.campuspride.org/tpc/womens-colleges/ .........................31

*Intersex*, CLEVELAND CLINIC (Jul. 23, 2023),
    https://my.clevelandclinic.org/health/articles/16324-intersex ...........27

Jennifer Levi & Kevin Barry, *"Made to Feel Broken": Ending
    Conversion Practices and Saving Transgender Lives*, 136
    HARV. L. REV. 1112 (2023) ..................................................................27

*Statement from Women's Rights And Gender Justice
    Organizations in Support of the Equality Act,* NAT'L ORG.
    FOR WOMEN, https://now.org/wp-
    content/uploads/2021/03/Statement-of-Womens-Rights-And-
    Gender-Justice-Organizations-in-Support-of-the-Equality-
    Act-2.pdf (Mar. 16, 2021) ...................................................................31

*Statement of Women's Rights and Gender Justice
    Organizations in Support of Full and Equal Access to
    Participation in Athletics for Transgender People*, AM. ASS'N
    OF UNIV. WOMEN,
    https://www.aauw.org/app/uploads/2020/02/Statement-from-
    Womens-Organizations-Supporting-Full-and-Equal-Access-
    to-Participation-in-Athletics-for-Transgender-People-nsa.pdf ...........31

*Trans woman*, MERRIAM-WEBSTER DICTIONARY
    https://www.merriam-
    webster.com/dictionary/trans%20woman#:~:text=%3A%20a
    %20transgender%20woman%20%3A%20a%20woman,Zach
    ary%20Zane (last visited Jan. 3, 2024) ..............................................35

*Woman*, CAMBRIDGE DICTIONARY,
 https://dictionary.cambridge.org/us/dictionary/english/woman
 (last visited Jan. 3, 2024)......................................................................................35

*Women Demand: A Letter to the Federal Elected Officials and
 Candidates from the Women's Community*, NAT'L WOMEN'S
 LAW CENTER, https://nwlc.org/resource/women-demand-a-
 letter-to-federal-elected-officials-and-candidates-from-the-
 womens-community/; https://nwlc.org/wp-
 content/uploads/2020/09/Womens-Community-Transition-
 Letter-Draft-10.15.2020.pdf (Oct. 15, 2020) ......................................................31

**Rules**

Fed. R. Civ. P. 23.1 ...............................................................................................42

Fed. R. Civ. P. 23.1(b)(3)........................................................................................42

## STATEMENT OF RELATED APPEALS

No appeal in this action has been brought under the same or similar title

before any appellate court.

## JURISDICTIONAL STATEMENT

Appellees agree that the district court had jurisdiction over Appellees' claims against Kappa Kappa Gamma Fraternity ("Kappa"), but it did not have jurisdiction over the claims against Mary Pat Rooney ("Rooney") and Kappa Kappa Gamma Building Co. (the "Building Co.").  Specifically, the district court lacked subject-matter jurisdiction over Appellees' breach-of-contract claim against the Building Co. due to an insufficient amount in controversy under 28 U.S.C. § 1332(a), which the district court recognized in dismissing the claim. *Westenbroek v. Kappa Kappa Gamma Fraternity*, No. 23-CV-51-ABJ, 2023 U.S. Dist. LEXIS 152458 (D. Wyo. Aug. 25, 2023).  Appellees also maintain that the district court lacked personal jurisdiction over Rooney, as argued herein.

This Court lacks jurisdiction over the appeal because the district court's order on the Motion to Dismiss was without prejudice and therefore not a final, appealable order.  The district court pointedly denied Appellees' request to dismiss the Amended Complaint with prejudice, unambiguously stating that its dismissal was without prejudice. *Id.* at *43–*44.  Appellees explained their basis for this conclusion in their Motion to Dismiss the Appeal, currently pending before the Court.

Appellants dispute this conclusion, arguing that the decision is appealable because it addressed the merits of their claims and not a procedural issue they

could cure through amendment. For support of this argument, Appellants turn to this Court's decision in *Moya v. Schollenbarger,* 465 F.3d 444, 448–54 (10th Cir. 2006). There, the Court considered an appeal of an order it found to be ambiguous as to whether it was dismissing the complaint or the entire action. *Id.* at 448. It concluded that the district court had intended to dismiss the case with prejudice because there was "not a sufficiently clear invitation for [plaintiff] to amend the complaint or otherwise continue the proceedings in the district court." *Id.* at 454 (quoting 15A Charles Alan Wright, et al., Federal Practice & Procedure § 3914.6) (internal quotation marks omitted).

Here, the district court was far clearer. It (1) rejected Appellees' request to dismiss the case with prejudice; (2) explicitly stated that the claims were dismissed ***without prejudice***; and (3) offered advice on how Appellants could have better positioned their claims in a second amended complaint to attempt to cure the defects it found in the First Amended Complaint. *Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at \*43–44. In short, the district court extended Appellants an invitation to amend their complaint. Instead, Appellants elected to proceed with filing an appeal of a non-final order. Accordingly, this Court lacks appellate jurisdiction.

Considering this issue fully briefed, Appellees devote the remainder of their brief to the merits of Appellants' underlying legal claims.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.    Whether a private organization has a right to reasonably interpret an undefined term in its own bylaws under Ohio law and a First Amendment right to select its own members or, alternatively, whether a federal court can determine how to interpret an undefined term in a private organization's bylaws and determine whom that organization can and cannot admit to its membership.

2.    Whether, after not advancing any argument in support of their direct claim in responding to a motion to dismiss, aggrieved members can state a direct claim for alleged personal injury based on frustrated contractual expectations without identifying any contractual obligation that was owed to them and breached and without identifying any damages they suffered unique from the rest of the organization's members arising from a cognizable legal claim.

## STATEMENT OF THE CASE

### A. Factual Background

Appellants' opening brief offers a "Facts" section that contains: their preferred characterization of Kappa Bylaws, Standing Rules, and Policies as they refer to the terms "women," "men," "sex," and "gender"; misrepresentations about what Kappa's governing documents actually state (e.g., the Standing Rules do not explicitly provide that "no person can be initiated as a Kappa member without approval from Sorority headquarters" and do not require "that elections employ a

secret ballot." *See* App. 188–218; policy arguments about how Appellants think Kappa should operate; allegations about the Gamma Omicron's voting process for admitting Artemis Langford into membership at the University of Wyoming; and allegations about Langford's unsubstantiated behavior at the Gamma Omicron chapter house following the chapter's decision to admit her (which the district court found "[u]nbefitting in federal court" and "irrelevant" as they had "no bearing on Plaintiffs' legal claims").[1]  *See Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at *44 n.68.

The undisputed facts necessary to decide this appeal are straightforward. Kappa is a non-profit corporation incorporated under Ohio law.  (App. 011.)  It is governed by a set of Bylaws and Standing Rules, each last revised in 2022.  (App. 169.)  Among other policies and procedures, those Bylaws set the criteria for membership in Kappa.  (App. 087.)  Per the Bylaws, one criteria for admission is that the candidate be a "woman."  (*Id.*)  The Bylaws do not define "woman" based

---

[1] Kappa recognizes that the Court takes factual allegations pled in a complaint as true at this procedural posture.  But given the publicity this case has generated and the nature of some of the allegations, Kappa notes that Langford and other chapter members have denied Appellants' inflammatory allegations.  This was briefed at the district court, but not relevant to this appeal.  Furthermore, for anyone assessing the credibility of those allegations, Appellants did not raise them in their pre-litigation correspondence concerning Langford's admission and the record is devoid of evidence that Appellants raised them at any point before filing this case. (*See* App. 258–60.)

on sex assigned at birth, chromosomal makeup, or any other genetic criteria. (App. 082–110.) In fact, the Bylaws do not define the term "woman" at all. (*Id.*)

Kappa's Standing Rules vest the Fraternity Council with the duty of "Interpreting the Fraternity Bylaws and Standing Rules." (App. 199.) Therefore, the Fraternity Council has authority granted in Kappa's governing documents to interpret any term that is not specifically defined. Since 2015, the Fraternity Council has interpreted the term "woman" to include individuals who identify as women. (Aplt. Br. 8–9; App. 263.) This interpretation is reflected in policies, guides, position statements, and FAQ documents issued by the Fraternity Council. (App. 112–14; 185; 263.)

Per Kappa's Standing Rules, chapter members at each collegiate chapter are responsible for selecting the new members of their chapter. (App. 199.) And "[e]ach chapter of Kappa Kappa Gamma has the final choice of its own members." (App. 263.) Kappa's Gamma Omicron chapter operates at the University of Wyoming, located in Laramie. (App. 041.) Langford, a transgender woman, sought admission to the Gamma Omicron chapter in the fall semester of 2022. (App. 036–37.) Langford was ultimately selected for membership by the members of that chapter. (App. 009–10.)

Kappa's Fraternity Council has no role in the selection of collegiate members, neither endorsing potential members for selection nor overruling

decisions of a collegiate chapter.  (App. 125; 191 ("[a]ctive members shall be responsible for selecting new members of their chapter."))    Nonetheless, Appellants argue that "Kappa and Mary Pat Rooney, the President of the Council of Kappa, and the Wyoming Chapter leadership orchestrated and implemented a plan that resulted in" Langford's admission.  (Aplt. Br. 9.)  They go on to state the basis of this contention: "[i]t could not be otherwise: Kappa's Standing Rules explicitly provide that 'no person can be initiated as a Kappa member without approval from Sorority headquarters.'"  (*Id.*)  But the Standing Rules do not explicitly state that.    Rather, the Standing Rules simply state that "[i]f the ***requirements for initiation*** have been fulfilled, Kappa Kappa Gamma Headquarters ***shall issue*** the authorization for initiation."  (App. 200) (emphasis added).  The Requirements for Initiation stated in the Bylaws are as follows:

> A collegiate new member who is registered as a full-time student during the pledge to membership year or during the term in which they pledged, has met all financial obligations and Fraternity standards of conduct, has completed a period of education about the Fraternity, and is in good standing with the educational institution may be initiated.   In extraordinary cases, chapters may petition the Membership Director for an exception to these requirements.

(App. 087.)  Therefore, the only thing that headquarters is explicitly authorized to do is consider if a potential member fulfills the requirements for initiation.  If they

6

do, headquarters is required to authorize the initiation because it is each chapter's decision whom to admit to their chapter.

Appellants and others were upset that Langford was voted into their chapter, so they retained two lawyers to dispute the chapter's decision to allow a transgender woman into its membership.  (App. 258–60.)  Their attorneys sent a letter detailing their grievances to Kappa and members of the Fraternity Council.  (*Id.*)  Kappa responded through its own outside counsel, explaining Kappa's policy of inclusion towards transgender women, informing Appellants' lawyers that membership decisions are decision of the chapter, and noting that Kappa does not overrule decisions of a collegiate chapter because some members or alumnae disagree with a chapter's decision.  (App. 125–27.)  Counsel further indicated it was unaware of the Gamma Omicron chapter violating Kappa's governing documents, but invited Appellants to identify any specific provisions they contend were not followed with regard to Langford's initiation.  (*Id.*)  This was the end of the parties' discussion of the issue prior to this litigation.

## B. Procedural History

Appellants filed their Complaint against Kappa, Rooney, the Building Co., and Langford, initially seeking to proceed anonymously.  (App. 005–06.)  Before Appellees responded to the Complaint, the district court sua sponte denied Appellants' motion to proceed anonymously and their renewed motion to proceed

anonymously. (*Id.*) Appellants then filed an Amended Complaint asserting four claims[2]: a derivative claim for breach of fiduciary duty (against Rooney); breach of their housing contracts (against the Building Co.); tortious interference with contract (against Kappa); and a direct cause of action (against Rooney). (App. 009–080.) The Amended Complaint explicitly stated that it was not seeking any damages from the Building Co. or from Langford. (App. 016–17.) Instead, it stated that it had sued these Defendants because it believed they were necessary parties. (*Id.*)

Appellees filed a Motion to Dismiss, advancing several arguments.[3] The Building Co. argued that the district court lacked subject matter jurisdiction over the breach-of-contract claim because the purported basis for jurisdiction was diversity of citizenship. (App. Vol. II 015–16.) Appellants pled that they were not seeking damages from the Building Co., meaning they could not meet the jurisdictional threshold. (*Id.*)[4] Rooney argued that the district court lacked

---

[2] The Amended Complaint does not state against whom each claim is brought, but the district court made this determination in its decision, and Appellants did not appeal that determination.

[3] Langford filed a separate Motion to Dismiss that the district court dismissed as moot after dismissing all claims against the other Defendants. *See Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at *44.

[4] Many members of the Gamma Omicron chapter sign a lease to live in a chapter house near campus. (App. 245–54.) The house is operated by the Building Co., which is a separate entity from Kappa. (*Id.*) For members who live in the house,

personal jurisdiction over her because she lacked minimum contacts with Wyoming and there were insufficient allegations in the Amended Complaint to suggest otherwise.  (App. Vol. II 016–17.)  On the derivative claim, Appellees argued that Appellants had not met the procedural prerequisites to pursuing the claim in court.  (App. Vol. II 018–20.)

Turning to the merits of the claims, Appellees argued that, under Ohio law, Kappa, as a private organization and through its Fraternity Council, had the right to reasonably interpret its own Bylaws.  (App. Vol. II 020–23.)  They further explained how a court telling a private organization whom it can and cannot accept as a member would violate the organization's First Amendment freedom of association.  (App. Vol. II 024–25.)  On the contract claims, Appellees demonstrated how Appellants failed to allege the violation of any contractual provision, thus dooming a breach-of-contract or tortious-interference claim.  (App. Vol. II 025–28.)  Finally, on the direct claim, Appellees articulated how the failure of the derivative claim was fatal to the direct claim.  (App. Vol. II 028–30.) Appellants did not present any argument to the district court as to why that direct claim should not be dismissed.  (App. Vol. II 034–53.)

---

their leases are with the Building Co., not Kappa.  (*Id.*)  Since becoming a member, Langford has never lived in the Kappa house.  (App 045.)  Appellants' claim against the Building Co. was based simply on Langford's "access and presence" in the house.  (App. 047.)

The district court granted Appellees' Motion to Dismiss. It agreed that the claim against the Building Co. lacked subject-matter jurisdiction. And although the district court found that it had personal jurisdiction over Rooney and that Appellants had satisfied the procedural requirements of a derivative claim, it adopted Appellees' position on the merits of the underlying claims, dismissing each of them.

Appellants then appealed to this Court. Notably, they do not pursue their breach-of-contract or tortious-interference claims on appeal, meaning they have abandoned those claims. *Peters v. Clark (In re Bryan)*, 857 F.3d 1078, 1095 n.48 (10th Cir. 2017) (citing *Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1277–78 (10th Cir. 1994)) ("issue not briefed in opening brief is deemed abandoned on appeal"). The district court held that the breach-of-contract claim was the only claim against the Building Co. and the tortious-interference claim was the only claim against Kappa. *Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at *8. The district court further held that the derivative and direct claims were only against Rooney. *Id.* at *8; *40. Appellants do not appeal those determinations, nor would there have been a basis to do so. This is because "[a] shareholder's derivative action is brought by a shareholder in the name of the corporation to enforce a corporate claim." *Crosby v. Beam*, 548 N.E.2d 217, 219 (Ohio 1989). Thus, Appellants assert their derivative claim on behalf of Kappa, not against Kappa.

And a direct claim may only be brought against a director or officer. *Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at *41 n.65; *see Heaton v. Rohl*, 954 N.E.2d 165, 175 (Ohio Ct. App. 2011). Therefore, Appellants have abandoned claims against the Building Co. and Kappa, and the only remaining defendant to the Amended Complaint against whom Appellants are pursuing claims is Rooney.

## SUMMARY OF THE ARGUMENT

This case arises out of the results of a collegiate sorority chapter's internal membership vote at the University of Wyoming in fall 2022. Six of the chapter's members were upset that their sorority sisters voted to admit a transgender woman. Rather than accept their chapter's decision to admit a member that they personally did not want in their chapter, Appellants have asked a federal court to define the term "women" in Kappa's governing documents as a "biological female" and overturn the membership decision of their chapter and remove Langford from membership. The judiciary, however, should not interfere in the decisions of a private organization in interpreting their governing documents and determining who can and cannot be admitted as a member.

Appellants' request that a federal court overturn the results of their chapter's fall 2022 membership vote through a shareholder derivative action fails because it rests on two false premises. First, Appellants misapprehend the role of courts in policing the internal activities of private organizations. They argue, without any

11

legal basis, that judicial deference to organizational autonomy is not required in a derivative action for breach of fiduciary duty.  They instead ask the Court to analyze a private, non-profit organization's Bylaws using an originalist approach similar to what some jurists use to answer questions of statutory or constitutional interpretation, even though the bylaws of private organizations are neither statutes nor constitutional amendments.  Rather, Ohio law, which governs the derivative claim, provides that private organizations have autonomy to reasonably interpret their bylaws.  Kappa's own governing documents expressly give Kappa's Fraternity Council authority to interpret Kappa's Bylaws, and the Fraternity Council's interpretation of its Bylaws, which do not define the term in question, is reasonable.

Second, Appellants assume that the term "woman" can only refer to an individual who is a "biological female."  Although that is one interpretation of the term, it is not the only reasonable one.  Courts, social science, and numerous other segments of society have adopted a broader, more inclusive definition of the term. Kappa's Fraternity Council, not bound by a Bylaw that defines "woman" more restrictively, is free to inclusively define "woman" to include transgender women in interpreting Kappa's Bylaws.  Differences of opinion between some members on this inclusive definition—which will undoubtedly happen in an organization of over 210,000 members with diverse personal views—does not mean the definition

12

is unreasonable; it only reflects disagreement. This Court need not define the term "women" or make any judgment about what is the best definition of that term. Instead, the Court need only recognize that Kappa's Fraternity Council's definition of "women" to include transgender women is reasonable to affirm the district court.

There is no bar in the Bylaws prohibiting Kappa from admitting a transgender woman as a member. Were a court to nonetheless reject Kappa's interpretation of an undefined term in its Bylaws that impacts its membership, it would not only violate Ohio law that mandates deference to Kappa's reasonable interpretation of its Bylaws, but also deprive Kappa of associational freedoms the First Amendment guarantees for private organizations.

Finally, Appellants did not attempt to defend their direct claim in district court and so forfeited their ability to assert it in this Court. Nevertheless, to the extent it is based on breach of fiduciary duty, it necessarily fails for the same reasons as identified above. And to the extent Appellants are now attempting to advance a claim for alleged personal injury based on frustrated contractual expectations, they fail because they do not identify any contractual obligation that was owed to them and was either breached or frustrated.

As Appellants abandoned the other claims in the Amended Complaint, the Court should affirm the district court's dismissal of all claims.

## ARGUMENT

### A. Appellants Fail to State a Derivative Claim

    i.   <u>Kappa Is Entitled to Reasonably Interpret Its Own Bylaws</u>

        *a. Ohio Law Grants Deference to a Voluntary Organization Interpreting Its Own Bylaws and Governing Documents*

Ohio law allows private, non-profit organizations latitude to reasonably interpret their own governing documents. As the district court recognized, "[a]s a general rule, Ohio courts are unwilling to interfere with the management and internal affairs of a voluntary association." *Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at \*30 (quoting *Redden v. Alpha Kappa Alpha Sorority, Inc.*, No. 1:09CV705, 2010 U.S. Dist. LEXIS 822, at \*13 (N.D. Ohio Jan. 6, 2010)). Ohio law recognizes that a private organization's right to interpret its own bylaws, rules, and regulations "is as sacred as the right to make them." *Stibora v. Greater Cleveland Bowling Ass'n*, 577 N.E.2d 1175, 1179 (Ohio Ct. App. 1989).

"Generally speaking, in matters of policy, discipline or internal economy of a voluntary association, wherein members have mutually agreed upon a charter or rules, the decision of the association itself is supreme." *Putka v. First Catholic Slovak Union*, 600 N.E.2d 797, 802 (Ohio Ct. App. 1991). Courts will only step in to disturb a private organization's interpretation of its own bylaws "when there has been some palpable violation of the constitution or laws of the corporation." *Redden*, 2010 U.S. Dist. LEXIS 822, at \*14 (quoting *Powell v. Ashtabula Yacht*

14

*Club*, No. 953, 1978 Ohio App. LEXIS 8855, 1978 WL 216074, at *4 (Ohio Ct. App. 1978)).  Stated another way:

> [C]ourts will not assume to act in place of those authorized to interpret the constitution and by-laws of a voluntary association unless those upon whom the duty is placed acted in an arbitrary and unreasonable manner. This is also true with respect to the determination of all questions of policy and internal management.

*Wellendorf v. Chauffeurs, Teamsters, etc., Local Union No. 377*, No. 87 C.A. 37, 1988 Ohio App. LEXIS 2166, at *17 (Ohio App. 1988) (finding that the union's construction of its own governing documents was reasonable and court would defer to this interpretation) (citing *Finlay v. Duffy*, 94 N.E.2d 466, 469 (Ohio Ct. App. 1950)); *Crossen v. Duffy*, 103 N.E.2d 769, 779 (Ohio Ct. App. 1951).  The term "arbitrary" has been defined by the Supreme Court of Ohio as "without adequate determining principle . . . not governed by any fixed rules or standard." *Ulliman v. Ohio High Sch. Ath. Ass'n*, 919 N.E.2d 763, 773 (Ohio Ct. App. 2009) (quoting *City of Dayton ex rel. Scandrick v. McGee*, 423 N.E.2d 1095, 1097 (Ohio 1981)) (internal quotation marks omitted).

When, as here, members are arguing that their interpretation of the bylaws is correct and the private organization's interpretation of the bylaws is incorrect, it "is not an issue to be decided by a court."  *See Stibora*, 577 N.E.2d at 1179; *Tucker v. Nat'l Ass'n of Postal Supervisors, Cleveland Branch 46*, 790 N.E.2d 370, 375 (Ohio Mun. Ct. 2003) (recognizing courts should only step in if the voluntary

organization's actions are "not just wrong, but also arbitrary and undertaken as a willful exercise of power"). Kappa's interpretation of its Bylaws is entitled to the same deference Ohio courts have consistently afforded Ohio's voluntary organizations.

> b. There Is No Basis to Limit the Deference Owed to Kappa to Interpretations Concerning Member Discipline and Due Process

Appellants strangely insist the Court cannot defer to Kappa's interpretation because "[a] derivative claim like the one Plaintiffs brought is not subject to the rule of non-interference." (Aplt. Br. 18.) They claim that judicial deference only applies when the claim is for "direct injuries resulting from a violation of due process or some other complaint personal to the plaintiff about an internal dispute-resolution process." (*Id*. at 21.) Appellants urge the Court not to defer to Kappa's interpretation of its own Bylaws because the derivative claim here "is not about due-process rights or a personal grievance concerning Kappa's internal-dispute resolution process." (*Id*. at 22.)

Notably, Appellants do not cite *any* authority that cabins Ohio law's deference to organizations' interpretations of their bylaws only to specific types of claims, to due-process rights, or to personal grievances.[5] In the absence of any

---

[5] Appellants represent that *Redden* supports this proposition because it applied the non-interference rule only to a claim concerning the sorority's disciplinary policy "and not plaintiff's separate claim for breach of fiduciary duties." (Aplt. Br. 21–

precedent even suggesting the limitation Appellants present as established, there is ample reason to reject Appellant's attempt to distinguish their case from longstanding and well-recognized non-interference principles of Ohio law.

First, Appellants' packaging of their grievance as a derivative claim for breach of fiduciary duty instead of a direct injury claim does not alter the principle that Kappa's Fraternity Council is entitled to deference in interpreting Kappa's Bylaws and governing documents.  Appellants appear to misunderstand the significance of a derivative claim.  Common law refused to permit stockholders to call corporate managers to account in actions at law, so the equitable remedy of a derivate suit was created to be a "suit to enforce a *corporate* cause of action against offices, directors and third parties."  *Henkel v. Aschinger*, No. 11CVH-11-14,324, et al., 2012 Ohio Misc. LEXIS 5598, at *12-13 (Ohio Comm. Pleas 2012) (citing *Ross v. Bernhard*, 396 U.S. 531, 534 (1970)).  A derivative suit requires a valid claim upon which the corporation could have sued, and a showing that the corporation itself refused to proceed after suitable demand (or some other extraordinary conditions).  *Id.* at *13.  Bringing a claim as a derivative action does

---

22.)  *See Redden*, 2010 U.S. Dist. LEXIS 822, at *3–*4.  What Appellants do not mention is that the court in *Redden* found that the plaintiff lacked standing to bring a breach-of-fiduciary-duty claim and thus did not need to reach the question of bylaw interpretation at all.  *Id.* at *10–*11.  The court made no finding that the non-interference rule was inapplicable to a claim for breach of fiduciary duties.

not lower the deference accorded to Fraternity Council. It is an equitable remedy to pursue a claim upon which Kappa could have sued.

Second, bringing a claim for breach of fiduciary duty also does not reduce the deference accorded to Fraternity Council. Rather, there is a presumption for breach of fiduciary duty claims that Fraternity Council acted in good faith and cannot be liable. When an aggrieved shareholder brings a derivative action alleging a breach of fiduciary duty, the shareholder must show that the alleged wrongdoers "have acted in bad faith or without the requisite objectivity." *Zalvin v. Ayers*, 157 N.E.3d 256, 263 (Ohio Ct. App. 2020) (internal citations omitted) (dismissing breach of fiduciary duty claim for failure to state a claim upon which relief can be granted). In assessing a derivative suit for breach of fiduciary duty, "it is presumed that any action taken by a director[6] on behalf of the corporation is taken in good faith and for the benefit of the corporation." *Brosz v. Fishman*, 99 F. Supp. 3d 776, 785 (S.D. Ohio 2015) (citing *Drage v. Proctor & Gamble*, 694 N.E.2d 479, 482 (Ohio Ct. App. 1997)). When officers and directors perform their duties "in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances," they

---

[6] Ohio courts impose a similar common law fiduciary duty on officers as that imposed by Ohio statute on directors. *Liquidating Tr. of the Amcast Unsecured Creditor Liquidating Tr. v. Baker*, 365 B.R. 91, 103 (S.D. Ohio Bkrupty. 2007).

have no liability.  *Liquidating Tr.*, 365 B.R. at 103.  In evaluating a director's compliance with a fiduciary's duty of care, "Ohio courts adhere to the 'business judgment rule,' and will not usually inquire into the wisdom of actions taken by the directors in the absence of fraud, bad faith or abuse of discretion" as the courts recognized that "many important decisions are made under circumstances of uncertainty."  *Koos v. Central Ohio Cellular*, 641 N.E.2d 265, 272 (Ohio Ct. App. 1994) (quoting *Radol v. Thomas*, 772 F.2d 244, 256 (6th Cir. 1985)) (internal quotation marks omitted).

Third, any claim based on Fraternity Council's decision on a matter of policy, including Bylaw interpretation, requires judicial deference.  Appellants' argument is that Rooney and Fraternity Council, as fiduciaries of a voluntary organization, breached their fiduciary duties because they did not interpret and apply the Bylaws properly.  (*See* Aplt. Br. 27–40.)  The breach of fiduciary duty claim rests squarely on whether Fraternity Council was allowed to interpret and apply the Bylaws to include transgender women or whether they violated their fiduciary duty in interpreting and applying the Bylaws.

"Courts will not interfere with the internal management of a corporation not for profit in the absence of proof that the managing officers are acting in excess of their corporate power, or that they are guilty of collusion or fraud."  *Strah v. Lake Cnty. Humane Soc'y*, 631 N.E.2d 165, 171 (Ohio Ct. App. 1993) (quoting

19

*Cincinnati Camp Meeting Ass'n v. Danby*, 56 N.E.2d 694, 696 (Ohio Ct. App. 1943)) (internal quotation marks omitted); *see also Tucker*, 790 N.E.2d at 375 (finding liability if the fiduciary's actions were "not just wrong, but also arbitrary and undertaken as a willful exercise of power"). Therefore, not only do Appellants have to overcome the presumption that Fraternity Council acted in good faith in accordance with their fiduciary obligations, but also the judicial deference accorded to Fraternity Council's interpretation of Kappa's Bylaws.

Ohio court cases establishing judicial deference give no indication that the rule only reaches claims concerning membership removal or internal discipline processes as Appellants suggest. In *Putka*, the court explained that courts defer to the decisions of private organizations "in matters of ***policy, discipline or internal economy***." *Putka*, 600 N.E.2d at 802 (emphasis added). The Northern District of Ohio in *Redden* described the deference as reaching the "internal affairs" of the organization, not just discipline issues. *Redden*, 2010 U.S. Dist. LEXIS 822, at *13. And when the court in *Stibora* held that a voluntary organization's right to interpret its governing documents was "sacred," it did not caveat that conclusion by limiting it to interpretations concerning questions of due process or personal grievance. *Stibora*, 577 N.E.2d at 1179.[7]

---

[7] The Court can also look across the country and find that courts have consistently granted the broad deference Appellants ask this Court to reject. *See, e.g., De Mille v. Amer. Fed'n of Radio Artists*, 187 P.2d 769, 775 (Cal. 1947) ("[t]he practical

In the absence of any case law to support Appellant's proposed limitation, it would be illogical for this Court to create new Ohio law on this matter. Consider the implications. Appellants would have the Court find that Kappa receives judicial deference in a Bylaw interpretation that removes a member for failing to meet membership qualifications, but no judicial deference in one that decides who can be a member for satisfying membership qualifications. Both interpretations address the composition of the organization's membership and membership qualifications and both interpretations stem from the same set of governing documents. Appellants do not explain why membership removal would be afforded significant deference while membership admittance would receive none.

---

and reasonable construction of the constitution and by-laws of a voluntary organization by its governing board is binding on the membership and will be recognized by the courts"); *Danese v. Ginesi*, 654 A.2d 479, 482 (N.J. App. 1995) ("[t]he courts recognize an association's right to adopt, administer, and interpret its own rules without judicial intervention"); *Barrash v. Am. Ass'n of Neurological Surgeons, Inc.*, No. 4:13-cv-1054, 2013 U.S. Dist. LEXIS 114605, at *16 (S.D. Tex. Aug. 13, 2013) ("[u]nder Texas law . . . [t]he right of a voluntary club or association to interpret its own organic agreements, such as its charter, its by-laws and regulations, after they are made and adopted, is not inferior to its right to make and adopt them"); *Bhd. of Locomotive Eng'rs v. Folkes*, 109 S.E.2d 392, 398 (Va. 1959) ("[i]t is well established that the construction of the by-laws . . . belongs not to the court, but to the board, council or other tribunal provided for the purpose in the organization").

       *c. Declining to Defer to Kappa's Interpretation of Its Bylaws Would Undermine the Purposes of the Judicial Non-Intervention Doctrine and Ensnare Courts in Unnecessary Litigation*

The United States District Court for the Western District of Texas succinctly described the rationale for judicial non-intervention: "if the courts were to interfere [every time] some member, or group of members, had a grievance, real or imagined, the non-profit, private organization would be fraught with frustration at every turn and would founder in the waters of impotence and debility." *Campbell v. Am. Psychological Ass'n*, 68 F. Supp. 2d 768, 779 (W.D. Tex. 1999) (internal quotation omitted).  Appellants' position that the Court should not defer to Kappa's interpretation of its Bylaws defining membership criteria would confine private organizations and the courts to precisely this fate.

This irrational rule could just as easily apply to a claim for any of Fraternity Council's other interpretations of Bylaws, including membership criteria, so any disputed interpretation would arguably support a derivative claim for breach of fiduciary duty.  For example, under Kappa's Bylaws, a member, among other requirements, must "[h]ave demonstrated integrity, respect, and regard for others and an appreciation of the worth of all individuals" and "[b]e willing to pledge to uphold the Kappa Kappa Gamma Fraternity *Bylaws, Standing Rules* and *Policies*." (App. 087.)  The logical extension of Appellants' position is that any Kappa member could assert a legal claim for breach of fiduciary duty against Fraternity

Council if she believed her chapter was admitting members who lacked integrity and Fraternity Council failed to prevent the members' initiation. The courts hearing the cases would not defer to Kappa's judgment, but instead, would judicially determine the meaning of "integrity" and who could be admitted under the courts' standards (which may differ between courts). And those same principles of judicial intervention in bylaw interpretations would apply to any private organization.

The litigation stemming from a novel judicial non-deference rule to bylaw interpretation simply because it is advanced as a derivative claim for breach of fiduciary duty would bury courts, private organizations, and their members. This underscores why Ohio law (like many other states' laws) only requires private organizations interpreting their own governing documents to make reasonable interpretations and otherwise stays away from the governance of private entities.

    ii.   <u>Fraternity Council's Interpretation of Kappa's Bylaws Was Reasonable</u>

Kappa and Rooney agree that the Fraternity Council cannot ignore Bylaws, but they did not do so in this case. Instead, as discussed above, the judicial non-intervention doctrine provides that courts sustain reasonable interpretations of private organizations' governing documents. An interpretation of Kappa's governing documents that allows for the admission of transgender women is reasonable. Thus, the Court should sustain it.

### a. Kappa's Bylaws Do Not Define the Term "Woman"

If Kappa's Bylaws defined the term "woman" in a way that explicitly excluded transgender women, Kappa and Rooney would also agree that adopting an inclusive definition would not be reasonable. As articulated by one court, a court should adjudicate a dispute if "a private voluntary organization plainly contravenes the terms of its bylaws" and is not "bound by an association's unreasonable construction of a plain and unambiguous provision of its constitution[.]" *Cal. Dental Ass'n v. Am. Dental Ass'n*, 590 P.2d 401, 403, 406 (Cal. 1979). But the parties agree that the term "woman" is not defined in Kappa's Bylaws. (*See* Aplt. Resp. to Mot. to Dismiss ("[i]n ruling against Plaintiffs the court concluded that 'Plaintiffs *cannot* point the Court to the bylaw that defines 'women' the way they wish . . . This is true").) All the Bylaws state is that members must be "women." (App. 086.) Fraternity Council is specifically authorized to interpret the Bylaws. (App. 199.) Given the lack of any definition in the Bylaws, Fraternity Council has interpreted "women" to include transgender women. Therefore, the question here is whether Kappa has adopted an unreasonable construction of a plain and unambiguous provision.

### b. The Term "Woman" Is Open to More than One Reasonable Interpretation

Appellants' position is premised on the assumption that only individuals who are "biological females" are women. This is one interpretation of the term,

but not the only one.  Kappa's interpretation of the term to include transgender women is reasonable.

Currently, over 1.6 million adults and youth identify as transgender in the United States, or roughly 0.6 percent of Americans who are 13 years old or older. *Hecox v. Little*, 79 F.4th 1009, 1016 (9th Cir. 2023).  Some courts, including a federal court in Ohio, have explicitly recognized that "[a] transgender woman ***is a woman*** who was assigned male at birth."  *Bodiford v. Krause*, No. 1:23 CV 1191, 2023 U.S. Dist. LEXIS 169907, at *6 (N.D. Ohio Sept. 25, 2023) (citation omitted) (emphasis added); *see also Kadel v. Folwell*, 620 F. Supp. 3d 339, 376 (M.D.N.C. 2022) ("[t]ransgender men are men; transgender women are women"); *Hobby Lobby Stores, Inc. v. Sommerville*, 186 N.E.3d 67, 81 (Ill. Ct. App. 2021) (finding a transgender woman "is female, just like the women who are permitted to use the women's bathroom.  The only reason that [a transgender woman] is barred from using the women's bathroom is that she is a *transgender* woman, unlike the other women . . .") (emphasis in original)).

Many courts, including this one, have long referred to transgender women using she/her pronouns that Appellants would reserve only for people born biologically female.  *See, e.g., Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019 (10th Cir. 2021) (using female pronouns to refer to party who was a transgender woman); *Hecox*, 79 F.4th 1009 (same); *United States v. Price*, 84 F.4th 738 (7th

Cir. 2023) (same); *Williams v. Kincaid*, 45 F.4th 759 (4th Cir. 2022) (same); *Qz'Etax v. Ortiz*, 170 F. App'x 551, 553 (10th Cir. 2006) (same).

Other courts, including the district court in this case, have recognized that the question of who is a woman does not have a straightforward answer while declining to answer it definitively. *See Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at *4 ("the Court will not define 'woman' today"); *B. P. J. v. W. Va. State Bd. of Educ.*, No. 2:21-cv-00316, 2023 U.S. Dist. LEXIS 1820, at *14 (S.D. W. Va. Jan. 5, 2023) ("I will not get into the business of defining what it means to be a 'girl' or a 'woman.' The courts have no business creating such definitions.").

Courts in the Sixth Circuit, where Kappa is headquartered and incorporated, have adopted expansive interpretations of "sex," which result in expansive definitions of "male" and "female." The Southern District of Ohio recognized that "biological markers" that compromise an individual's biological sex" include "inter alia their organs, their chromosomes, their hormones, and their gender identity." *Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, No. 2:23-cv-01595, 2023 U.S. Dist. LEXIS 131707, at *23 (S.D. Ohio Jul. 28, 2023). That court explained:

> [B]iological sex is not quite as binary as that definition presumes. Instead, the concept of "biological sex" encompasses a multitude of biological components (including gender identity) that often diverge in the same individual; for any given person, some of their biological markers may align with maleness while other markers

> align with femaleness . . . Sometimes, that divergence manifests in obvious physical ways: for example, in intersex individuals whose reproductive or sexual anatomy [do not] fit into an exclusively male or female (binary) sex classification . . . In others, the divergence in their biological components is still physical, but in less obvious or outwardly apparent ways . . . Simply put, it is not so simple to define "biological sex" as just male or female.

*Id.* at \*22–\*23 (citing *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 821–23 856–57 (10th Cir. 2022) (en banc) (Wilson, J., dissenting; Pryor, J., dissenting); Jennifer Levi & Kevin Barry, *"Made to Feel Broken": Ending Conversion Practices and Saving Transgender Lives*, 136 HARV. L. REV. 1112, 1117 (2023); *Intersex*, CLEVELAND CLINIC (Jul. 23, 2023), https://my.clevelandclinic.org/health/articles/16324-intersex; F.P. Kruijver et al., Male-to-female transsexuals have female neuron numbers in a limbic nucleus, 85 J. CLINICAL ENDOCRINOLOGY & METABOLISM 2034 (2000) (internal quotation marks omitted).

As explained by the Middle District of Tennessee:

> [S]ex can mean different things to different people and/or mean different things in different contexts, and the notion that there is only one definition of 'sex'—or only one sense in which the word 'sex' properly can be used—is patently wrongheaded.

*Gore v. Lee*, No. 3:19-cv-0328, 2023 U.S. Dist. LEXIS 107984, at \*30 (M.D. Tenn. Jun. 22, 2023). That court further recognized that "male" and "female" can

have meanings transcending mere external genitalia at birth and that a person may be able to switch between the two based on gender identity or changes in external genitalia. *Id.* at \*32. And that a birth certificate designation of "male" or "female" is not a designation that is "immutable over a person's life, or applies to every context, or is the only possible way to think of the person's 'sex,' or is the person's 'true sex.'" *Id.* at \*53; *see also Hobby Lobby Stores*, 186 N.E.3d at 79 (recognizing gender identity can be a factor used in state legislation to determine "sex," and that "sex" is not an immutable condition or "eternally fixed").

To see the difference of opinion on this issue, the Court can also look to the growing mass of cases addressing whether there is a place for transgender women and girls in sports. Some jurisdictions and administrative athletic bodies preclude or have sought to preclude transgender women from participating in women's sports. *See Hecox*, 79 F.4th 1015 (addressing injunction against enforcement of Idaho law that banned transgender women from participating in women's sports); *D.N. v. DeSantis*, No. 21-cv-31344, 2023 U.S. Dist. LEXIS 198678 (S.D. Fla. Nov. 6, 2023) (lawsuit over Florida law prohibiting transgender girls from participating in girls high school sports).[8] Others take the opposite approach. *Soule v. Conn.*

---

[8] That Florida saw it necessary to pass a law clarifying that transgender girls cannot "participat[e] . . . in any school-sponsored girls' sports" as opposed to relying on the fact that the sports in question were already expressly limited to girls underscores the point that "girls" or "women" are not terms that apply to only people born biologically female. *See D.N.*, 2023 U.S. Dist. LEXIS 198678, at \*5.

*Ass'n of Sch.*, 57 F.4th 43 (2d Cir. 2022) (lawsuit over Connecticut policy allowing transgender students to compete on gender-specific athletic teams consistent with their gender identity).

Participation in high school and college sports is just one of many social and political debates surrounding the transgender community. Indeed, whether one's sex can be changed is "a topic which has been in the news on many occasions and 'has become an issue of contentious political . . . debate.'" *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021) (quoting *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1051 (6th Cir. 2001)) (internal quotation marks omitted). Appellants and the amici supporting their position plainly have one view as to how policymakers in public and private realms should treat transgender women and girls. Specific to this case, they want transgender women banned from Kappa. They are undoubtedly joined in those views by others across the country. Others, including a majority of the members of Kappa's Gamma Omicron chapter, feel differently.

The biological reality of sex and gender is complicated. *Hecox*, 79 F.4th at 1024. The Ninth Circuit has cited the Endocrine Society Guidelines, which recognize:

> The phrase 'biological sex' is an imprecise term that can cause confusion. A person's sex encompasses the sum of several biological attributes, including sex chromosomes, certain genes, gonads, sex hormone levels, internal and

> external genitalia, other secondary sex characteristics, and gender identity. These attributes are not always aligned in the same direction.

*Id.* But, in a case involving a private organization's interpretation of its governing documents, the Court does not need to resolve those complicated questions and define what it means to be a woman. Instead, this Court only needs to decide whether Kappa, acting through Rooney and the Fraternity Council, interpreted its documents reasonably. "[A] difference of opinion does not rise to the level of a breach of fiduciary duty." *Maas v. Maas*, 161 N.E.3d 863, 879 (Ohio Ct. App. 2020). And interpreting the term "woman" in the same way as legislatures and courts that have touched on the question in other contexts was reasonable.[9]

As a final point, Appellants argue that the Bylaws "use 'woman' as it is commonly understood – a biological female." (Aplt. Br. 27). To determine whether Appellants' proposed definition is the only "common understanding" of "woman," this Court can look to how other women's organizations and groups define "woman." Kappa's inclusive definition aligns with all other 25 sororities that are a part of the National Panhellenic Conference ("NPC"). (App. 126.) It further aligns with the admissions policies of at least 22 historically women's

---

[9] Even if one were to adjudge that Kappa's interpretation as wrong, that is not sufficient to impose liability for a breach of fiduciary duty claim because the presumption is that Fraternity Council acted in good faith absent factual allegations that establish bad faith, fraud, or abuse of discretion. *See supra* 18–19.

colleges.  (*See* App. 023–24 (citing *Historically Women's Colleges with Trans-Inclusive Admissions Policies*, CAMPUS PRIDE, https://www.campuspride.org/tpc/womens-colleges/ (citing to the policies, and providing links to those policies)).  It further aligns with innumerable other private women's organizations that have defined "women" to include transgender women through their public statements.[10]

Interpreting the term "women" in the same way as other NPC groups, women's colleges, and women's organizations is reasonable and reflects a "common understanding" of this term.

---

[10] *Statement from Women's Rights And Gender Justice Organizations in Support of the Equality Act,* NAT'L ORG. FOR WOMEN, https://now.org/wp-content/uploads/2021/03/Statement-of-Womens-Rights-And-Gender-Justice-Organizations-in-Support-of-the-Equality-Act-2.pdf (Mar. 16, 2021) (statement signed by over 80 organizations that "transgender girls and women are girls and women"); *Women Demand: A Letter to the Federal Elected Officials and Candidates from the Women's Community*, NAT'L WOMEN'S LAW CENTER, https://nwlc.org/resource/women-demand-a-letter-to-federal-elected-officials-and-candidates-from-the-womens-community/; https://nwlc.org/wp-content/uploads/2020/09/Womens-Community-Transition-Letter-Draft-10.15.2020.pdf (Oct. 15, 2020) (letter signed by more than 200 organizations; "we use the phrase 'women and girls' and explicitly note that this includes transgender women and girls"); *Statement of Women's Rights and Gender Justice Organizations in Support of Full and Equal Access to Participation in Athletics for Transgender People*, AM. ASS'N OF UNIV. WOMEN, https://www.aauw.org/app/uploads/2020/02/Statement-from-Womens-Organizations-Supporting-Full-and-Equal-Access-to-Participation-in-Athletics-for-Transgender-People-nsa.pdf (statement signed by 23 organizations that "transgender girls and women are girls and women").

      c. *Even if the Court Were to Deny Kappa the Right to Interpret Its Own Governing Documents, Kappa's Interpretation Is Correct Under Appellants' More Demanding Analysis*

Even if Ohio law did not afford private organizations deference in reasonably interpreting their governing documents, which it plainly does, the result in this case would be the same. Appellants urge the Court to conduct an analysis of Kappa's Bylaws through an originalism-style lens wherein the Court would try to surmise the views of Kappa's founders in the 1870s and review dictionary definitions from the time of Kappa's founding to determine whether "women," as defined in Kappa's Bylaws, refers only to people who are biologically female. (Aplt. Br. 30–33.) As argued throughout, courts do not scrutinize the governance of private organizations like they do statutes and constitutional provisions, and doing so here would be improper. However, even under this proposed framework, Appellees prevail.

Appellants fixate on the 1870s to advance their argument, making repeated reference to Kappa's founders and how they would have understood the term "woman." Although the record is devoid of any evidence as to what Kappa's founders would have thought about transgender women, Appellants assure the Court that they only intended Kappa to include people born biologically female in their definition of women.[11] (*Id.* 30–32.) They say this must be so because

_____

[11] "[T]transgender women like women generally . . . have historically been

dictionary definitions of that era so restricted the term. (*Id.* 31.) Their ultimate conclusion is that the Court should approach this like a contract between two parties: look at the plain language of the contract, interpreting words and phrases as they would have been understood at the time the contract was formed. (*Id.* (quoting *Alexander v. Buckeye Pipeline Co.*, 374 N.E.2d 146, 151 (Ohio 1978).)

But Appellants have not advanced a breach-of-contract claim. They advance a claim for breach of fiduciary duty, which is assessed under an entirely different standard than a contract claim. In a breach-of-fiduciary-duty claim, the Court presumes Fraternity Council acted in good faith, and requires Appellants to allege facts to establish bad faith. *See supra* 18–19.

Moreover, the problem with Appellants' approach is that the Bylaws in question were not ratified in 1870, 1882, 1910, 1926, or 1966. They were ratified in 2022. (App. 137–66.) Appellants dismiss this change as a "technical revision," (Aplt. Br. 35), but the report of the Bylaws Committee and the general understanding of the term "woman" in 2022 shows that Appellees' interpretation prevails in this analysis.

The Bylaws Committee presented the proposed updated Bylaws with a report discussing the changes on March 16, 2022. (App. 138–40.) That report

---

discriminated against, not favored." *Hecox*, 80 F.4th at 1029. Therefore, in seeking to advance the interests of women whom had historically faced discrimination, Kappa's founders may well have embraced transgender women.

indicated that the drafters of the proposed Bylaws intended for them to be "inclusive of all our membership." (App. 139.) By that point, Kappa had already issued its "Guide for Supporting Our LGBTQIA+ Members, which clarified that it interpreted the term "woman" to include transgender women. (App. 112.) Paired with the contemporaneous statement that the Bylaws were drafted to be inclusive of all members, the Court can discern the intent for the term "woman," as used in the governing Bylaws, includes transgender women. Furthermore, a FAQs document was also issued with the Bylaws and Standing Rules Revisions 2022 that stressed that Kappa was founded "on the principles of integrity, respect and regard for others" and, therefore, "want[s] to be as inclusive of all members as we can be." (App. 185.)

The FAQs further explained:

> Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character. Please see Kappa's Position Statements on Membership Selection and Single-Gender Organizations.

> We also look to NPC policy as an NPC member organization. The NPC Recruitment Eligibility (2020) policy states: "for the purpose of participation in Panhellenic recruitment, woman is defined as an individual who consistently lives and self-identifies as a woman. Each women's-only NPC member organization determines its own membership selection policies and procedures."

(*Id.* (providing link to position statements).)

Additionally, dictionary definitions of the word "women" used in 2022 reflect the evolution of its meaning. The Cambridge Dictionary has a definition of "woman" as "an adult who lives and identifies as female though they may have been said to have a different sex at birth." *Woman*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/woman (last visited Jan. 3, 2024). It provides an example that "Mary is a woman who was assigned male at birth." *Id.* The Merriam-Webster Dictionary defines a "trans woman" as "a woman who was identified as male at birth." *Trans woman*, MERRIAM-WEBSTER DICTIONARY https://www.merriam-webster.com/dictionary/trans%20woman#:~: text=%3A%20a%20transgender%20woman%20%3A%20a%20woman,Zachary% 20Zane (last visited Jan. 3, 2024).

Thus, even if the Court failed to allow Kappa to interpret its own Bylaws and analyzed Appellants' claim based on the parties' understanding of the Bylaws applicable at the time of Langford's admission, it would be left with the Bylaws as enacted in 2022 which were: (1) presented for consideration by delegates in 2022 to Kappa's convention as intended to be "inclusive"; (2) explained in a FAQs document in 2022 to include individuals who identify as women, and referenced the previously issued position statement; (3) enacted after Kappa had issued multiple policies explaining that it considers individuals who identify as women to

35

be included within the definition of "women"; and (4) issued as contemporaneously published dictionaries comported with Kappa's definition of the term.[12]  At the time that Langford was admitted in the fall of 2022, it was clear that the term "women" in the Bylaws included individuals who identified as women and this should have been understood by all members, even if they disagreed with that interpretation.

> iii.    <u>Once Kappa Has Reasonably Interpreted Its Own Bylaws, a Court Dictating Whom It Can and Cannot Admit Would Violate the First Amendment</u>

The First Amendment right of a private organization to conduct itself as it sees fit and associate with members of its choosing is inherent in the judicial non-intervention doctrine.  Although Appellees agree that litigants cannot use the First Amendment as a shield against meeting their contractual obligations, a court telling a private organization that it cannot reasonably interpret its own governing documents to select members it chooses to associate with would violate the First Amendment.  "Interference with expressive associational rights is clearest when it involves matters concerning decisions about a group's membership." *W. Va. Coal.*

---

[12] Appellants also do not address the implications of their analysis on other portions of the membership criteria.  For instance, it would not make sense to assess the character and integrity of potential members today (an assessment the Bylaws require chapters to make) under the standards of 1870 society when standards of morality and decency differed vastly from those of the present day. Yet Appellants would have Kappa make those assessments as they would have been understood by Kappa's founders regardless.

*Against Domestic Violence, Inc. v. Morrisey*, No. 2:19-cv-00434, 2023 U.S. Dist. LEXIS 154406, *29–*31 (S.D. W. Va. Aug. 31, 2023).    As discussed above, Kappa's governing documents allow for the admission of any transgender woman whom a chapter votes to accept.    Thus, interference by this or any court in Kappa's decision to admit Langford (or any transgender woman) as a member because she is a transgender woman would violate the First Amendment.

### a. Court Orders Constitute State Action

Responding to the district court's discussion of the serious First Amendment concerns that would flow from adopting Appellants' position, Appellants argue that the case does not implicate the First Amendment because there is no state action.[13]    (Aplt. Br. 25.)    But the Supreme Court has recognized that actions of courts constitute state actions.    *See Shelley v. Kraemer*, 334 U.S. 1, 14–18 (1948); *see also Duke v. Smith*, 784 F. Supp. 865, 870 (S.D. Fla. 1992) (recognizing a court interferes with the First Amendment freedom of expression in "substitut[ing] its own judgment for that of the [p]arty").    This Court dictating Kappa's membership would implicate Kappa's First Amendment freedoms.

---

[13] Of course, the First Amendment applies to all government actions, both state and federal.

### b. Courts Cannot Make the Membership Decisions for Private Organizations

At its core, this is a case about who can and cannot join the membership of a private organization. Specifically, it is about whether Kappa can admit transgender women to its membership or not. The First Amendment confines those decisions to organizations and their members, not government actors like courts and legislatures. "Impediments to the exercise of one's right to choose one's associates can violate the right of association protected by the First Amendment." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 658 (2000) (internal citations omitted). The Supreme Court recognized, "[w]hile the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley v. Irish-American Gay, Lesbian, & Bisexual Group of Boston*, 515 U.S. 557, 579 (1995). "And as is true of all expressions of First Amendment freedoms, the courts may not interfere on the ground that they view a particular expression as unwise or irrational." *Democratic Party of United States v. Wis.*, 450 U.S. 107, 124 (1981).

First Amendment associational freedoms apply in the case of a private organization where members disagree about whom should be eligible for admission:

> [An organization's] speech or conduct may reflect the
> view of only a bare majority of the members, or even just
> the view of the members' delegate—such as the editor of
> a newspaper or the pastor of a congregation.  It suffices
> that the speech or conduct represents an official position.

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1149 (10th Cir. 2013) (quoting *Dale*, 530 U.S. at 655) (internal quotation marks omitted).  In one recent case, the Ninth Circuit concluded that requiring a beauty pageant to allow a transgender woman to compete would violate the pageant's First Amendment rights.  *See Green v. Miss USA, LLC*, 52 F.4th 773 (9th Cir. 2022).  The same logic would control this case, the only difference being that Kappa is seeking to include transgender women instead of exclude them.  But in both instances, it is the organization that should make the decision, not the court.

Forcing Kappa to exclude Langford and other transgender women from its membership implicates the same First Amendment concerns as forcing the Boy Scouts of America to include gay scoutmasters, as was at issue in *Dale,* or forcing a privately organized parade to allow a group to march when the organizers did not agree with the message, as was at issue in *Hurley*.

    iv.   <u>To the Extent Appellants Now Assert a Derivative Claim Based on the Gamma Omicron Chapter's Election Procedures, They Have Forfeited the Claim in the District Court, Failed to Demonstrate Futility, and Failed to Allege Facts to Show Bad Faith</u>

        *a.   Appellants Forfeited This Claim by not Raising It with The District Court and by not Arguing Plain Error in Their Brief*

A close reading of Appellants' brief reveals that the factual basis for their derivative claim has shifted since this case was in the district court. Below, Appellants focused their derivative claim on the Bylaw interpretation that has occupied the majority of the analysis in this brief: whom is Kappa permitted to admit under its Bylaws? (App. 073–75.) Now, in their opening brief, Appellants attempt to add a second claim concerning the election procedures the Gamma Omicron chapter used in the vote on Langford's membership. (Aplt. Br. 29). Appellants forfeited this claim by not addressing or asserting it below.

"When a plaintiff raises a legal theory on appeal that was not raised in the district court, we consider that theory forfeited." *Parker Excavating, Inc. v. Lafarge W., Inc.*, 863 F.3d 1213, 1221 (10th Cir. 2017) (citing *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1127–28 (10th Cir. 2011)). A forfeited argument can prevail only under plain-error review. *Richison*, 634 F.3d at 1128. Plain error is shown by establishing "(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Parker Excavating*, 863 F.3d at 1221. If, however, the

appellant fails to even argue that the new argument prevails under a plain-error standard, it "marks the end of the road for an argument for reversal not first presented to the district court." *Richison*, 634 F.3d at 1131.

Although the Amended Complaint made factual allegations concerning the election procedures the Gamma Omicron chapter used in voting on Langford's admission, Appellants' explanation of their derivative claim for breach of fiduciary duty focused entirely on the decision to admit transgender members, not the voting procedures the chapter used to do so.  (App. 073–75.)  As further evidence that Appellants did not intend to raise the argument in the district court, they did not discuss it at all when they argued that they had met the exhaustion requirement for a derivative claim.  (App. Vol. II 042–44.)  Appellees argued that Appellants had not shown futility given that Kappa's counsel had invited Appellees to identify specific provisions of Kappa's governing documents that Langford's admission allegedly violated.  (See App. 125–27; App. Vol. II 018–20.)  Responding to that argument, Appellants only addressed the alleged breach of fiduciary duty related to the admission of transgender women, not any claim concerning voting procedures.  (App. Vol. II 042–44.)   On those arguments, the district court found that Appellants had met the futility requirements, without addressing any claim of voting irregularities. *See Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at *26–29.

For the first time on appeal, Appellants argue that their claim for breach of fiduciary duty also relates to non-anonymous and irregular voting at the chapter. (Aplt. Br. 29). Appellants, however, forfeited this argument by not raising it in the district court and then doomed it in this Court by not making a plain-error argument for its success. *See Richison*, 634 F.3d at 1131.

### b.    *Appellants Failed to Demonstrate Futility for This Claim*

Furthermore, even if Appellants had argued plain error in their brief, they would have been unsuccessful because they would not have been able to show futility in a derivative claim premised on this theory. Rule 23.1 of the Federal Rules of Civil Procedure imposes special requirements that plaintiffs must meet when asserting a derivative claim. It requires plaintiffs to submit a verified complaint that states with particularity "any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary from the shareholders or members," and "the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). Courts can excuse this requirement when the plaintiff shows that further demand would have been futile. *Pikk v. Pedersen*, 826 F.3d 1222, 1227 (10th Cir. 2016).

In a futility analysis, courts "adopt the futility law of the state of incorporation of the company on behalf of which the plaintiffs are bringing suit." *Pikk*, 826 F.3d at 1228 (citing *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108

42

(1991)).  Ohio's futility standard is demanding.  *In re Ferro Corp. Derivative Litig.*, No. 1:04CV1626, 2006 U.S. Dist. LEXIS 11608, at *13 (N.D. Ohio Mar. 21, 2006) ("establishing demand futility in Ohio is not an easy task").  "Futility means that the directors' minds are closed to argument and that they cannot properly exercise their business judgment in determining whether the suit should be filed."  *Carlson v. Rabkin,* 789 N.E.2d 1122, 1128 (Ohio Ct. App. 2003).  Ohio courts recognize that the requirement that plaintiffs first make a demand before proceeding with a derivative claim "is clearly not a technical procedural requirement" and instead "serves the very important purpose of ensuring that before a shareholder derivative suit is brought, the company's board of directors has considered all possible intracorporate remedies."  *Grand Council v. Owens*, 620 N.E.2d 234, 238 (Ohio Ct. App. 1993).

In arguing they met the futility requirement, Appellants relied on a letter from their attorney which raised their grievances with Kappa.  (App. 258–60.)  This letter raised some concerns about the decision process of the chapter being "deeply flawed."  (App. 259.)[14]  The letter, however, did not identify any Bylaw or Standing Rule that Appellants contend was violated by the Gamma Omicron

---

[14] Notably, Appellants' counsel's letter that was used to establish all the issues that were raised with Fraternity Council in November, approximately six weeks after the chapter's vote to admit Langford as a member, does not allege that any members were not able to participate in any voting.  (App. 258 –60.)  This was first alleged with the filing of the Complaint.

chapter's voting process.  (App. 258–60.)  Kappa's response invited Appellants to identify "specific provisions in any Kappa governing documents that [they] contend were not followed by Kappa."  (App. 126.)  Appellants did not respond.

The district court's conclusion on the only argument Appellants did present was that they established futility given that Kappa had made its policy of admitting transgender members clear.  *Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at *26–29.  But the district court made no holding about the futility of raising any alleged voting irregularities as no such argument was advanced by Appellants.

Indeed, it is unclear under what authority Fraternity Council can deny membership to an individual based on an alleged issue that occurred with a chapter's voting process that is due to no fault of the member.  As explained above, the only thing that headquarters is explicitly authorized to do in "approving a member" is consider if the requirements for initiation were fulfilled, which has nothing to do with a chapter's voting process.  *See supra* 5–7.  If they were, headquarters is required to authorize the initiation because it is each chapter's decision whom to admit to their chapter.  *See id.*  But, at the very least, these issues had to be raised with Fraternity Council to establish that Fraternity Council had authority to take an action and failed to do so in violation of its fiduciary duties.  Appellants cannot meet Ohio's high bar for showing futility by crafting a new unsupported argument at this juncture.

c.     *Appellants Failed to Allege Facts to Show Bad Faith*

Finally, even if Appellants had argued plain error in their brief and even if they could establish futility to allow them to pursue a derivative claim, Appellants have failed to state a claim for breach of fiduciary duty based on alleged voting irregularities.   As discussed above, it is presumed that any action taken by Fraternity Council was taken in good faith and in the best interest of Kappa, and Appellants must show that Appellants acted in bad faith or without requisite objectivity.  *See supra* 18–19.   Furthermore, this Court cannot inquire into the wisdom of Fraternity Council's actions in the absence of fraud, bad faith, or abuse of discretion.  *See id.*

Fraternity Council did not conduct the alleged irregular voting procedure. All they are alleged to have done is allowed Langford to be initiated despite voting irregularities.   Simply failing to do something they allegedly should have done (even though the Bylaws do not authorize non-initiation due to a voting irregularity) is not sufficient to establish a breach of fiduciary duty.  There are no factual allegations to support any contention of fraud, bad faith, or abuse of discretion.   To satisfy the requirements under Ohio law for breach of fiduciary duty, plaintiffs "must plead facts, as distinct from generalized conclusions, which, if proved, would overcome the presumption that the [officers] have acted in good faith and in the best interests of the corporation."  *In re Gas Natural, Inc.*, No.

45

1:13-CV-02805, 2014 U.S. Dist. LEXIS 184046, at *51 (N.D. Ohio Sept. 24, 2014).  Without factual allegations to support a contention of bad faith, Appellants cannot overcome the presumption of good faith accorded to Fraternity Council, and no breach of fiduciary duty claim can survive.

## B. Appellants' Direct Claim Is Both Forfeited and Fails on the Merits

Appellants forfeited their direct claim in the district court when they did not address it at all in response to Appellees' Motion to Dismiss.  But even if they had not forfeited the claim, Appellants fail to state a direct claim because they do not plausibly allege an injury arising from any cognizable legal claim from which they suffered damages unique from the rest of Kappa's members.

### i. Appellants Forfeited Their Direct Claim When They Did Not Defend It in the District Court in Response to the Motion to Dismiss

Appellees moved to dismiss the Amended Complaint in its entirety, including Appellants' direct claim.  In their response, Appellants argued that they had plausibly asserted a derivative claim (App. Vol. II 042–47), a breach-of-contract claim (App. Vol. II 047–53), and a tortious-interference claim (*id.*).  They did not offer the district court any argument as to why it should permit their direct claims to proceed, which Appellees noted in their reply in support of the motion. (App. Vol. II 062.)

Under this Court's precedent, a party forfeits an argument by failing to raise it in response to a motion to dismiss.  *See Ashaheed v. Currington*, 7 F.4th 1236,

1242 n.2 (10th Cir. 2021).  Appellants did not attempt to defend their direct claim below and so forfeited their ability to assert it in this Court.

    ii.   Even if Appellants Had Preserved Their Direct Claim, It Would Fail

With numerous grounds on which it can affirm the district court's dismissal of Appellants' derivative claim, the Court can easily dispose of the direct claim should it permit Appellants to pursue it despite their waiver in the district court.

To establish a direct claim, Appellants must show: "(1) the injury arises out of a special duty, e.g., via contract, between the wrongdoer and the shareholder; or (2) the shareholder suffered damages separate and distinct from that suffered by other shareholders."  *Heaton v. Rohl*, 954 N.E.2d 165, 175 (Ohio Ct. App. 2011). In other words, the complaining shareholder must be "injured in a way that is separate and distinct from an injury to the corporation."  *Morgan v. Ramby*, No. 2012-Ohio-763, 2012 Ohio App. LEXIS 662, at *11 (Feb. 27, 2012) (citations omitted).

There must be some injury to the corporation from which the shareholder suffered distinct damages in order for a direct cause of action to proceed.  *Carlson*, 789 N.E.2d at 1126-27; *see also Barr v. Lauer*, No. 2007-Ohio-156, 2007 Ohio App. LEXIS 154, at *7–*8 (Jan. 18, 2007) (analyzing plaintiff's breach of contract, fraud, and misrepresentation causes of action as direct actions).  "[A]ctions for breach of fiduciary duty [against] directors or officers are generally to be brought

in derivative suits." *Joseph v. Joseph*, No. 19-3350, 2022 U.S. App. LEXIS 23216, at *30 (6th Cir. Aug. 18, 2022) (citing *Maas v. Maas*, 161 N.E.3d 863, 882 (Ohio Ct. App. 2020)).  To the extent this claim is based upon the alleged breach of fiduciary duty, it fails for the reasons discussed herein.

> iii.  <u>Appellants Have Not Alleged Any Frustration of Contractual Obligations</u>

In their argument on the direct claim, Appellants advance the theory that they have been uniquely injured by Rooney's purported breach of fiduciary duty due to the "contractual violations" they suffered.  (Aplt. Br. 42.)  But Appellants do not direct the Court to any contractual violations unique to them.  Appellants were similarly unable to point to the breach of any contractual provision in the district court when they were still advancing breach-of-contract and tortious-interference-with-contract claims.

Below, Appellees noted that there was no provision in the contracts Appellants had referenced in the Amended Complaint that Langford's admission into Kappa violated.  (App. Vol. II 026.)  In response, Appellants raised the existence of a second contract not at issue in the Amended Complaint, but failed to articulate a specific portion of a contract that was breached.  (App. Vol. II 047–52.)  Most of the direct-claim section of Appellants' brief is spent discussing Langford's alleged behavior.  Even if the allegations about Langford's behavior were true—and there are substantial reasons to doubt their veracity—Appellants fail to show

how that behavior is connected to some unidentified contractual obligation that Rooney owed to them.  Absent such an argument, it is unclear how Appellants can articulate a direct claim rooted in the frustration of contractual expectations.

### C. The Court Can Also Dispose of Appellants' Claims Against Rooney on Personal-Jurisdiction Grounds

In the event the Court does not fully affirm based on the above argument, it can also affirm the district court with regard to claims against Rooney because the district court lacked jurisdiction over Rooney.  Rooney presented this argument in the Motion to Dismiss, and the district court rejected it.  *Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at \*20–25.  Given that the district court awarded complete relief to Rooney on other grounds, she may raise her jurisdictional argument as an alternative basis for affirming without filing a cross-appeal.  *See Un. Fire & Cas. Co. v. Boulder Plaza Residential, LLC*, 633 F.3d 951, 958 (10th Cir. 2011) (citations omitted).

"The law of the forum state and constitutional due process limitations govern personal jurisdiction in federal court."  *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10th Cir. 2017) (citations omitted).  Wyoming, the forum state, extends personal jurisdiction to the constitutional limit in the Due Process Clause.  *See* Wyo. Stat. § 5-1-107.  Thus, to establish personal jurisdiction over Rooney, Appellants needed to establish that she has "minimum contacts" with the State of Wyoming such that Rooney having to defend a lawsuit in the state

"would not offend traditional notions of fair play and substantial justice."
*Dudnikov v. Chalk & Vermilion Fine Arts*, 514 F.3d 1063, 1070 (10th Cir. 2008)
(quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (internal
quotation marks omitted).  To establish minimum contacts, they needed to show
that Rooney "purposefully directed" her activities at the forum state and that
Appellants suffered injuries arising from those same activities.  *Id.* at 1071 (citing
*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).  Purposeful direction
requires a demonstration that Rooney (1) acted intentionally; (2) "expressly aimed"
her actions at Wyoming; and (3) knew that the "brunt of the injury" would be felt
in Wyoming.  *Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 966–67 (10th Cir.
2022).  In the personal-jurisdiction context, contacts of a company's officers or
other agents in their capacity as officers do not establish personal jurisdiction over
the officers.  *Ten Mile Indus. Park v. W. Plains Serv. Corp.*, 810 F.2d 1518, 1527
(10th Cir. 1987).

Rooney is a citizen of Illinois, not Wyoming.  (App. 016.)  The Amended
Complaint did not allege that Rooney directed any activity at the State of
Wyoming, let alone activity related to Appellants' alleged injuries.  It also did not
allege that Rooney was present in Wyoming for any of the relevant events, or that
she was involved in those events from afar.  (App. 010–80.)  Her involvement in
administering Kappa policies as a Kappa officer also does not create personal

jurisdiction in Wyoming.   Those allegations concern actions affecting Kappa generally, not ones purposefully directed at Wyoming.  Without any allegation of a single contact between Rooney and the forum state, the district court lacked personal jurisdiction.

The district court's analysis of this issue gave Appellants' allegations too much credit in establishing the "expressly aimed" element of the purposeful-direction test.  The district court held that Appellants had shown Rooney expressly aimed her conduct at Wyoming based on an email from a different person that used the term "we" in referencing Kappa proceeding with Langford's initiation. *Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at *22–*23.  Appellees respectfully disagree that Appellants were able to establish the express-aiming element with regard to Rooney without any allegations actually attributed to Rooney.

Additionally, the district court, while recognizing that Appellants cannot establish personal jurisdiction over Rooney using solely her contacts with Wyoming in her capacity as a Kappa director, found that the court had personal jurisdiction.  *See Westenbroek*, at *23–*24 (quoting *Walden v. Fiore*, 571 U.S. 277, 286 (2014)), for the holding that "due process requires that a defendant be haled into court in a forum State based on h[er] own affiliation with the State, not based on the . . . 'attenuated' contacts [s]he makes by interacting with other

persons affiliated with the state" and then nonetheless concluding that Rooney's contacts were sufficient to establish personal jurisdiction).

For these reasons, the Court could also affirm on a finding that the district court lacked personal jurisdiction over Rooney.

## **CONCLUSION**

The district court correctly dismissed this case, recognizing that courts have a limited role to play in the governance of private, voluntary organizations. Kappa reasonably interpreted its Bylaws to permit chapters to induct transgender women as members. Appellants' objection to their chapter having done so does not give rise to a legal claim. Appellees accordingly ask the Court to affirm the district court's dismissal of Appellants' claims.

Dated: January 3, 2024                          Respectfully Submitted,

*/s/ Natalie M. McLaughlin*
Natalie M. McLaughlin (Ohio Bar 0082203)
Brian W. Dressel (Ohio Bar 0097163)
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio  43216-1008
Telephone:  (614) 464-5452
Facsimile:   (614) 464-5452
E-mail:   nmmclaughlin@vorys.com
            bwdressel@vorys.com

*Counsel for Defendants-Appellees*
*Kappa Kappa Gamma Fraternity,*
*Mary Pat Rooney, and Kappa Kappa*
*Gamma Building Co.*

Scott P. Klosterman (Wyoming Bar
No. 6-3081)
Williams, Porter, Day & Neville, P.C.
159 North Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602-3902
Telephone:   (307) 265-0700
Facsimile:    (307) 266-2306
E-Mail:       sklosterman@wpdn.net

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I hereby certify as follows:

1. This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i). Excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(B), the brief contains 12,322 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). It has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

*/s/ Natalie M. McLaughlin*
Natalie M. McLaughlin

## <u>CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS</u>

All required privacy redactions have been made to this document, and with the exception of those redactions, every document submitted in digital form is an exact copy of the written document filed with the clerk.  Said document has been scanned for viruses with Trend Micro Apex One Antivirus, version 18.917.00 (last updated January 3, 2024), and according to that program is free of viruses.


*/s/ Natalie M. McLaughlin*
Natalie M. McLaughlin

1