No. 23-8065

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

JAYLYN WESTENBROEK, et al.,
*Plaintiffs-Appellants*,

v.

KAPPA KAPPA GAMMA FRATERNITY, an Ohio non-profit corporation, as
nominal Defendant and as a direct Defendant, et al.,
*Defendants-Appellees*,

and

ARTEMIS LANGFORD,
*Defendant*.

On Appeal from the United States District Court
for the District of Wyoming
No. 23-CV-00051-ABJ (Judge Alan B. Johnson)

## BRIEF OF *AMICUS CURIAE* NATIONAL PANHELLENIC CONFERENCE
## IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

Nicole L. Masiello
ARNOLD & PORTER
  KAYE SCHOLER LLP
255 West 55th Street
New York, NY 10019
(212) 836-8000
nicole.masiello@arnoldporter.com

R. Stanton Jones
Jayce L. Born
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave. NW
Washington, DC 20001
(202) 942-5000
stanton.jones@arnoldporter.com
jayce.born@arnoldporter.com

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

The National Panhellenic Conference ("NPC") is a non-profit corporation that is exempt from taxation under section 501(c)(6) of the Internal Revenue Code.  NPC does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

<u>/s/ R. Stanton Jones</u>
R. Stanton Jones

*Counsel for Amicus Curiae*

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ..................................................................... iii

INTEREST OF *AMICUS CURIAE* .............................................................1

SUMMARY OF ARGUMENT ................................................................3

ARGUMENT ....................................................................................5

I.    The First Amendment's Freedom of Association Guarantees the Fundamental Rights of Private Organizations to Establish Their Own Membership Criteria and to Choose Their Own Members...............................5

II.   Private Organizations Have a Settled Right to Interpret Their Own Bylaws and Other Governing Documents and Rules ......................................10

III.  Plaintiffs' Theory of Liability Would Seriously Undermine the Organizational Autonomy of NPC and Its Member Sororities.......................17

CONCLUSION .................................................................................22

CERTIFICATE OF COMPLIANCE.........................................................23

CERTIFICATE OF DIGITAL SUBMISSION  AND PRIVACY REDACTIONS ..............................................................................24

CERTIFICATE OF SERVICE ...............................................................25

## TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Apilado v. N. Am. Gay Amateur Athletic All.*,
  792 F. Supp. 2d 1151 (W.D. Wash. 2011) ............................................................8

*Apple II Condo. Ass'n v. Worth Bank & Trust Co.*,
  659 N.E.2d 93 (Ill. App. Ct. 1995) ..................................................................14

*Barrash v. Am. Ass'n of Neurological Surgeons, Inc.*,
  No. 4:13-cv-1054, 2014 WL 2169813 (S.D. Tex. May 22, 2014) ....................12

*Boy Scouts of Am. v. Dale*,
  530 U.S. 640 (2000)..............................................................................3, 4, 6, 7, 8

*Brain v. Canterwood Homeowners Ass'n*,
  No. 57716-0-II, 2023 WL 6122707 (Wash. Ct. App. Sept. 19,
  2023) .................................................................................................................14

*Dallas Athletic Club Protective Comm. v. Dallas Athletic Club*,
  407 S.W.2d 849 (Tex. Civ. App. 1966)................................................................13

*Darren Patterson Christian Acad. v. Roy*,
  No. 23-cv-01557, 2023 WL 7270874 (D. Colo. Oct. 20, 2023) .........................8

*Davidovich v. Israel Ice Skating Fed'n*,
  140 A.3d 616 (N.J. Super. Ct. App. Div. 2016) .................................................13

*Dep't of Lab. v. Aluminum, Brick & Glass Workers Int'l Union, Loc.
  200*,
  941 F.2d 1172 (11th Cir. 1991) .........................................................................15

*Dist. Grand Lodge No. 25 Grand United Order of Odd Fellows v.
  Jones*,
  160 S.W.2d 915 (Tex. Comm'n App. 1942) .......................................................12

*Falcone v. Middlesex Cnty. Med. Soc'y*,
  170 A.2d 791 (N.J. 1961) ..................................................................................11

*Green v. Miss U.S.A., LLC*,
  52 F.4th 773 (9th Cir. 2022) ................................................................................8

*Hennessey v. NCAA,*
    564 F.2d 1136 (5th Cir. 1977) ...............................................................14

*Hobby Lobby Stores, Inc. v. Sebelius,*
    723 F.3d 1114 (10th Cir. 2013) (en banc) ...........................................8

*Int'l Bhd. of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers &*
    *Helpers, AFL-CIO v. Hardeman,*
    401 U.S. 233 (1971)...............................................................................14

*Koszela v. Nat'l Ass'n of Stock Car Auto Racing, Inc.,*
    646 F.2d 749 (2d Cir. 1981) ..................................................................12

*Lamden v. La Jolla Shores Clubdominium Homeowners Ass'n,*
    980 P.2d 940 (Cal. 1999) .......................................................................12

*Levant v. Whitley,*
    755 A.2d 1036 (D.C. 2000) ....................................................................12

*Loc. 334 v. United Ass'n of Journeymen,*
    669 F.2d 129 (3d Cir. 1982) ..................................................................15

*M'Baye v. World Boxing Ass'n,*
    429 F. Supp. 2d 660 (S.D.N.Y. 2006) ...................................................13

*Marjorie Webster Jr. Coll., Inc. v. Middle States Ass'n of Colls. &*
    *Secondary Schs., Inc.,*
    432 F.2d 650 (D.C. Cir. 1970)...............................................................12

*Most v. Am. Fed'n of Musicians of U.S. & Canada,*
    7 F. App'x 551 (9th Cir. 2001) ..............................................................15

*NAACP v. Golding,*
    679 A.2d 554 (Md. 1996) ................................................................12, 16

*Nat'l Hockey League Players' Ass'n v. Bettman,*
    No. 93 Civ. 5769, 1994 WL 738835 (S.D.N.Y. Nov. 9, 1994).........14

*Oberbillig v. W. Grand Towers Condo. Ass'n,*
    807 N.W.2d 143 (Iowa 2011) ................................................................15

*Our Lady's Inn v. City of St. Louis,*
    349 F. Supp. 3d 805 (E.D. Mo. 2018) ....................................................8

*Roberts v. United States Jaycees*,
    468 U.S. 609 (1984)................................................................6, 10, 11, 16

*Ruiz v. Sauerland Event GmbH*,
    801 F. Supp. 2d 118 (S.D.N.Y. 2010) .................................................13

*Scheire v. Int'l Show Car Ass'n*,
    717 F.2d 464 (9th Cir. 1983) ...............................................................14

*Seitzinger v. Cmty. Health Network*,
    676 N.W.2d 426 (Wis. 2004)................................................................14

*Shelley v. Kraemer*,
    334 U.S. 1 (1948)..................................................................................10

*Tackney v. U.S. Naval Acad. Alumni Ass'n, Inc.*,
    971 A.2d 309 (Md. 2009) .....................................................................15

*Thomas M. Cooley L. Sch. v. Am. Bar Ass'n*,
    459 F.3d 705 (6th Cir. 2006) .........................................................11, 12

*Westenbroek v. Kappa Kappa Gamma Fraternity*,
    No. 23-cv-51, 2023 WL 5533307 (D. Wyo. Aug. 25, 2023) ...............9

## INTEREST OF *AMICUS CURIAE*[1]

Founded in 1902, the National Panhellenic Conference ("NPC") is the premier advocacy and support organization for the advancement of the sorority experience. It serves as the umbrella group for 26 national and international women's-only social sororities. NPC sororities are located on more than 670 college and university campuses in all 50 states, with more than 340,000 current undergraduate members across 3,281 chapters. Last year, NPC sororities provided nearly $6.7 million in scholarships to their members and donated more than $28 million in funding, and more than 5 million volunteer hours, to national and international philanthropies.

In collaboration with its member organizations, NPC seeks to foster sorority communities committed to women's empowerment and the development of young women who are engaged in their campuses and communities. As the leading advocate for the sorority experience, NPC coordinates community-wide engagement with local, state, and national lawmakers, and it submits *amicus curiae* briefs in cases that could impact sororities, their members, or the sorority experience. NPC also advocates on behalf of its member sororities when colleges and universities attempt to interfere with sorority chapters' organizational autonomy, including their ability

---

[1] All parties have consented to the filing of this brief. No counsel for any party authored this brief in whole or in part and no entity or person, aside from *amicus curiae*, its members, and its counsel, made any monetary contribution toward the preparation or submission of this brief.

to choose their own membership policies and criteria. For example, some colleges and universities have attempted to restrict sorority recruitment (*i.e.*, prohibiting freshmen from participating) as a condition of official university recognition. Others have tried to encroach on sorority governance matters; for example, one university sought to install its staff as appellate arbiters when sororities terminated a student's membership. In these and other situations, NPC has stepped in to defend sororities' associational rights and to safeguard their autonomy in decision-making and self-governance. Through its advocacy, NPC highlights the importance of women's-only spaces and showcases the transformational power of the sorority experience.

NPC has a direct interest in this case because Plaintiffs-Appellants' claims strike at the core of sororities' organizational independence and autonomy. Their claims directly challenge sororities' ability to set their own membership policies and criteria, and to interpret their own governing documents. If accepted, Plaintiffs' legal theories would severely undermine sororities' independence as private organizations and infringe on their members' constitutional freedom of association. The district court's decision correctly protects the rights of private organizations to set their own membership policies and otherwise govern themselves, and it prevents challenges to those policies that threaten to interfere with the First Amendment associational rights of the organizations' members. This Court should affirm.

## SUMMARY OF ARGUMENT

This case is about the decisional autonomy of private organizations and their well-established associational right to define and interpret their own membership policies.  If an individual member disagrees with a private organization's choices about the make-up of its membership or its interpretation of membership or other governance-related policies, that member has a range of options at their disposal, but using the federal courts to do their private bidding is not one of them.  In this case, Plaintiffs—six current or former members of the Kappa Kappa Gamma ("KKG") sorority chapter at the University of Wyoming ("UW Chapter")—challenge their sorority chapter's decision to admit a particular member, arguing that KKG violated its bylaws when it interpreted its membership criteria to allow that member's admission.  The district court correctly rejected Plaintiffs' claims, which seek to embroil courts in the self-governance and internal decision-making of a private organization in violation of its members' constitutional rights.

The First Amendment's freedom of expressive association bars courts from intruding on sororities' autonomy as Plaintiffs request.  Recognizing that the very act of associating with a certain group of individuals reflects and expresses the views of the group's members, the Supreme Court has held unequivocally that "[i]mpediments to the exercise of one's right to choose one's associates can violate the right of association protected by the First Amendment."  *Boy Scouts of Am. v.*

3

*Dale,* 530 U.S. 640, 648 (2000) (quoting *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 548 (1987)).  If private citizens could utilize the judiciary to alter the membership policies or individual membership decisions of a private organization, it would impose such an unconstitutional impediment.

Furthermore, complementary to a member's right of association is a private organization's right to self-governance.  Courts around the country have long refused to interfere in matters concerning the internal affairs of private groups.  Under settled principles of corporate law, a private organization is free to craft its own governing documents, including its charter and bylaws, and to interpret those documents.  And courts generally defer to those internal governance decisions out of respect for the organization's autonomy.  That deference is crucial to the existence and autonomy of private organizations.  It allows a private organization and its members to create their own space with their chosen associates, governed by their chosen rules.

Any judicial decisions departing from this tradition of deference—and from settled First Amendment precedent—would harm private organizations around the country by impeding their ability to govern themselves.  For NPC and its member sororities, including KKG, such a decision would severely undermine their mission and purpose.  Sororities have long sought to empower women on college campuses nationwide, and their ability to set and apply the criteria for their own membership is integral to the sorority experience.  If courts or other state actors could overturn

the membership decisions of private organizations based on policy or interpretive disagreements, sororities would lose the autonomy that has allowed them to thoughtfully and intentionally define their values and missions to create a support system that has benefitted women around the country for more than a century.

## ARGUMENT

Under both federal constitutional law and state corporate law, the private decision-making of private organizations, adopted by their private members, generally lies beyond the purview of courts or other government actors. Under the First Amendment, private organizations possess an associational right to establish their own membership criteria and to choose their own members. And under the overwhelming majority of states' laws, courts broadly defer to the decisions of private organizations about their self-governance, including an organization's interpretations of its own bylaws and governing documents. For good reason. Any other approach would disrupt the very purpose and mission that each organization has chosen to serve and advance, and their members—here, women around the country who chose to join a sorority—would be left to suffer the consequences.

## I. The First Amendment's Freedom of Association Guarantees the Fundamental Rights of Private Organizations to Establish Their Own Membership Criteria and to Choose Their Own Members

The First Amendment "guarantees freedom of association," including the "right to associate with others in pursuit of a wide variety of political, social,

economic, educational, religious, and cultural ends." *Roberts v. United States Jaycees*, 468 U.S. 609, 618, 622 (1984); *see Dale*, 530 U.S. at 647 (quoting *Roberts*). This constitutional freedom of association "is crucial in preventing the majority from imposing its views on groups that would rather express other, perhaps unpopular, ideas." *Dale*, 530 U.S. at 647–48; *see also Roberts*, 468 U.S. at 622 (similarly stating that the right to free association "is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority"). Thus, the government cannot "impair the ability of the group to express those views, and only those views, that it intends to express." *Dale*, 530 U.S. at 648.

"Government actions that may unconstitutionally infringe upon this freedom can take a number of forms," including actions that punish or otherwise burden a person's membership in an organization, or other attempts "to interfere with the internal organization or affairs of the group." *Roberts*, 468 U.S. at 622, 623. Key here, "[i]mpediments to the exercise of one's right to choose one's associates can violate the right of association protected by the First Amendment." *Dale*, 530 U.S. at 658 (internal quotation omitted). And the Supreme Court has said that "[t]here can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire." *Roberts*, 468 U.S. at 623; *see also Dale*, 530 U.S. at 648 (similar). The converse must be at least equally true: government action that forces a private group

*not* to accept a member that the group *does* desire imposes an extreme impediment to a group's associational freedom. Yet that is precisely what Plaintiffs seek here in requesting a court order overturning KKG's choice to admit a particular member.[2]

Supreme Court precedent establishes that the relief Plaintiffs seek—the forced exclusion of transgender women from membership in KKG, a private organization—is forbidden. In *Dale*, the Supreme Court held that a state anti-discrimination statute that required the Boy Scouts to accept a gay man as a scoutmaster violated the group's freedom of expressive association by "interfer[ing] with the Scouts' choice not to propound a point of view contrary to its beliefs." 530 U.S. at 653–54, 656. The Boy Scouts, the Court found, engaged in expressive activity in seeking to transmit a system of values that included being "morally straight" and "clean" and excluded "homosexual conduct." *Id.* at 649–50 ("It seems indisputable that an association that seeks to transmit such a system of values engages in expressive activity."). Whatever the merit of that view, the Court concluded that the presence of an "avowed homosexual and gay rights activist" as an assistant scoutmaster would interfere with the Boy Scouts' "desire to not promote homosexual conduct as a legitimate form of behavior." *Id.* at 655–56, 653 (internal

---

[2] Federal and state anti-discrimination laws can prevent private groups from discriminating on the basis of protected class, but those laws are irrelevant here. Plaintiffs do not argue that KKG discriminates on the basis of any protected class, nor could they, when KKG adopted a *more* inclusive membership policy.

quotation marks omitted).[3]

Lower courts have relied on *Dale* in rejecting claims that would interfere with the associational rights of private organizations in a wide variety of cases. *See, e.g.*, *Green v. Miss U.S.A., LLC*, 52 F.4th 773 (9th Cir. 2022) (rejecting transgender woman's challenge to beauty pageant's rule that only "natural born females" could participate); *Darren Patterson Christian Acad. v. Roy*, No. 23-cv-01557, 2023 WL 7270874 (D. Colo. Oct. 20, 2023) (private Christian preschool entitled to preliminary injunction under *Dale* where participating in state program would require preschool to abandon its hiring policies and policies governing faculty and student conduct, like forbidding using pronouns that do not correspond to a student's or employee's biological sex); *Our Lady's Inn v. City of St. Louis*, 349 F. Supp. 3d 805 (E.D. Mo. 2018) (city ordinance prohibiting discrimination in employment based on reproductive health decisions violated freedom of association of Catholic elementary schools who did not want to hire individuals who advocate for or perform abortions); *Apilado v. N. Am. Gay Amateur Athletic All.*, 792 F. Supp. 2d 1151 (W.D.

---

[3] In so holding, the Supreme Court explained that "the First Amendment simply does not require that every member of a group agree on every issue in order for the group's policy to be 'expressive association.'" *Dale*, 530 U.S. at 655; *see also Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1149 (10th Cir. 2013) (en banc) (Hartz, J., concurring) ("[An organization's] speech or conduct may reflect the view of only a bare majority of the members . . . . It suffices that the speech or conduct represents an 'official position.'") (quoting *Dale*, 530 U.S. at 655).

Wash. 2011) (rejecting plaintiffs' challenge to their disqualification from the "Gay Softball World Series" because the court could not force the tournament organization to include an unlimited number of heterosexual players).

Here, the district court correctly concluded that, as in *Dale*, interference with the membership policies and choices of a private sorority would improperly impede the sorority's associational rights. As Judge Johnson so aptly put it, "[w]hether excluding gay scoutmasters in *Dale* or including transgender women in Kappa, [courts] may not invade Kappa's sacrosanct, associational right" to include *any* group of individuals in its membership. *Westenbroek v. Kappa Kappa Gamma Fraternity*, No. 23-cv-51, 2023 WL 5533307, at *14 (D. Wyo. Aug. 25, 2023). KKG and the UW Chapter have chosen to consider as eligible for KKG membership any person who identifies as a woman, and the UW Chapter reinforced that interpretation of its membership criteria when its members voted to associate with Ms. Langford in 2022. This is expressive association that reflects and conveys KKG's and its UW Chapter's views—namely, that transgender women contribute to, and are a valuable part of, the sorority experience, and that KKG and the UW Chapter more broadly value inclusivity.[4] That some members may disagree with this message does not

---

[4] Plaintiffs may disagree with these views, but they cannot seriously contest that they are part of "political, social, economic, educational, religious, [or] cultural ends" protected by constitutional freedom of association. Plaintiffs themselves assert

entitle it to any lesser degree of protection. *See supra* n.3.

Plaintiffs do not argue otherwise. Instead, they contend only that the First Amendment does not bar their claims because they are private actors, and the First Amendment only protects against state action. But Plaintiffs can only force KKG to exclude transgender women from the sorority if a court, a government institution, so orders. It is well-established that action by courts is state action. *See Shelley v. Kraemer*, 334 U.S. 1, 14–18 (1948). If a court were to force KKG to exclude transgender women from its membership, it would fundamentally alter KKG's expressive message in violation of the First Amendment. That alone is reason enough for this Court to affirm the decision below, and it should do so.

## II. Private Organizations Have a Settled Right to Interpret Their Own Bylaws and Other Governing Documents and Rules

Intertwined with the First Amendment's freedom of association, the widely recognized principle of judicial noninterference in the internal affairs and self-governance of private organizations further supports affirmance of the decision below. Because the freedom to form private organizations provides "an indispensable means of preserving other individual liberties," *Roberts*, 468 U.S. at 618, like the freedoms of speech and assembly, courts around the country have long declined to interfere with the internal affairs of private organizations—both

---

"[t]he claim that 'trans women are women' is a political slogan." App. Vol. 1 at 29 (Am. Compl. ¶ 42).

incorporated and unincorporated, for profit and not-for-profit. That deference extends to the policies and rules in an organization's governing documents, as well as the interpretation of those policies or rules by those the organization vests with interpretive authority. KKG's decision-making at issue here is no exception. This country's long tradition of judicial noninterference in the internal affairs of private groups leaves no doubt that courts should defer to KKG's decision where (1) KKG, a private membership organization, chose how to define its membership in its governing documents and assigned to certain people the power to interpret that definition, and (2) those people properly exercised their interpretive power.

As noted, for decades, courts have recognized that the judiciary should allow organizations a great deal of autonomy in their own governance. *See Roberts*, 468 U.S. at 618–19. As the New Jersey Supreme Court noted more than sixty years ago, "[c]ourts have been understandably reluctant to interfere with the internal affairs of membership associations and their reluctance has ordinarily promoted the health of society." *Falcone v. Middlesex Cnty. Med. Soc'y*, 170 A.2d 791, 796 (N.J. 1961). That bedrock principle has not eroded in the years since. Nor is this principle limited to a few states, as both federal and state courts around the country have adhered to it. Put simply, "[c]ourts have made the policy decision to ensure that [private] organizations act in the public interest and do not abuse their power, but judicial review is limited to protecting the public interest." *Thomas M. Cooley L. Sch. v. Am.*

*Bar Ass'n*, 459 F.3d 705, 713 (6th Cir. 2006) (recognizing that accreditation groups are "private organizations" so judicial review is more limited than it would be if a government agency made the same decision).    To that end, courts generally "respect[] various aspects of association decisionmaking," *Lamden v. La Jolla Shores Clubdominium Homeowners Ass'n*, 980 P.2d 940, 950 (Cal. 1999) (collecting cases), meaning that "as a general rule, courts will not interfere in the internal affairs of a voluntary membership organization," *NAACP v. Golding*, 679 A.2d 554, 558 (Md. 1996); *see also Levant v. Whitley*, 755 A.2d 1036, 1043 (D.C. 2000) (similar).[5]

By way of example, Texas "courts play an extremely limited role in policing the activities of private organizations," with a very narrow exception applied primarily in cases involving a deprivation of due process.  *Barrash v. Am. Ass'n of Neurological Surgeons, Inc.*, No. 4:13-cv-1054, 2014 WL 2169813, at *1–2 (S.D. Tex. May 22, 2014).  For the better part of a century, Texas courts have "generally held that the constitution and by-laws of a voluntary association, whether incorporated or not, are controlling as to its internal management." *Dist. Grand Lodge No. 25 Grand United Order of Odd Fellows v. Jones*, 160 S.W.2d 915, 922

---

[5] This judicial deference is especially strong where, as here, an organization is one of several in its field and members have a choice as to whether to join, as opposed to where a group has "complete dominance" so the prospective member has "little choice but to join." *Koszela v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 646 F.2d 749, 754 (2d Cir. 1981); *see also Marjorie Webster Jr. Coll., Inc. v. Middle States Ass'n of Colls. & Secondary Schs., Inc.*, 432 F.2d 650, 655–56 (D.C. Cir. 1970).

(Tex. Comm'n App. 1942). Private organizations can both create their own constitution and bylaws and interpret those documents without fear of unwarranted judicial second-guessing, and "a member, by becoming such, subjects himself, within legal limits, to his organization's power to administer, as well as to its power to make, its rules." *Dallas Athletic Club Protective Comm. v. Dallas Athletic Club*, 407 S.W.2d 849, 850 (Tex. Civ. App. 1966) ("The right of such an organization to interpret its own organic agreements, its laws and regulations, after they are made and adopted, is not inferior to its right to make and adopt them[.]") (citation omitted).

This power of a private organization to make, adopt, and interpret its bylaws and other rules dates back to common law, and in many jurisdictions "deference has always been afforded to the internal decision making process of the private association . . . because our courts ordinarily recognize an association's right to adopt, administer, and interpret its own rules without judicial intervention." *Davidovich v. Israel Ice Skating Fed'n*, 140 A.3d 616, 633 (N.J. Super. Ct. App. Div. 2016) (cleaned up). Applying these principles, courts overwhelmingly defer to private organizations' interpretations of their own rules. *See, e.g.*, *Ruiz v. Sauerland Event GmbH*, 801 F. Supp. 2d 118, 125 (S.D.N.Y. 2010) ("Courts generally defer to a private organization's interpretation of its rules in the absence of bad faith or illegality."); *M'Baye v. World Boxing Ass'n*, 429 F. Supp. 2d 660, 667–68 (S.D.N.Y. 2006) ("[A] court should not intervene if it simply disagrees with what it perceives

to be an unreasonable application of an organization's rules, but it may do so in response to legitimate allegations of bad faith or illegality."); *Scheire v. Int'l Show Car Ass'n*, 717 F.2d 464, 465–66 (9th Cir. 1983) (under California law, judicial review appropriate only if association has "plainly contravened" its bylaws and the "burdens on the courts and on the interest of the association in its autonomy do not outweigh the aggrieved member's interests") (citation omitted). That deference has been afforded to interpretative decisions made by a wide variety of organizations, from condo and homeowners' associations[6] to not-for-profit hospitals,[7] athletic associations,[8] and labor unions.[9]

---

[6] *Apple II Condo. Ass'n v. Worth Bank & Trust Co.*, 659 N.E.2d 93, 98 (Ill. App. Ct. 1995) ("A higher level of deference is necessary when courts review decisions made by self-governing bodies such as condominium associations."); *Brain v. Canterwood Homeowners Ass'n*, No. 57716-0-II, 2023 WL 6122707, at *6 (Wash. Ct. App. Sept. 19, 2023) ("[H]omeowners' associations must be given room to interpret and apply their own governing documents as long [as] the result is neither arbitrary nor unreasonable.") (citation omitted).

[7] *Seitzinger v. Cmty. Health Network*, 676 N.W.2d 426, 433 (Wis. 2004) ("Applications of hospital bylaws are reviewed under a deferential standard of review. . . . [W]e conclude that a hospital's interpretation of its bylaws should stand if reasonable.").

[8] *Hennessey v. NCAA*, 564 F.2d 1136, 1142–43 (5th Cir. 1977) (where collegiate athletic association was formed, in part, to adopt rules to govern its members, court should not reject the association's reasonable interpretation of its own bylaws); *Nat'l Hockey League Players' Ass'n v. Bettman*, No. 93 Civ. 5769, 1994 WL 738835, at *11 (S.D.N.Y. Nov. 9, 1994) (noting that because a dispute turned on interpretation of the association's bylaws, an arbitrator would have to "defer to" the president).

[9] *Int'l Bhd. of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers & Helpers, AFL-CIO v. Hardeman*, 401 U.S. 233, 242–43 (1971) (labor law "could [not] justify

In addition to this general deference to organizational decision-making, when an organization's governing documents vest a specific person (or persons) with authority to interpret the organization's bylaws, a number of courts apply the highly deferential business judgment rule to those people's interpretation. *See, e.g.*, *Oberbillig v. W. Grand Towers Condo. Ass'n*, 807 N.W.2d 143, 153 (Iowa 2011) (collecting cases); *Tackney v. U.S. Naval Acad. Alumni Ass'n, Inc.*, 971 A.2d 309, 318 (Md. 2009) (Maryland law).[10]

Here, KKG's Standing Rule 5.1 states that the "administrative duties of Fraternity Council shall include: . . . [i]nterpreting the Fraternity *Bylaws* and *Standing Rules*[.]" *See* App. Vol. 1 at 199. Thus, KKG decided to entrust its Fraternity Council with interpreting its bylaws—a decision that was KKG's to make—and the Fraternity Council satisfied its corporate responsibility when it interpreted the word "woman" to include anyone who identifies as a woman—an interpretation that was its to make. The Fraternity Council's decision thus should be

---

. . . a substitution of judicial for union authority to interpret the union's regulations"); *Most v. Am. Fed'n of Musicians of U.S. & Canada*, 7 F. App'x 551, 552 (9th Cir. 2001) (court "not inclined to upset a union's interpretation of its own bylaws"); *Dep't of Lab. v. Aluminum, Brick & Glass Workers Int'l Union, Loc. 200*, 941 F.2d 1172, 1177 (11th Cir. 1991) ("[A] union's interpretation of its own bylaws and constitution is entitled to deference . . . to the extent it is fair and reasonable."); *Loc. 334 v. United Ass'n of Journeymen*, 669 F.2d 129, 132 (3d Cir. 1982) (similar).

[10] That is not to say a party with authority to interpret an organization's bylaws may contravene a clear or unambiguous bylaw, but where, as here, the bylaw is ambiguous or there is a dispute over its meaning, courts defer to the party with interpretative authority. *Oberbillig*, 807 N.W.2d at 153–54.

afforded significant deference, whether under the business judgment rule or under the general principle that courts generally should not interfere with the autonomy of organizational decision-making.  *See NAACP*, 679 A.2d at 563 (recognizing that "[t]he NAACP Constitution confers broad authority on the Board to create and interpret the organization's rules and to regulate membership" so where "[t]he organization's interpretation was not arbitrary," it is "entitled to deference").

Given the longstanding tradition of allowing private organizations autonomy and self-governance, this deference makes sense.  If KKG included a choice-of-law provision in its governing documents that differed from the choice of law that might result if the court were left to follow its usual analysis, a court would have to respect KKG's selection.  So, too, for KKG's decision to vest the authority to interpret its bylaw provisions in the Fraternity Council, and the Fraternity Council's corresponding interpretations.  A court must defer to that interpretation, even if that may not be the same interpretation the court would have adopted if left to its own devices.  That deference preserves the fundamental ability of an organization to set its own rules to define its own identity, and in turn protects a freedom that has long served as "an indispensable means of preserving other individual liberties," the freedom of association.  *Roberts*, 468 U.S. at 618.

### III.    Plaintiffs' Theory of Liability Would Seriously Undermine the Organizational Autonomy of NPC and Its Member Sororities

NPC and its member organizations have played an important role in promoting the advancement and development of women in America.  Sororities were arguably the very first "women's groups," originally founded over a century ago in the mid-1800s to provide women with a support system on college campuses that had only recently begun to admit women, and to provide women opportunities to advance themselves socially and academically in a world dominated by men.  That tradition remains to this day, where sorority members encourage one another to become the best versions of themselves and to make their communities and the world a better place.  If the Court concludes that KKG does not have the right to interpret its own governing documents to define its own membership, that holding would expose NPC and sororities across the country to a flood of actions second-guessing their internal decision-making, which in turn would impair the transmission of the views and messages that make the sorority experience valuable and impede the very goals that sororities have spent more than a century trying to help women across the country accomplish.

NPC sets policies for its member organizations on certain topics, like recruitment eligibility, extension to new campuses, and promotion of the sorority experience; on others, it instead issues guidance on best practices in areas such as academic excellence, scholarship, and alcohol accountability; and on others still, it

17

does not weigh in at all, leaving it up to each member organization to set its own policies, issue its own guidance, or delegate the decision-making to its chapters, instead.  Most relevant here, NPC's Panhellenic Recruitment Eligibility Policy (2020) states that, "[f]or the purpose of participation in Panhellenic recruitment, woman is defined as an individual who consistently lives and self-identifies as a woman."

Once recruitment eligibility is determined under this shared NPC policy, the membership eligibility policies of each individual member sorority takes precedence.  Each NPC member sorority and, for some, each of those sororities' chapters, determine their own membership selection policies and procedures, ranging from the requisite high school and college grade point averages and the fees members must pay to the behavioral standard of conduct members must abide by and the values and standards they must embody.  For example, two organizations require at least a 2.0 college GPA for continued membership, one a 2.2, one a 2.25, three a 2.5, one a 2.75, and at least nine allow individual chapters to set their own GPA requirements.  There is even wider variation among the values and standards that each individual sorority requires their members to live up to: from justice, wisdom, faith, truth, honor, and loyalty; to personal growth, friendship, service, and loyalty; to good scholarship, excellent character, congeniality, and sympathy with the work of the Fraternity; to academic interest, character, financial responsibility,

leadership ability, and personal development, to name just a few. Similarly, when it comes to the behavioral standard of conduct to which members must adhere, one organization prohibits "actions unbecoming" a member of the sorority, while another requires that members bring honor and integrity to the organization and demonstrate respect for herself and other members, and yet another forbids disloyalty to the principles of the Fraternity and any conduct contributing to the impairment of its welfare or prestige.

Given these broad and varying membership criteria, it is not difficult to imagine the wave of suits that could follow if Plaintiffs' claims are permitted to proceed, let alone if they are ultimately successful. A plaintiff who was not offered membership to a sorority because her collegiate GPA was too low might sue for membership, arguing that the sorority or chapter acted unreasonably, or its officers breached their fiduciary duties, when they interpreted "good scholarship" to mean a GPA of 2.0 or 2.75 or anywhere in between. A student who disagrees with the viewpoint of another organization on campus—such as the College Republicans, the Fellowship of Christian Athletes, or Students United for Reproductive Freedom— might ask a court to order the sorority or chapter to exclude members of that group from membership because participating in that other organization is "conduct unbecoming" of a member, "impair[s] . . . the welfare or prestige" of the sorority, or undermines those individuals' "excellent character." The list goes on and on.

Today, the fundamental principles of freedom of expression in the First Amendment and the long tradition of judicial noninterference with the governance of private organizations stand in the way of these suits. But if the decision below is reversed on either of these grounds, no longer. Such a decision also would have ripple effects outside of the litigation context. As noted above, NPC steps in to advocate on behalf of its members organizations in various situations where colleges and universities impose restrictions on sorority decision-making or otherwise attempt to regulate or interfere with that decision-making. If the decision below is reversed, little, if anything, stands in the way of colleges and universities stepping into the private affairs of sorority chapters on their campuses by imposing restrictions or regulations that directly impact their membership decisions and the viewpoints those membership decisions reflect.

This fallout would have a serious impact on the sorority experience, including, most notably, the unique support system and advancement opportunities that sororities provide for their members. Decisions like *Dale* vigorously protect the First Amendment freedom of association because joining together with others to pursue whatever ends you choose is a fundamental act of expression. This country's long history of judicial deference to organizational decision-making serves a crucial role in protecting this freedom, too. But Plaintiffs' theory would substantially erode that fundamental right in one fell swoop, allowing anyone to substitute their own

desired viewpoints for the sororities' by changing the sororities' membership criteria, and other private decision-making, as they see fit. As a result, sororities will lose the very autonomy that has for decades allowed them to carefully define and hone their membership criteria and governing principles in the way that those organizations believe will best support and advance their members. That loss would come at a high price for women around the country, who benefit both from the work that sororities undertake to provide women opportunities to advance and from the encouragement of their sorority sisters to realize their potential and determine their own future.

The District Court correctly understood and applied the principles that have long allowed private organizations to make these choices. Plaintiffs' theory, on the other hand, sharply breaks from decades of settled federal and state law, the impacts of which would be felt by NPC, its membership organizations, and every other private membership organization in the country. Here, NPC and its membership organizations ask only to retain the decisional autonomy they have enjoyed since their founding. Affirming the decision below does just that.

## CONCLUSION

For these reasons, and those in defendants-appellees' brief, the decision below should be affirmed.

Dated: January 10, 2024

Respectfully submitted,

*/s/ R. Stanton Jones*

| | |
|---|---|
| Nicole L. Masiello | R. Stanton Jones |
| ARNOLD & PORTER | Jayce L. Born |
| KAYE SCHOLER LLP | ARNOLD & PORTER |
| 255 West 55th Street | KAYE SCHOLER LLP |
| New York, NY 10019 | 601 Massachusetts Ave., NW |
| (212) 836-8000 | Washington, DC 20001 |
| nicole.masiello@arnoldporter.com | (202) 942-5000 |
| | stanton.jones@arnoldporter.com |
| | jayce.born@arnoldporter.com |

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

1.      The foregoing brief complies with the type-volume limitations of Fed.

R. App. P. 32(a)(7)(B)(i) because the brief contains 5,265 words, excluding the parts

of the brief exempted by Fed. R. App. P. 32(f).

2.      The brief also complies with the typeface requirements of Fed. R. App.

P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Microsoft Word

365 in Times New Roman 14-point font.


Dated: January 10, 2024                    */s/ R. Stanton Jones*
                                           R. Stanton Jones

## CERTIFICATE OF DIGITAL SUBMISSION
## AND PRIVACY REDACTIONS

I certify that all required privacy redactions have been made in this brief

pursuant to 10th Cir. R. 25.5. I further certify that the hard copies of this brief to be

submitted to the Court are exact copies of the version submitted electronically and

that the electronic submission of this brief was scanned for viruses with the most

recent version of a commercial virus scanning program and is free of viruses.


Dated: January 10, 2024                    */s/ R. Stanton Jones*
                                           R. Stanton Jones

## CERTIFICATE OF SERVICE

I hereby certify that on January 10, 2024, I caused the foregoing brief to be electronically filed with the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/ECF users.


Dated: January 10, 2024                    */s/ R. Stanton Jones*
                                           R. Stanton Jones