No. 23-8065

# In the United States Court of Appeals
# for the Tenth Circuit

JAYLYN WESTENBROEK, ET AL.,

*Plaintiffs-Appellants*,

v.

KAPPA KAPPA GAMMA FRATERNITY, AN OHIO NON-PROFIT CORPORATION
AS NOMINAL DEFENDANT AND AS A DIRECT DEFENDANT, ET AL.,

*Defendants-Appellees*,

ARTEMIS LANGFORD,

*Defendant.*

On Appeal from the United States District Court for the District of Wyoming
No. 2:23-CV-00051-ABJ, Hon. Alan B. Johnson

## APPELLANTS' REPLY BRIEF

GENE C. SCHAERR
CRISTINA MARTINEZ SQUIERS
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com

SYLVIA MAY MAILMAN
INDEPENDENT WOMEN'S LAW CENTER
1802 Vernon Street NW, Suite 1027
Washington, DC 20009
Telephone: (202) 807-9986
s.maymailman@gmail.com

JOHN KNEPPER
LAW OFFICE OF JOHN G. KNEPPER, LLC
P.O. Box 1512
Cheyenne, WY 82003
Telephone: (307) 632-2842
John@KnepperLLC.com

CASSIE CRAVEN
LONGHORN LAW LLC
109 East 17th Street, Suite 223
Cheyenne, WY 82001
Telephone: (307) 823-3062
cassie@longhornlawllc.com

*Counsel for Plaintiffs-Appellants*

JANUARY 24, 2024

**\*ORAL ARGUMENT IS REQUESTED**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION ...................................................................................1

ARGUMENT .........................................................................................2

    I.    The District Court Erred in Dismissing Plaintiffs' Derivative Claim by Improperly Granting Defendants Vast Deference Despite Allegations of Breach of Fiduciary Duty and Bad Faith. .............3

        A.    No Deference Doctrine Insulates Defendants from Blatant Disregard of Kappa's Bylaws and Bad-Faith Conduct....................5

            1.    Plaintiffs Allege that Defendants Changed Kappa's Membership Criteria in Violation of the Bylaws and Other Governing Documents—Not that Defendants Simply Misinterpreted a Word. ...............................................6

            2.    Fiduciary Duty Principles Apply, But the Business Judgment Rule Does Not Protect Defendants' Conduct. .................................................................12

            3.    Ohio's Rule of Non-Interference is Inapplicable to Derivative Claims. ................................................14

            4.    The First Amendment Does Not Give Defendants the Right to Ignore the Organization's Bylaws. .................16

        B.    Plaintiffs Have Not Forfeited Or Failed to Adequately Allege Any Part of Their Derivative Claim. ....................................19

    II.    Plaintiffs Properly Preserved Their Direct Claim and Have Stated a Valid Claim Under Ohio Law. .............................................22

    III.    The Court Has Personal Jurisdiction Over Rooney. ...............................24

CONCLUSION.....................................................................................27

CERTIFICATE OF COMPLIANCE.........................................................29

CERTIFICATE OF DIGITAL SUBMISSION ...........................................30

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Alexander v. Buckeye Pipe Line Co.*,
   374 N.E.2d 146 (Ohio 1978) ....................................................................8

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..............................................................................20

*Beverage Holdings, L.L.C. v. 5701 Lombardo, L.L.C.*,
   150 N.E.3d 28 (Ohio 2019) .....................................................................8

*Bodiford v. Krause*,
   No. 1:23-cv-1191, slip op., 2023 WL 6214514
   (N.D. Ohio Sept. 25, 2023) ....................................................................11

*Browning v. Fraternal Ord. of Eagles*,
   No. 1769, 1986 WL 9644 (Ohio Ct. App. Aug. 22, 1986) ...................17

*Carlson v. Rabkin*,
   789 N.E.2d 1122 (Ohio Ct. App. 2003) ................................................23

*Clark v. Martinez*,
   543 U.S. 371 (2005) ................................................................................7

*Crosby v. Beam*,
   548 N.E.2d 217 (Ohio 1989) .................................................. 4, 14, 22, 24

*Davis v. Prudential Secs., Inc.*,
   59 F.3d 1186 (11th Cir. 1995) ...............................................................18

*Democratic Party of U.S. v. Wisconsin ex rel. La Follette*,
   450 U.S. 107 (1981) ...............................................................................17

*Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*,
   514 F.3d 1063 (10th Cir. 2008) .............................................................25

*Duke v. Smith*,
   784 F. Supp. 865 (S.D. Fla. 1992) ........................................................17

*Harris v. Sharp*,
   941 F.3d 962 (10th Cir. 2019) ...............................................................23

*Int'l Bhd. of Elec. Workers v. Gromnicki*,
    745 N.E.2d 449 (Ohio Ct. App. 2000)....................................................17

*Juarez v. Texas Ass'n of Sporting Offs. El Paso Chapter*,
    172 S.W.3d 274 (Tex. App. 2005).........................................................7

*Marsalis v. Wilson*,
    778 N.E.2d 612 (Ohio Ct. App. 2002)..................................................13

*Matney v. Barrick Gold of N. Am.*,
    80 F.4th 1136 (10th Cir. 2023) ...........................................................15

*Milkie v. Acad. of Med. of Toledo & Lucas Cnty.*,
    246 N.E.2d 598 (Ohio Ct. App. 1969)..................................................17

*Newsome v. Gallacher*,
    722 F.3d 1257 (10th Cir. 2013) ................................................... 25, 26

*Parker Excavating, Inc. v. Lafarge W., Inc.*,
    863 F.3d 1213 (10th Cir. 2017) ...........................................................19

*Powell v. Ashtabula Yacht Club*,
    No. 953, 1978 WL 216074 (Ohio Ct. App. 1978)................................14

*Putka v. First Cath. Slovak Union*,
    600 N.E.2d 797 (Ohio Ct. App. 1991)..................................................14

*Ray v. Hidden Harbour Ass'n, Inc.*,
    104 N.E.3d 261 (Ohio Ct. App. 2018)....................................................4

*Redden v. Alpha Kappa Alpha Sorority, Inc.*,
    No. 1:09CV705, 2010 WL 107015 (N.D. Ohio Jan. 6, 2010)............14

*Reister v. Gardner*,
    174 N.E.3d 713 (Ohio 2020)....................................................... 12, 14

*Rusakiewicz v. Lowe*,
    556 F.3d 1095 (10th Cir. 2009) .........................................................25

*Shelley v. Kraemer*,
    334 U.S. 1 (1948)................................................................................17

iii

*Smith v. United States*,
  561 F.3d 1090 (10th Cir. 2009) ............................................................. 11, 13, 20

*Stepak v. Schey*,
  553 N.E.2d 1072 (Ohio 1990) ...................................................................... 12

*Stibora v. Greater Cleveland Bowling Ass'n*,
  577 N.E.2d 1175 (Ohio Ct. App. 1989) ...................................................... 12, 14

*Swantack v. New Albany Park Condo. Ass'n Bd. of Dirs.*,
  No. 2:22CV2130, 2022 WL 17600518 (S.D. Ohio Dec. 13, 2022) ................... 18

*Ten Mile Indus. Park v. W. Plains Serv. Corp.*,
  810 F.2d 1518 (10th Cir. 1987) .................................................................. 24, 25

**Statutes**

Wyo. Stat. Ann. § 5-1-107 ............................................................................ 24

**Rules**

Fed. R. Civ. P. 23.1 ...................................................................................... 15

Ohio R. Civ. P. 8(A) ..................................................................................... 13

Ohio R. Civ. P. 23.1 ..................................................................................... 15

**Other Authorities**

Genny Beemyn,
  *Women's Colleges with Trans-Inclusive Policies*,
  Campus Pride (Dec. 9. 2021) ...................................................................... 10

Timothy Bella,
  *Cambridge Dictionary updates definition of 'woman' to include
  trans women*, Wash. Post (Dec. 13, 2022) .................................................... 9

*Cambridge Dictionary* ................................................................................. 9

Nat'l Panhellenic Conf., Inc.,
  *Manual of Information* (27th ed. 2023) ..................................................... 10, 11

iv

## INTRODUCTION

Kappa Kappa Gamma's ("Kappa") Bylaws have long required that a new member "shall be a woman." Defendants admit that the "Fraternity Council cannot ignore Bylaws." Br. of Defs.-Appellees' ("Opp'n") at 23. Indeed, the Council has fiduciary duties that require it to follow Kappa's Bylaws and other governing documents.

And yet the district court permitted an evasion of those duties in the name of deference to the Council. But the principles of deference invoked by the district court do not immunize Defendants from liability here. That is because this case is not about whether the court should defer to Defendants' "interpretation" of some ambiguous or polysemous word; it is about whether Defendants acted in bad faith by changing Kappa's membership criteria in violation of the sorority's governing documents. Because Defendants are bound to follow Kappa's governing documents and they failed to do so, Plaintiffs brought breach of fiduciary duty claims for the injuries these actions caused Kappa (the derivative claim) and for the specific injuries these actions caused Plaintiffs (the direct claim).

Rather than challenge the sufficiency of these claims under the plausibility standard required at the motion-to-dismiss stage, Defendants make the same mistake the district court did—disregarding the allegations in the complaint concerning breach of fiduciary duty and instead litigating an "interpretation" of woman. Based

on this transformation of Plaintiffs' claims, Defendants argue they are owed complete deference on the derivative claim and that Plaintiffs forfeited arguments related to their direct claim. But Defendants are wrong because no deference doctrine immunizes bad-faith breaches of fiduciary duties, which is what Plaintiffs allege here. Further, Plaintiffs have preserved their direct claim. Indeed, they explicitly defended that claim before the district court.

Defendants' feeble attempt at challenging the district court's personal jurisdiction over Defendant Rooney fares no better. Defendants offer no reason to challenge the district court's findings—Plaintiffs sufficiently alleged that Rooney violated her fiduciary duties by approving the admission of a biological male into the sorority chapter at the University of Wyoming and thus aimed her activities at Wyoming. The Court should therefore reject Defendants' arguments and reverse the district court's dismissal of Plaintiffs' well-pleaded claims.

## ARGUMENT

Defendants offer four unpersuasive arguments to defend the district court's errors. They first insist on an unreasonable breadth of deference for their actions, even though such deference is unsupported by any case Defendants can cite. Defendants then say Plaintiffs' derivative claim should exclude their bypassing the Standing Rules when admitting a biological male, Langford, because Plaintiffs forfeited this claim and failed to meet the pre-suit demand requirement. Defendants

also argue that Plaintiffs' direct claim is both forfeited and unavailable. And they

finally argue that the district court lacked personal jurisdiction over Defendant

Rooney. But Defendants are wrong at every turn, and the decision below must

therefore be reversed.

I.    **The District Court Erred in Dismissing Plaintiffs' Derivative Claim by Improperly Granting Defendants Vast Deference Despite Allegations of Breach of Fiduciary Duty and Bad Faith.**

Plaintiffs have properly alleged a derivative, breach-of-fiduciary-duty claim,

explaining in detail how Kappa acted in bad faith by violating its Bylaws and other

governing documents to change Kappa's membership criteria and admit a male to

the sorority. *See* App. Vol. 1 at 28–39, 74–75 (¶¶ 43–67, 162–67); Appellants' Brief

("Op. Br.") at 27–29. Defendants present a barrage of deference doctrines to support

the district court's dismissal of Plaintiffs' derivative claim. Opp'n at 14–23. But

none of these doctrines permit Defendants to act as the complaint alleges—in bad

faith and in violation of their duties to uphold Kappa's governing documents.

Defendants also claim (at 40–44) that Plaintiffs forfeited, and otherwise cannot

establish, a derivative claim based on the improper election procedures by which

Langford was voted into the chapter. But this argument is also based on ignoring

Plaintiffs' allegations. Because all of Defendants' arguments distort or discount the

allegations in the complaint, it is important first to provide a brief recap of Plaintiffs'

allegations and the governing law.

3

For a breach of fiduciary duty claim, a plaintiff "must allege the existence of a fiduciary duty, the breach of that duty, and damages proximately caused therefrom." *Ray v. Hidden Harbour Ass'n, Inc.*, 104 N.E.3d 261, 269 (Ohio Ct. App. 2018) (citation omitted). Directors of nonprofits owe fiduciary duties to the nonprofit, including a duty to act in good faith and in accord with the nonprofit's bylaws and governing documents. Op. Br. at 27–28. If there is harm to the organization based on the breach, a shareholder may file a derivative action, and if there is a harm unique to a shareholder based on the breach, that shareholder may file a direct action. *Crosby v. Beam*, 548 N.E.2d 217, 219 (Ohio 1989).

The operative complaint explains Kappa's governing documents—its Articles of Incorporation, Bylaws, and Standing Rules. App. Vol. 1 at 10–11 (¶ 3), 28 (¶ 43), and 36 (¶ 59). The Bylaws require that "a new member shall be a woman." *Id.* at 31 (¶ 51), and no other governing document or policy permits the expansion of Kappa membership beyond women unless there is an amendment to the Bylaws. *Id.* at 36 (¶ 60), 39 (¶ 67). The Bylaws can only be amended "by a Convention by a two-thirds vote." *Id.* at 104. The complaint further alleges that Defendants changed this membership criteria—by adding "and individuals who identify as women"— through unilateral position statements rather than through amending the Bylaws. *Id.* at 50–51 (¶ 100). Then, Defendants orchestrated a plan to admit a biological male to the chapter at the University of Wyoming by applying this new membership

criteria and encouraging various election irregularities. *Id.* at 40–43 (¶¶ 68–76) and 62–64 (¶¶ 129–130, 134). Through these actions, Defendants violated Kappa's Bylaws and breached their duties of loyalty, care, and obedience. *Id.* at 50–51, 52–53 (¶¶ 100, 102), 62–64 (¶¶ 129–130, 134), 74 (¶ 163). The complaint notes how these actions harmed Kappa at-large and Plaintiffs uniquely. *Id.* at 43–44 (¶¶ 77, 79), 45 (¶ 82); Op. Br. 11–13. Because Defendants breached their fiduciary duties through these violations of the governing documents, Plaintiffs asserted a derivative claim (based on the harms to Kappa) and a direct claim (based on the unique harms to Plaintiffs). App. Vol. 1 at 73–75, 77. In addition, Plaintiffs allege that Defendants acted in bad faith through the conduct described above. App. Vol. 1 at 54 (¶ 105); *see also* 49–50 (¶ 98); 50 (¶¶ 99–100).

Defendants' efforts to defend against these claims by invoking (a) specious deference doctrines and (b) a patently erroneous waiver argument should be rejected, and the district court's dismissal of Plaintiffs' derivative claim reversed accordingly.

### A. No Deference Doctrine Insulates Defendants from Blatant Disregard of Kappa's Bylaws and Bad-Faith Conduct.

Defendants invoke three doctrines—a judicial policy limiting interference with an organization's internal affairs, the First Amendment's guarantee of free association, and the business judgment rule—to avoid judicial scrutiny of their actions. As explained in Plaintiffs' opening brief, however, the first two doctrines are inapplicable to this case. Op. Br. 18–26. And, while the business judgment rule

does require deference to certain business decisions, it does not protect actions taken in bad faith, which is exactly what Plaintiffs allege happened here. Thus, as explained next, Defendants' reliance on these various deference doctrines is misplaced.

> **1.    Plaintiffs Allege that Defendants Changed Kappa's Membership Criteria in Violation of the Bylaws and Other Governing Documents—Not that Defendants Simply Misinterpreted a Word.**

Defendants' arguments around deference all involve the notion that the Court should defer to Defendants' "interpretation" of the word "woman" because courts should not intervene in the internal decisions, including membership decisions, of an organization. Opp'n at 14–16, 21, 36. This is the same justification the district court provided when dismissing Plaintiffs' derivative claim. App. Vol. 2 at 98–99. But Plaintiffs' derivative claim is not that Defendants merely misinterpreted woman. The claim centers on Defendants' deliberately changing the membership criteria and doing so without amending the Bylaws and in bad faith. *See* App. Vol 1 at 35 (¶ 57), 48 (¶ 92), 54 (¶ 105).

Kappa's Bylaws unambiguously state: "A new member shall be a woman." App. Vol. 1 at 86 (Bylaws, Art. III, Sec. 1.A.). And while it is true, as Defendants state (at 5), that Kappa's rules demand that the Fraternity Council "[i]nterpret[] the Fraternity Bylaws and Standing Rules," interpretation requires the construction of existing Bylaws, not the invention of new ones. *See Clark v. Martinez*, 543 U.S.

6

371, 378 (2005) (contrasting interpretation with invention).  The Fraternity Council never provided a construction, reasonable or otherwise, of woman.  Instead, the Council purported to *add* a category of members—"women *and* individuals who identify as women"—outside the Bylaw amendment process.  App. Vol. 1 at 263 (emphasis added).  This action was legislation—not interpretation.  *See Juarez v. Texas Ass'n of Sporting Offs. El Paso Chapter*, 172 S.W.3d 274, 279 (Tex. App. 2005) (noting that while courts should avoid "interfer[ing] with the internal management of a voluntary association," they should hold governing bodies accountable for "substitut[ing] legislation for interpretation" and acting "unreasonably.").

Defendants claim (at 33–34) that while woman meant biological female at the time the term was adopted, a new understanding was silently ratified during the 2022 revision to the Bylaws.  The allegations (and documents attached to the complaint) point the other way though.  For one, the Bylaws Committee Chairman explained that the 2022 changes were merely "structur[al]," leaving the content generally "unchanged."  App. Vol. 1 at 138.  Although the Bylaws committee report does say that the 2022 revisions sought to use "inclusive" language, Opp'n at 33–34, in part by avoiding "gendered pronouns," App. Vol. 1 at 139, the committee elaborated only that it would maintain the term "chairman."  *Id.*  The committee explicitly *kept* gendered language—woman—in its membership criteria.

7

Defendants next say (at 5) that a 2015 online statement, never referenced by the Bylaws committee report, describes Kappa as an organization "comprised of women and individuals who identify as women." App. Vol. 1 at 114, 263. This online statement only exposes that Defendants did not (and do not) believe "women" incorporates "individuals who identify as women;" instead, the two are different categories joined with an "and." Similarly, Defendants refer to an FAQ document issued with the Bylaws that refers to this same 2015 statement. Opp'n at 5 (citing App. Vol. 1 at 185). But the problem remains—these two mentions do not reflect a new definition of woman in the Bylaws.

Defendants further argue that myriad modern sources support defining women as men who "identify as women" and thus an official change in the membership criteria was unnecessary. But no modern source supports this argument.[1]

---

[1] Even if a modern source did support Defendants' position, Defendants ignore a cardinal rule of interpretation: "When considering the language of a particular contractual provision, common words will be given their ordinary meaning unless manifest absurdity results or unless some other meaning is clear from the face or overall contents of the agreement." *Beverage Holdings, L.L.C. v. 5701 Lombardo, L.L.C.*, 150 N.E.3d 28, 32 (Ohio 2019) (cleaned up). And the relevant plain meaning of a contractual term is the meaning "at the time" the contract was made. *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 151 (Ohio 1978). The ordinary meaning of "woman," adopted by Kappa almost 150 years ago and maintained to this day, is a biological female. *See* Op. Br. at 30–40. Further, Defendants' approach destroys the ability to use language, as they say that "woman" is open to multiple interpretations as well as the words "biological sex" and "female." Opp'n at 26–28. By rejecting common, ordinary meaning, Defendants not only *deny* Kappa women their right to associate with other women, they also take a sledgehammer to an

Defendants first point to two contemporary dictionaries that allegedly support the inclusion of males as "women." Opp'n at 35–36. But the first dictionary has and continues to define woman as "an adult female human being," and has labeled this an "A1" meaning—that is, the understanding that English speakers need to perform at basic levels in society. *See Woman*, *Cambridge Dictionary*, https://bit.ly/3U4X8op (last visited Jan. 13, 2024); *Help, What do the A1, B2 and C1, etc. labels mean?*, *Cambridge Dictionary*, https://bit.ly/3HlmEOx (last visited Jan. 13, 2024). While an identification-based definition was added (after Kappa's 2022 Bylaws revision), it does not replace the basic understanding, or A1 meaning, of the word. *See* Timothy Bella, *Cambridge Dictionary updates definition of 'woman' to include trans women*, Wash. Post (Dec. 13, 2022), https://bit.ly/3SgjfXk. The second dictionary defines "trans woman" as an individual "identified as male at birth." Opp'n at 35. This definition simply highlights society's opposite understanding of "woman" as an individual identified as "female" at birth. Neither dictionary therefore helps Defendants.

---

ingredient essential for civilization: the ability to communicate. *See* Br. of Over 450 Kappa Kappa Gamma Alumnae as Amicus Curiae at 6 ("Stripped of the fraught political context of this case, the point is so rudimentary and obvious that it is in danger of being overlooked.").

Defendants next invoke modern court cases and miscellaneous organizational statements that use the term "transgender woman" or other modifications to the word "woman." Opp'n at 28–31. While Defendants hope these instances prove that woman is commonly used in a non-biological sense, their citations only show that society considers the word "woman," standing alone, to exclude biological males. For example, Defendants point to women's colleges that have expanded membership to include males. Opp'n at 30–31. But each college's policies articulate this expansion, from Bryn Mawr College admitting "all individuals who have identified and continue to identify as women (including cisgender and trans women)," to Wellesley College admitting "candidates assigned male at birth who identify as women." Genny Beemyn, *Women's Colleges with Trans-Inclusive Policies*, Campus Pride (Dec. 9. 2021), https://bit.ly/47RhO6m. So too with the National Panhellenic Conference, which (circularly) describes woman as "an individual who consistently lives and self-identifies as a woman." Nat'l Panhellenic Conf., Inc., *Manual of Information* 55 (27th ed. 2023) ("NPC Manual"), available at http://tinyurl.com/4mnscrtn.[2] Defendants have not properly made any such changes to their governing documents.

---

[2] Moreover, the NPC does not and cannot determine a sorority's "membership selection policies," which NPC explicitly acknowledges is each sorority's own determination. NPC Manual 55. While Kappa must maintain harmony with NPC Unanimous Agreements and policies when they affect membership selection,

The modern court cases Defendants cite are equally unhelpful. The courts consistently describe individuals as "transgender women," rather than using the unqualified word "women" to describe individuals who fall outside the common understanding. *See Bodiford v. Krause*, No. 1:23-cv-1191, slip op., 2023 WL 6214514, at *2 (N.D. Ohio Sept. 25, 2023) (cited by Defendants (at 25) and noting that even though the prisoner called himself a "transgender woman," the prisoner was a male.).

Defendants' strenuous effort to contort "woman" was avoidable—they could have presented new membership requirements for ratification. And because Defendants refused to change the membership criteria through the required procedures, Plaintiffs brought this lawsuit. Thus, Defendants' statement (at 38) that "[a]t its core, this is a case about who can and cannot join the membership of a private organization," is a mischaracterization of Plaintiffs' claims and a refusal to accept Plaintiffs' breach of fiduciary duty allegations, as the Court must at the motion-to-dismiss stage. *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).

---

amendments must occur through the procedures outlined in Kappa's Bylaws. For example, the NPC Unanimous Agreements prohibit a woman from being initiated in two sororities, *see id.* at 33, so Kappa's duly adopted Bylaws mirror this, explaining that for initiation, "a woman shall … [n]ot have been initiated into any other member group of the National Panhellenic Conference," App. Vol. 1 at 87.

For this reason alone, the Court can reject Defendants' invocation of these various deference doctrines, as none of them permits Defendants to avoid judicial scrutiny for breaching fiduciary duties and acting in bad faith. *See Stibora v. Greater Cleveland Bowling Ass'n*, 577 N.E.2d 1175, 1178–79 (Ohio Ct. App. 1989); *Stepak v. Schey*, 553 N.E.2d 1072, 1077 (Ohio 1990) (Holmes, J., concurring); Op. Br. 23–26. However, as explained next, there are numerous additional reasons to reject the application of these doctrines as a bar to Plaintiffs' claims.

### 2. Fiduciary Duty Principles Apply, But the Business Judgment Rule Does Not Protect Defendants' Conduct.

Plaintiffs have alleged all the elements of a derivative, breach of fiduciary duty claim—(1) Defendants owe Kappa fiduciary duties, App. Vol. 1 at 73–74 (¶ 160); (2) Defendants violated those duties, *id.* at 74–75 (¶¶ 163–64); and (3) those violations harmed Kappa, *id.* at 75 (¶ 166). And while Defendants are correct that the business judgment rule often applies when assessing a director's conduct pursuant to a breach of fiduciary duty claim, Opp'n 18–19, they are incorrect to suggest that the doctrine supports the district court's dismissal of Plaintiffs' derivative claim.

"The business-judgment rule is 'a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *Reister v. Gardner*, 174 N.E.3d 713, 716 (Ohio 2020) (citation omitted). And "'[a]

party challenging a board of directors' decision bears the burden of rebutting the presumption.'" *Marsalis v. Wilson*, 778 N.E.2d 612, 616 (Ohio Ct. App. 2002) (citation omitted). But this burden is a burden of proof, requiring a plaintiff "at trial to present evidence to rebut the presumption the rule imposes." *Id.* The rule is not a pleading requirement. Put differently, "plaintiffs are not likewise obligated to plead operative facts in their complaint that would rebut the presumption." *Id.* Rather, a plaintiff "only need plead the claim itself in the form of 'a short and plain statement showing that (they are) entitled to relief.'" *Id.* (quoting Ohio R. Civ. P. 8(A)).

Plaintiffs have cleared this hurdle. They have alleged why Defendants owed fiduciary duties as a board of directors for a nonprofit, how Defendants breached those duties by unlawfully changing the membership criteria and pushing Langford's membership, and the damages that have resulted from the breach to Kappa and to Plaintiffs. *See supra* pp. 4–5. What is more, Plaintiffs have also alleged how Defendants acted in bad faith. *See, e.g.*, App. Vol. 1 at 49–50 (¶ 98). Defendants do not challenge the sufficiency of these allegations. And at the motion-to-dismiss stage, the court must "accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." *See Smith*, 561 F.3d at 1098. Thus, the business judgment rule is no impediment to Plaintiffs proceeding on their derivative claim.

13

### 3.    Ohio's Rule of Non-Interference is Inapplicable to Derivative Claims.

Defendants say that courts may not second guess a private organization's interpretation of its bylaws and that "[b]ringing a claim as a derivative action does not lower the deference accorded to Fraternity Council."  Opp'n at 15, 17–18.  But this rule applies only to challenges from plaintiffs alleging direct personal injuries. *See* Op. Br. at 20–23 (citing *Redden v. Alpha Kappa Alpha Sorority, Inc.*, No. 1:09CV705, 2010 WL 107015, at *3–4 (N.D. Ohio Jan. 6, 2010) (unpublished); *Powell v. Ashtabula Yacht Club*, No. 953, 1978 WL 216074, at *1 (Ohio Ct. App. 1978) (unpublished); *Stibora*, 577 N.E.2d at 1178–79; *Putka v. First Cath. Slovak Union*, 600 N.E.2d 797, 801–02 (Ohio Ct. App. 1991)).  Indeed, Defendants are unable to cite a single case applying the non-interference rule to a derivative claim, and Plaintiffs are similarly unaware of a case in which this rule has been so applied.

This is unsurprising.  Ohio's judicial policy is designed to prevent second guessing internal, day-to-day decisions of an organization as applied to an individual.  *See* Op. Br. at 21–22.  The nature of a derivative claim, however, is that there has been harm to the entire corporation.  *Crosby*, 548 N.E.2d at 219.  And Ohio courts already have well-established rules designed to permit suits protecting the organization while giving directors some breathing room: A plaintiff has to show that the actions that led to the corporate harm were done in bad faith.  *Reister*, 174 N.E.3d at 716.  Ohio and federal civil procedure rules also impose an additional

14

burden to maintain this balance, requiring that shareholders make a pre-suit demand or show futility. *See* Ohio R. Civ. P. 23.1; Fed. R. Civ. P. 23.1. The district court's novel approach of dismantling an existing body of law for this particular case is unreasoned and destabilizing.

Perhaps recognizing that no cases support the district court's approach, Defendants try to argue that Plaintiffs have just "package[d]" their claim "as a derivative claim for breach of fiduciary duty" when it is really "a direct injury claim." Opp'n 17–18.[3] But this argument ignores Plaintiffs' allegations instead of, as needed at the motion-to-dismiss stage, explaining why Plaintiffs' allegations are implausible.

In short, Plaintiffs have alleged all the elements of a derivative, breach of fiduciary duty claim. *See supra* pp. 4–5. And in assessing a motion to dismiss, the court must accept Plaintiffs' allegations and the inferences resulting from those allegations. *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1144 (10th Cir. 2023). Defendants do not suggest this Court should reject Plaintiffs' allegations because they are conclusory or implausible. *See id.* Instead, Defendants pretend that Plaintiffs assert a different claim—a claim that the non-interference rule applies to.

---

[3] Plaintiffs assume that Defendants are referring to a claim outside of the shareholder context, such as a constitutional violation or breach of contract, rather than a direct claim that is based on a breach of fiduciary duty and brought by a shareholder.

15

The Court should reject Defendants' mischaracterization of Plaintiffs' claim and apply the longstanding, proper legal framework governing fiduciary duty claims.

### 4. The First Amendment Does Not Give Defendants the Right to Ignore the Organization's Bylaws.

Finally, the First Amendment similarly fails to provide Defendants the immunity they seek. The First Amendment's freedom of expressive association applies when a state actor is meddling with such association. As explained in the opening brief (at 23–26), there is no state actor here, and no authority supports the district court's novel conclusion that the First Amendment protects a private organization from a private lawsuit when it contravenes its own voluntarily chosen and private obligations as provided in its corporate bylaws.

Defendants argue that where courts prevent an association's interpretation of its membership criteria, such action is "state action" that would violate the First Amendment. But again, Plaintiffs are not asking the Court to prevent Kappa's interpretation of its membership criteria. Plaintiffs have alleged that Defendants violated Kappa's Bylaws by appending a new membership category—not that Defendants misinterpreted some woolly noun. App. Vol. 1 at 74–75 (¶¶ 163–66); *see also* Op. Br. at 27–29.

Judicial enforcement of private contracts is entirely consistent with the First Amendment. Defendants' arguments to the contrary miss the point. Of course, a court may not apply state law to override a private organization's chosen association.

16

*Democratic Party of U.S. v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 122-23 (1981); *see also Duke v. Smith*, 784 F. Supp. 865, 870 (S.D. Fla. 1992), *rev'd,* 13 F.3d 388 (11th Cir. 1994).  And perhaps a hypothetical court's demand that an organization for boys include outdoorsy or sporty girls would violate that organization's association rights even without a state or federal nondiscrimination policy imposing such inclusion.  But in these cases, the court is asked to *impede* the organization's commonly understood membership criteria.  Here, Plaintiffs seek to *enforce* the organization's commonly understood membership criteria, and therefore *enforce* Kappa's associational rights.  Courts routinely resolve disputes over an organization's membership decisions and whether an organization's expulsion of a member was consistent with that organization's own bylaws and rules.  *See, e.g.*, *Int'l Bhd. of Elec. Workers v. Gromnicki*, 745 N.E.2d 449, 452–53 (Ohio Ct. App. 2000); *Browning v. Fraternal Ord. of Eagles*, No. 1769, 1986 WL 9644, at *1 (Ohio Ct. App. Aug. 22, 1986) (unpublished); *Milkie v. Acad. of Med. of Toledo & Lucas Cnty.*, 246 N.E.2d 598, 602 (Ohio Ct. App. 1969).

Defendants cite the landmark case of *Shelley v. Kraemer* for the proposition that judicial enforcement of private contracts always constitutes state action.  334 U.S. 1, 4 (1948) (holding that judicial enforcement of race-exclusionary private contracts triggers a violation of the Fourteenth Amendment's promise of equal protection).  But this Court would be upending the law in applying *Shelley*-like

17

reasoning to the First Amendment's right to associate. As other courts have recognized, "the holding in *Shelley* 'has not been extended beyond the context of race discrimination' and . . . the concept of state action has 'been narrowed by the Supreme Court.'" *Swantack v. New Albany Park Condo. Ass'n Bd. of Dirs.*, No. 2:22CV2130, 2022 WL 17600518, at *5 (S.D. Ohio Dec. 13, 2022) (citing *Davis v. Prudential Secs., Inc.*, 59 F.3d 1186, 1191 (11th Cir. 1995)). Moreover, even assuming *Shelley*-like state action applies, the First Amendment is not violated through the court's enforcement of Kappa's Bylaws. Instead, the First Amendment is vindicated, as Kappa members maintain their right to associate as described in the Bylaws. Ultimately, Kappa concedes (at 36) that requiring a corporation to comply with its own freely chosen Bylaws does not infringe an organization's First Amendment rights of association. That principle requires rejection of Kappa's First Amendment argument.

*     *     *

In sum, Defendants' attempt to shield their actions through various deference rules fails because the application of each of these rules depends on misreading Plaintiffs' complaint as alleging that Defendants simply misinterpreted "woman." But Plaintiffs instead allege that Defendants subverted their own Bylaws and other governing documents and did so in bad faith by changing their membership criteria.

And it is Plaintiffs' allegations, not Defendant's actions or defenses, that are entitled to deference at the motion-to-dismiss stage.[4]

### B.     Plaintiffs Have Not Forfeited Or Failed to Adequately Allege Any Part of Their Derivative Claim.

Defendants make a final attempt to get rid of Plaintiffs' derivative claim by asserting that Plaintiffs have now raised, for the first time on appeal, a second derivative claim based on the election irregularities that resulted in Langford's admission. Opp'n at 40. Defendants claim that Plaintiffs have forfeited this argument, and regardless, Plaintiffs have failed to show futility or allege bad faith. *Id.* at 42–46. Defendants are wrong on all points.

First, forfeiture does not apply here. Forfeiture applies when a party raises new legal theories for the first time on appeal. *Parker Excavating, Inc. v. Lafarge W., Inc.*, 863 F.3d 1213, 1221 (10th Cir. 2017). Yet Plaintiffs have presented no new theories on appeal. Instead, the First Amended Complaint alleges numerous breaches of Defendants' fiduciary duties based on violations of the Bylaws, Standing Rules, and Articles of Incorporation, including that Defendants unlawfully changed the membership criteria and pushed Langford's admission through numerous procedural irregularities. *See also* Op. Br. 8–13, 28–29.

---

[4] Defendants' flood-of-litigation concern is misplaced, as it assumes that Plaintiffs' complaint alleges a dispute over debatable language. Opp'n at 22–23. As discussed, the well-established structure surrounding breach of fiduciary duty claims already prevents overwhelming the judicial system.

Indeed, Defendants admit that "the Amended Complaint made factual allegations concerning the election procedures the Gamma Omicron chapter used in voting on Langford's admission." Opp'n at 41. And the Complaint, in the section titled "Derivative Cause of Action," states that: "By not only allowing, but also by endorsing and actively working to secure the membership of Langford, the directors of the Sorority have violated their duties of loyalty, care, and obedience/compliance." App. Vol. 1 at 73, 74 (¶ 163). Defendants complain that this allegation was insufficient and Plaintiffs did not explain in enough detail that the way in which Langford was admitted was part of the derivative claim. *Id.* But, at the motion-to-dismiss stage, the court must "accept as true *all* well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." *Smith*, 561 F.3d at 1098 (emphasis added). And a complaint "does not need detailed factual allegations," much less incredibly detailed assertions concerning how each alleged fact relates to each alleged cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Defendants ignore this plausibility standard (and Plaintiffs' allegations) and seek to hold Plaintiffs to an invented and much higher standard.

Further, Plaintiffs did raise the issue of the election irregularities before the district court. In their opposition to Defendants' motion to dismiss, Plaintiffs

defended the sufficiency of their allegations concerning the derivative claim, including the unlawful admission of Langford.  App. Vol. 2 at 49.

Second, Defendants' futility argument—that Plaintiffs failed to make the required pre-suit demand—lacks merit because it is also based on the false notion that Plaintiffs have now raised some second derivative claim about election irregularities.  For the sole derivative claim, which, as explained above, includes allegations about the election irregularities, the district court held that Plaintiffs met the futility standard.  App. Vol. 2 at 92.  And Defendants concede that the letter Plaintiffs relied on for their futility argument before the district court raised "concerns about the decision process of the chapter" in admitting Langford.  Opp'n at 43.

Finally, Defendants argument that "[t]here are no factual allegations to support any contention of fraud, bad faith, or abuse of discretion" concerning the election irregularities completely ignores Plaintiffs' complaint.  Plaintiffs specifically allege that Defendants "violated other Bylaws, Standing Rules, and Policies" because they "actively pressured members . . . to support Langford's admission" through an irregular election process.  App. Vol. 1 at 54 (¶ 106); *see also id.* at 62–63 (¶¶ 129–31).

The Court should therefore reject Defendants' attempt to mischaracterize Plaintiffs' arguments on appeal as asserting a new claim that requires a new legal analysis.

## II. Plaintiffs Properly Preserved Their Direct Claim and Have Stated a Valid Claim Under Ohio Law.

As to Plaintiffs' direct claim, Defendants do not dispute that a shareholder may file a direct action "if the complaining shareholder is injured in a way that is separate and distinct from an injury to the corporation." *Crosby*, 548 N.E.2d at 219. The First Amended Complaint details several injuries that are personal to Plaintiffs, including Langford's visible erection while staring at the girls in the house and his repeated questioning about women's anatomy. Op. Br. at 40–41. Yet Defendants argue (at 46–48) that Plaintiffs forfeited their direct claim against Rooney and Kappa and suffered no unique "contractual violations." Both arguments fail, as the first misstates the record on appeal, *see* App. Vol. 2 at 49–50 (responding to motion to dismiss and arguing that Plaintiffs had a valid direct claim under Ohio law), and the second rests on the false notion that Plaintiffs had to state a frustration of *independent* contractual obligations to plead a direct claim.

1. Starting with the forfeiture argument, Defendants claim (at 46) that "[Plaintiffs] did not offer the district court any argument as to why it should permit their direct claims to proceed, which Appellees noted in their reply in support of the motion." The record directly contradicts this argument. Plaintiffs stated in their

Response in Opposition to Defendants' Motion to Dismiss that they "also seek direct relief from the Defendants." App. Vol. 2 at 49. In support of this claim, Plaintiffs argued that they were injured by Langford's "inappropriate and threatening behavior in the sorority house," and that "[i]nstead of protecting Plaintiffs, Defendants and their agents have urged Plaintiffs to quit Kappa Kappa Gamma altogether." App. Vol. 2 at 50.

These arguments were sufficient. "To preserve [an] issue in [the] district court, [a plaintiff] need[s] only to alert the court to the issue and seek a ruling." *Harris v. Sharp*, 941 F.3d 962, 979 (10th Cir. 2019). Plaintiffs have therefore preserved their direct claim.

2. As for Defendants' second argument, they are correct that "[t]here must be some injury to the corporation from which the shareholder suffered distinct damages in order for a direct cause of action to proceed." Opp'n at 47. But Defendants are incorrect in stating that Plaintiffs' direct claim fails because they "do not direct the Court to any contractual violations unique to them." *Id.* at 48. This argument simply repeats the district court's error. *See* App. Vol. 2 at 105 (holding that "only [Plaintiffs'] frustrated contractual expectations merit consideration").

Defendants (and the district court) are wrong because unique contractual violations are just one way to prove a direct claim. Another way is by showing a unique injury. *Carlson v. Rabkin*, 789 N.E.2d 1122, 1127 (Ohio Ct. App. 2003).

And here, the operative complaint clearly alleges numerous unique injuries to Plaintiffs that are distinct from the injuries suffered by the rest of Kappa's members. As explained above, Kappa members beyond Laramie have not encountered Langford's unwanted and uncomfortable behavior.  App. Vol. 1 at 67–71 (¶¶ 143–52).  Thus, Plaintiffs adequately pleaded that they were "injured in a way that is separate and distinct from an injury to the corporation."  *Crosby*, 548 N.E.2d at 219. And the district court erred by adding an additional requirement concerning contractual violations.

### III.   The Court Has Personal Jurisdiction Over Rooney.

Finally, Defendants are wrong that the district court incorrectly held that it had personal jurisdiction over Rooney.  As the district court noted, Plaintiffs sufficiently alleged that Rooney purposefully directed her activities at Wyoming, violating her fiduciary duties by approving the admission of Langford to the Gamma Omicron Chapter at the University of Wyoming.  App. Vol. 2 at 83–88.  The district court reached this conclusion after correctly applying Wyoming law.

Wyoming's long arm statute extends personal jurisdiction as far as the U.S. Constitution allows.  *See* Wyo. Stat. Ann. § 5-1-107.[5]  And under the Fourteenth

---

[5] Kappa cites (at 50) *Ten Mile Industrial Park v. Western Plains Service Corp.*, 810 F.2d 1518, 1527 (10th Cir. 1987), for the proposition that personal jurisdiction does not extend to contacts of corporate officers with the forum state made in their official capacity.  However, that case cites no Wyoming state law rulings for that

Amendment's due process clause, specific jurisdiction is proper over a foreign defendant when that defendant "purposeful[ly] direct[ed]" its activities at the forum by acts that are (1) "intentional," (2) "expressly aimed at the forum," and (3) done with "knowledge that the brunt of the injury would be felt in the forum." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc*., 514 F.3d 1063, 1072 (10th Cir. 2008). Applying this analysis to a breach of fiduciary duty claim, the Tenth Circuit has held that a corporate officer can be sued in a derivative action by the corporation in the state in which the injury occurred. *Newsome v. Gallacher*, 722 F.3d 1257, 1264–81 (10th Cir. 2013) ("Thus, in a lawsuit claiming breach of fiduciary duty, we believe it is appropriate to consider harm to those to whom a fiduciary duty was owed … when answering the question of who was injured and where.").

Defendants claim (at 50) that Plaintiffs' Complaint did not make sufficient allegations regarding the elements above. But the district court correctly found that all three elements of specific jurisdiction were met based on specific allegations in the Complaint. *See* App. Vol. 2 at 83–88. First, Plaintiffs' Complaint sufficiently

---

proposition. *See id.* (citing federal cases applying other States' law and treatises). And the Tenth Circuit has since clarified *Ten Mile*, holding that it stood for the narrow proposition that "the court lacked jurisdiction over an 'executive committee' of a corporation for the contacts made by the corporation [itself]." *Rusakiewicz v. Lowe*, 556 F.3d 1095, 1102 (10th Cir. 2009) (citing *Ten Mile*, 810 F.2d at 1526–27). Here, Rooney's actions "are contacts in [Wyoming] by the defendants themselves, not—as in *Ten Mile*—contacts that have been imputed to them on account of the actions of the corporation." *Id.* at 1103.

alleged intentional action: "Rooney, despite 'aware[ness]' of Langford's ineligibility, 'violated [her] fiduciary duties to [KKG] when [she] procured and approved the initiation of' Langford." *Id.* at 85 (alterations in original) (quoting First Am. Compl. ¶¶ 49, 105). Second, Rooney expressly aimed her tortious conduct at Wyoming because with Rooney's approval, Langford's "admission … occurred at a KKG chapter house in Wyoming." *Id.* at 87. Third, the alleged harm occurred on the campus in Laramie, Wyoming, so any harm would be felt in Wyoming. *Id.* at 87–88 (citing *Newsome*, 722 F.3d at 1268–69 in support of its analysis). Defendants fail to mention or engage with any of these allegations.

Defendants also argue (at 51) that the district court gave Plaintiffs' allegations "too much credit in establishing" the second element of personal jurisdiction— whether the defendant's actions were expressly aimed at the forum. More specifically, Defendants claim that "[t]he district court held that [Plaintiffs] had shown Rooney expressly aimed her conduct at Wyoming based on an email from a different person that used the term 'we' in referencing Kappa proceeding with Langford's initiation." Opp'n at 51. But the district court admitted that the email "goes both ways." App. Vol. 2 at 85–86. The district court's actual analysis of this second element hinged on Rooney's approval of Langford's admission—not an email. *Id.* at 87 ("accepting Plaintiffs' allegation that Rooney approved Langford as true, as I must, the 'focal point' of Rooney's actions occurred in Wyoming").

26

Defendants do not and cannot contest this point and thus have offered no valid reason for rejecting the district court's finding of specific jurisdiction.

## CONCLUSION

Defendants' arguments boil down to claiming that they are owed extreme deference for fundamentally changing the nature of Kappa as a sorority.  But directors of organizations do not enjoy boundless deference; corporate principles demand that Defendants follow Kappa's Bylaws and governing documents. Plaintiffs have sufficiently alleged that Defendants failed to do so.

 Ultimately, Defendants are left with name calling, accusing Plaintiffs and amici of wanting "transgender women banned from Kappa."  Opp'n at 29.  The problem is that Plaintiffs (and the members of Kappa) have never been asked what they want.  Rather, Defendants have unilaterally acted outside of the regular processes and procedures to impose their will on the sorority.  Because Plaintiffs sufficiently alleged that this unilateral action was unlawful and harmful, the Court should reverse the district court's dismissal of Plaintiffs' claims and allow this case to proceed.

Dated: January 24, 2024                    Respectfully submitted,

                                           */s/ Sylvia May Mailman*
                                           SYLVIA MAY MAILMAN
                                           INDEPENDENT WOMEN'S LAW CENTER
                                           1802 Vernon Street NW, Suite 1027
                                           Washington, DC 20009
                                           Telephone: (202) 807-9986
                                           s.maymailman@gmail.com

                                           GENE C. SCHAERR
                                           CRISTINA MARTINEZ SQUIERS
                                           SCHAERR | JAFFE LLP
                                           1717 K Street NW, Suite 900
                                           Washington, DC 20006
                                           Telephone: (202) 787-1060
                                           gschaerr@schaerr-jaffe.com

                                           CASSIE CRAVEN
                                           LONGHORN LAW LLC
                                           109 East 17th Street, Suite 223
                                           Cheyenne, WY 82001
                                           Telephone: (307) 823-3062
                                           cassie@longhornlawllc.com

                                           JOHN G. KNEPPER
                                           LAW OFFICE OF JOHN G. KNEPPER, LLC
                                           P.O. Box 1512
                                           Cheyenne, WY 82003
                                           Telephone: (307) 632-2842
                                           John@KnepperLLC.com

                                           *Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g), I certify that this document:

(i) complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(A) because, excluding those portions exempted by Fed. R. App. P. 32(f), it contains 6,445 words, as determined by the word counting feature of Microsoft Word; and

(ii) complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) and 10th Circuit Rule 32(A) because it has been prepared in a proportionally spaced typeface using Microsoft 365, in Times New Roman 14-point font.

Dated: January 24, 2024

                                        */s/ Sylvia May Mailman*
                                        Sylvia May Mailman

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1)    all required privacy redactions have been made per 10th Cir. R. 25.5;

(2)    if required to file additional hard copies, that the ECF submission is an exact copy of that document;

(3)    the digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, McAfee LifeSafe, version 1.11.279, most recently updated on [date], and according to the program is free of viruses.

Dated: January 24, 2024

*/s/ Sylvia May Mailman*
Sylvia May Mailman
